# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **Juan Felix Trinidad-Garcia and Juan Felix Trinidad-Rodriguez,**<br><br>    **Plaintiffs,**<br><br>vs.<br><br>**Popular Inc.; Banco Popular de Puerto Rico; Popular Securities, LLC**<br><br>    **Defendants** | **Civil Action No. 21-1529**<br><br>**Under Bank Holding Company Act, Puerto Rico Pendent Claims for Fault in Causing the Loss in Value of the Pledge Collateral, For Breach of Contract, Request for Specific Compliance and/or Damages, Pre-Contractual Fault and Damages**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

## Index

I.  NATURE OF THE ACTION ................................................................................................1

II.  JURISDICTION AND VENUE .........................................................................................6

III.  DEMAND FOR TRIAL BY JURY ...................................................................................6

IV.  PARTIES.............................................................................................................................7

    1.  THE TRINIDADS ...........................................................................................................7
        A.  Juan Felix Trinidad-Garcia................................................................................7
        B.  Juan Felix Trinidad-Rodriguez...........................................................................9
    2.  THE DEFENDANTS .......................................................................................................10
        A.  Popular, Inc. ......................................................................................................11
        B.  Banco Popular de Puerto Rico .........................................................................11
        C.  Popular Securities LLC .....................................................................................11

V.  THE PARTICIPANTS IN THE CONTINUING TYING VIOLATION AND CONSPIRACY ...............12

    1.  POPULAR ONE ............................................................................................................12
    2.  THE POPULAR ENTITIES' PARTICIPANTS .......................................................................12
        A.  The BPOP participants.......................................................................................12
        B.  The BPPR participants .......................................................................................13
        C.  The PSL participants ..........................................................................................14

VI.  THE ACTION AGAINST PSL IS NOT SUBJECT TO ARBITRATION ...................................15

VII.  THE TYING VIOLATIONS OF THE BHCA ...................................................................16

VIII.  DEFENDANTS' CONTINUING VIOLATION AND CONTINUING CONSPIRACY TO VIOLATE THE BHCA ........................................................................................................................24

        A.  BPOP.................................................................................................................24
        B.  BPPR.................................................................................................................25
        C.  PSL....................................................................................................................25

IX.  THE ONGOING AND UNINTERRUPTED ACTS OF AIDING AND ABETTING .........................27

**X.  THE TYING ARRANGEMENT AND OVERT ACTS IN FURTHERANCE OF THE CONTINUING TYING CONSPIRACY IN VIOLATION OF THE BHCA** ...................................................................................**28**

1.  THE UNAUTHORIZE SALE AND PURCHASE OF PLEDGED SECURITIES AND FAILURE TO PAY OFF TRINIDAD-RODRIGUEZ'S SCL ...................................................................................................................................28
2.  THE RETENTION AND USE OF PMA TO CARRY OUT THE LEGAL OVERT ACTS..............................................29
3.  POPULAR'S REFUSALS TO ALLOW THE TRINIDADS TO WITHDRAW MONIES FROM THEIR MONEY MARKET ACCOUNTS ..........................................................................................................................................................29
4.  POPULAR'S REFUSAL TO ALLOW THE TRINIDADS TO TRANSFER THE PLEDGE COLLATERAL FROM PSL TO ANY OTHER BROKER DEALER ...............................................................................................................................30
5.  ON TWO OCCASIONS POPULAR STOPPED MAKING MONTHLY PAYMENTS OWED TO TRINIDAD-GARCIA AND INSTITUTED MULTIPLE FRIVOLOUS APPELLATE PROCEEDINGS ..........................................................................32
    A.  *First Occasion* ....................................................................................................................................*32*
    B.  *Second Occasion* .................................................................................................................................*35*
6.  POPULAR'S ADAMANT BREACH OF THE CFI ORDER FOR IT TO PAY TRINIDAD-GARCIA THE MONTHLY INSTALLMENTS FROM ITS OWN FUNDS ONCE THE FUNDS AVAILABLE IN THE MONEY MARKET ACCOUNTS AT PSL WERE DEPLETED ................................................................................................................................................37
7.  POPULAR FILED ON JUNE 26, 2019, A COLLECTION AND MORTGAGE EXECUTION ACTION AGAINST TRINIDAD-GARCÍA WITH THE CFI, CAROLINA PART, IN CIVIL CASE # CA2019CV02387 IN BREACH OF THE *STATUS QUO* IMPOSED BY THE 2014 STIPULATION JUDGMENT ................................................................................................38
8.  POPULAR FILED ON NOVEMBER 14, 2019, WITH THE CFI, SAN JUAN PART, IN CIVIL CASE # KCD 2014-0827 (602), AN URGENT REQUEST FOR PROVISIONAL REMEDY TO SECURE JUDGMENT AGAINST TRINIDAD-GARCIA .....39
9.  POPULAR OPPOSED TRINIDAD-GARCIA'S AUTHORIZATION REQUEST TO THE CFI TO PAYOFF, AT SUBSTANTIAL DISCOUNT, A MORTGAGE THAT ENCUMBERS ONE OF HIS REAL ESTATE PROPERTIES ...............................................39
10.  POPULAR HAS EXERCISED, UP TO THIS DATE, TOTAL CONTROL OVER THE MANAGEMENT OF THE TRINIDADS' INVESTMENT ACCOUNTS AT PSL TIED, AS PLEDGED COLLATERAL, TO THEIR BANK ACCOUNTS AND SCL'S AT BPPR.........................................................................................................................................................40
11.  POPULAR BREACH OF THE CONFIDENTIAL SETTLEMENT AGREEMENT ........................................................40
12.  RAMOS REQUESTED AND OBTAINED AN UNLAWFUL PERSONAL LOAN FROM TRINIDAD-RODRIGUEZ .........41
13.  TORO FALSELY TESTIFIED AND COMMITTED PERJURY AT THE FINRA ACTION ..........................................41

**XI.  THE TRINIDADS LEARNED ABOUT THE BHCA VIOLATIONS WITHIN THE FOUR YEARS PRECEDING THE FILING OF THIS ACTION** ..................................................................................................**42**

**XII.  THE STATUTE OF LIMITATIONS FOR THE BHCA COMMENCED TO RUN FROM THE DATE OF THE OCCURRENCE OF EACH CONTINUING AIDING AND ABETING ACT AND OVERT ACT IN FURTHERANCE OF THE CONSPIRACY** ...........................................................................................**42**

**XIII.  THE START OF THE STATUTE OF LIMITATIONS PERIOD FOR THE TRINIDAD'S BHCA ACTION HAS CONTINUED UNINTERRUPTED UP TO DATE** ..............................................................................**43**

**XIV.  CAUSES OF ACTION** ..........................................................................................................................**43**

1.  FIRST CLAIM FOR RELIEF - THE BHCA VIOLATIONS .................................................................................43
    A.  *The Banking Practice In Question Was Unusual In The Banking Industry* ....................................*44*
    B.  *The Tying Arrangement* .....................................................................................................................*49*
    C.  *The Tying Arrangements Benefitted Popular* ...................................................................................*50*
    D.  *The Tying Arrangements Caused Injury to The Trinidads' Property*...............................................*50*
    E.  *The Trinidads' Request for Compensation* .......................................................................................*51*
2.  SECOND CLAIM – CONSPIRACY IN VIOLATION OF THE BHCA.....................................................................51
    A.  *The Tying Conspiracy*........................................................................................................................*51*
    B.  *The Tying Conspiracy Overt Acts Benefitted Popular* ......................................................................*52*
    C.  *The Continuing Tying Conspiracy Overt Acts Caused Injury to The Trinidads' Property*....................*52*
    D.  *The Trinidads' Request for Compensation* .......................................................................................*53*
3.  THIRD CLAIM – PENDENT CLAIM FOR FAULT IN CAUSING THE LOSS IN VALUE OF THE PLEDGE COLLATERAL 53
4.  FOURTH - PENDENT CLAIM FOR DAMAGES CAUSED BY POPULAR'S AIDING AND ABETTING OVERT ACTS IN FURTHERANCE OF THE CONTINUING TYING CONSPIRACY ..............................................................................60
    A.  *Request for compensation for property losses*.................................................................................*62*

    *B.    Request for compensation for mental and emotional anguish, suffering and distress* ............................ 62

    *C.    Request for compensation for loss of image or good will* ......................................................... 63

    5.    FIFTH CLAIM - PENDENT CLAIM FOR BREACH OF CONTRACT INCORPORATED IN THE 2014 STIPULATION JUDGMENT .................................................................................................................................................. 64

    6.    SIXTH CLAIM - PENDENT CLAIM FOR BREACH OF CONFIDENTIAL SETTLEMENT AGREEMENT, REQUESTING STRICT COMPLIANCE AND MONETARY COMPENSATION ......................................................................... 66

    7.    SEVENTH CLAIM – PENDENT CLAIM FOR FAULT – "*CULPA IN CONTRAHENDO*" ............................... 67

    8.    EIGHT CLAIM – PENDENT CLAIM FOR PUNITIVE DAMAGES ......................................................... 68

    9.    NINTH CLAIM – PENDENT CLAIM FOR ATTORNEY'S FEES, EXPENSES AND INTERESTS ................... 69

**XV.    THE TRINIDAD'S HAVE MADE EXPRESS RESERVES TO TRY BEFORE THIS COURT THE FEDERAL CLAIM MADE IN THIS COMPLAINT** .......................................................................................... **70**

**XVI.    PRAYER FOR RELIEF** ...................................................................................................... **70**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Juan Felix Trinidad-Garcia and Juan Felix Trinidad-Rodriguez, <br><br>     **Plaintiffs,** <br><br>     vs. <br><br> Popular Inc. and Banco Popular de Puerto Rico; Popular Securities, LLC; <br><br><br>     Defendants | Civil Action No. <br><br> **Under Bank Holding Company Act, Puerto Rico Pendent Claims for Fault in Causing the Loss in Value of the Pledge Collateral, For Breach of Contract, Request for Specific Compliance and/or Damages, Pre-Contractual Fault and Damages** <br><br> **JURY TRIAL DEMANDED** |

<u>**COMPLAINT**</u>

<u>**TO THE HONORABLE COURT:**</u>

    **COME NOW,** the plaintiffs, Juan Felix Trinidad-Garcia ("Trinidad-Garcia" or "Tito") and Juan Felix Trinidad-Rodriguez ("Trinidad-Rodriguez" or "Don Felix") (henceforth collectively referred to as the "Trinidads" or "Plaintiffs"), by and through the undersigned counsels, and respectfully allege, state and request, as follows:

## I.    NATURE OF THE ACTION

    1.    Trinidad-Garcia and Trinidad-Rodriguez, pursuant to the Bank Holding Company Act ("BHCA"), bring this action against Defendants, Popular Inc. ("BPOP") and its subsidiaries, Popular Securities, LLC ("PSL) and Banco Popular de Puerto Rico ("BPPR") (henceforth collectively referred to as "Popular", the "Popular Entities" or "Defendants"), seeking fair and adequate monetary compensation for the losses they sustained as result of the Popular Entities' anticompetitive, unfair and predatory practices, including tying arrangements prohibited by the BHCA.

2.      On or around early **November 18, 2010**, BPOP, BPPR, PSL and Mr. José Arturo Ramos ("Ramos"), then a financial advisor at Wachovia Securities, Inc. ("Wachovia"), and other individuals identified hereunder, associated in fact between themselves, , conspired with each other and aided and abetted one another to devise and, in fact, formulated, a tying arrangement scheme (henceforth the "Tying Conspiracy"), whereby BPPR would extend secured credit lines ("SCL") to the Trinidads and the other clients of Ramos at Wachovia, on the condition that they transfer their portfolios to PSL to be used as pledged collateral, obtain additional investment services and products from PSL, and not form any of its competitors (henceforth the "Tying Arrangements").

3.      Since **November 2010** and up to the present, the Popular Entities and the other members of the Tying Conspiracy, through the Offices of Popular One -- the Trademark of a "one-stop platform" -- directly participated, aided, and abetted and conspired in the execution and continuing perpetuation of the Tying Arrangement Scheme.

4.      The Popular Entities and the other members of the Tying Conspiracy used the Offices of Popular One to associate in fact the employees of BPPR and PSL, with the purpose of offering and providing to high-net-worth clients, like the Trinidads, integrated banking and financial planning, and SCL products and services through BPPR, and financial and investment advice and services, through PSL.

5.      On or around **November 18, 2010**, the Popular Entities and Ramos, aiding and abetting one another, and conspiring with each other, caused the Trinidads to enter a tying arrangement through which BPPR extended credit to the Trinidads on the conditions that they obtain additional investment services and products from PSL, transfer the management of their investment portfolios to PSL and do not obtain such investment services and products from any competitor of PSL, as follows:

(1) Popular, through PSL, entered in a contract with Ramos, by which, in exchange for Ramos inducing the Trinidads to enter the tying arrangements, Ramos was granted a forgivable loan ("FL") of **$510 k**, to be effective upon the transfer of his investment licenses and assets under management ("AUM") to PSL;

(2) Popular, through Ramos, caused each of the Trinidad to open a Personal Management Bank Account ("PMA") with BPPR and granted a SCL of **$22 million** to Trinidad-Garcia and of **$3 million** to Trinidad-Rodriguez;

(3) as a condition for BPPR to open the PMAs and grant the SCLs to the Trinidad, Popular caused the Trinidads to open investments accounts at PSL, to transfer there from Wachovia their investment's purses with joint gross assets of around **$48,581,507**;

(4) Popular, through BPPR, tied the Trinidad's accounts at PSL, as Pledged Collateral, to their SCLs at BPPR;

(5) Popular caused the Trinidad to execute pledge agreements by which they transferred to BPPR control over their tied investment accounts at PSL, which were used as Pledged Collateral for the SCLs at BPPR's Accounts;

(6) Popular, through BPPR, made **three wire transfers** to Wachovia, withdrawing from the SCLs the total amount of **$23,201,625.93** to pay off the Trinidad's debts at Wachovia; and,

(7) Popular, through these tying arrangements, had BPPR acquire the management of the Trinidad's SCLs purse of **$23,201,625.93** and PSL acquire the management of the Trinidad's investment purse with gross assets of **$48,581,507** (henceforth the "Tying Arrangement"). This Tying Arrangement is strictly prohibited by the BHCA.

6.    Since **November 2010**, within the four years preceding the filing of this action, and up to this date, the Popular Entities, aiding and abetting in the execution of the continuing Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy: (i) kept tied the Trinidad's PSL's investment accounts, as Pledged Collateral, to their SCLs' at BPPR; (ii) precluded the Trinidads from selling any securities at PSL to make any substantial payments to reduce or payoff the balance owed by the SCLs at BPPR; and (iii) precluded the Trinidads from moving their investment accounts from PSL to any of PSL's Brokerage House competitors.

7.    Since **November 2010**, within the four years preceding the filing of this action, and up to this date, the Popular Entities, aiding and abetting in the execution of the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, have engaged in an uninterrupted and ongoing violation of the anti-tying prohibitions of the BHCA that has caused the Trinidads to sustain a continuous injury to their property by, among others, the following acts:

(1)    PSL's refusal to allow the Trinidad to withdraw moneys from their money market accounts due to collateral deficiencies of their SCLs at BPPR;

(2)    initially, from **November 2015** to **September 2018**, and thereafter, from **March 2020** to **August 2021**, BPPR stopped making monthly payments owed to Trinidad-Garcia, under an Amended Stipulation Judgment entered on **May 15, 2014,** by the Puerto Rico Court of First Instance ("CFI"), in Case No. SJ2014CV00063, alleging that there was a collateral deficiency of his SCL tied to his investment accounts at PSL;

(3)    in those two separate time periods, BPPR instituted groundless appellate proceeding and filed multiple frivolous briefs therein, to delay the compliance with the CFI's payment orders due to the collateral deficiency;

(4)    on **June 26, 2019,** BPPR filed a collection and mortgage execution action against Trinidad-Garcia with the CFI, Carolina Part, in Civil Case # CA2019CV02387, for the non-payment of the loan caused by the Popular Entities failure to comply -- due to such collateral deficiency -- with the monthly payment orders repeatedly entered against them by the CFI and affirmed by the PR Courts of Appeal;

(5)    on **November 14, 2019,** BPPR filed with the CFI, San Juan Part, in Civil Case # KCD 2014-0827 (602), an Urgent Request for Provisional Remedy to Secure Judgment against Trinidad-García, requesting to seize all his assets to secure collection of the balance owed by him of the SCL tied to his investment accounts at PSL;

(6)    on **February 12, 2021,** BPPR procured an Order from the Court in Civil Case # KCD 2014-0827 (602), that is still in force, and that prohibits Trinidad-Garcia from engaging, without prior Court authorization, in any monetary transaction that transfers assets greater than $100,000 in favor of corporations, legal persons or partnerships;

(7)    **up to this date,** BPPR has opposed -- due to such collateral deficiency -- an authorization request that Trinidad-Garcia made on **April 19, 2021**, to the CFI to allow him to payoff, at substantial discount, a mortgage that encumbers one of his real estate properties because of the balanced he owed in the SCL;

(8)  **up to this date,** BPPR, in bad faith, has tried to impose upon the Trinidad arbitrary and non-negotiable conditions to settle their SCLs tied to their investment accounts at PSL;

(9)  **up to this date**, BPPR has exercised total control over the management of the Trinidad's investment accounts at PSL tied, as Pledged Collateral, to their SCLs by BPPR; and,

(10)  **up to this date**, BPPR has prevented the Trinidad from moving their assets at PSL to any other investment firm.

8.     By reason of the foregoing continuing tying violations and overt acts perpetrated by the Popular Entities in furtherance of the Tying Conspiracy, the Trinidads have sustained and continue to sustain injury to their property that is actionable under the anti-tying provisions of the BHCA.

9.     By reason thereof, the Trinidads have sustained, and continue to sustain, a substantial loss in value of their assets invested at PSL, as well as present and future injury to the value of their commercial public image and goodwill.

10.     In this action, the Trinidads seek fair and adequate monetary compensation for these proprietary losses, to be trebled under the BHCA, as well as an award for reasonable costs and attorney's fees.

11.     By reason of the foregoing continuing tying violations and overt acts perpetrated by the Popular Entities in furtherance of the Tying Conspiracy, the Trinidads have also sustained additional monetary losses, as well as mental anguish and emotional distress that are actionable under the PR statutory laws.

12.     The Trinidads invoke this Court's supplemental jurisdiction to try the pendent claims brough herein against the Popular Entities for contractual fault, fault in causing losses in value of the pledge collateral, breach of contract, request for specific compliance thereof, fault in precontractual negotiations, emotional distress, and punitive damages. Thereunder, the Trinidads

request fair and adequate compensation for these damages and punitive damages in the amounts to be proven at trial, plus, reasonable attorney's fees and costs.

## II.       JURISDICTION AND VENUE

13.      This Honorable Court has subject matter jurisdiction to allow this suit pursuant to 28 U.S.C. § 1331.

14.      The conduct alleged in this action is actionable against the Defendants under the Bank Anti-tying12 U.S.C. § 1972*, et seq.* The Court has jurisdiction over the subject matter of this action under 12 U.S.C. 1975, that provides that "[a]ny person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefore in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee." *Id.*

15.      Pursuant to 42 U.S.C. §1367(a), this Honorable Court has supplemental jurisdiction over the pendent claims raised herein by the Trinidads pursuant to Articles 1003, 1158, 1163, 1164, 1167, 1168, 1255, 1271-1273, 1536, 1538-1540 of the Puerto Rico Civil Code, since they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

16.      Venue lies under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. §3732(a) because Defendant's principal place of business is in Puerto Rico and the acts forming the basis of this Complaint caused Plaintiff to sustain her damages within the District of Puerto Rico.

## III.       DEMAND FOR TRIAL BY JURY

17.      Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff demands a trial by jury in the instant case, pursuant to Fed. R. Civ. P. 38b.

# IV.    PARTIES

### 1.    The Trinidads

#### A.  Juan Felix Trinidad-Garcia

18.    Tito Trinidad is of legal age, married to Ms. Sharon Santiago-Nieves, domiciled in San Juan, Puerto Rico. At all times relevant herein, Tito had five minor female daughters attending high school and or University.

19.    Tito was born in Fajardo, Puerto Rico, on January 10, 1973, was raised in Cupey Alto, Puerto Rico, and is currently 48 years old. Tito is a retired professional boxer. Tito began boxing at age ten (10) and turned professional in 1990 at age seventeen (17).

20.    As a boxer, Tito won 5 prizes in the amateur championships in Puerto Rico at the divisions of 100, 112, 119, 126, and 132 pounds. His amateur record was 51 wins and 6 losses. Tito signed as a professional boxer at the age of 17. His first 5 fights as a professional were won by knockout. He knocked out 9 of his first 10 opponents.

21.    In June 1993, in his 20th professional boxing bout, at the age of 20, Tito won his first world title for the International Boxing Federation, welterweight crown, from Maurice Blocker in two (2) rounds. Tito had Fifteen successful defense fights, 12 by knockout, including: on January 29, 1994, over Héctor "Macho" Camacho (W 12); on September 17,1994, over Yory Boy Campas (TKO 4); on December 10, 1994, over Oba Carr (TKO 8); on February 10, 1996, over Rodney Moore (TKO 4); on May 18, 1996, over Freddie Pendleton (KO 5); on February 20, 1999, over Pernell Whitaker (W 12); and on September 18, 1999, over Oscar de la Hoya (W 12). Tito Trinidad then moved up in weight to win the World Boxing Association light-middleweight title from David Reid (W 12) on March 3, 2000. On July 22, 2000, Tito won by TKO in the 3rd round against Mamadou Thiam. Later that year Tito unified titles on December 2, 2000, with a

12th round TKO over IBF champion Fernando Vargas. On May 12, 2001, Tito became a three-division champion with a 5th round TKO over William Joppy for the WBA middleweight title.

22.     Tito managed to remain undefeated for almost 12 years from 1990 to 2001, achieving a streak of 40 fights without knowing defeat facing the best boxers of his divisions. He was world champion in 3 divisions 147, 154, and 160 pounds. He won 5 world titles in 3 divisions without knowing the defeat. He holds the longest record as undefeated Welterweight Champion. Tito unified 3 titles at each weight. He has been the only welterweight, 147 pounds, in history to reach middleweight, 160 pounds, undefeated. He has been the only boxer in history to snatch the world title from 3 undefeated champions and to also defeat a future undefeated world champion. He is considered one of the top 3 welterweights in history. He achieved 15 defenses at welterweight, 12 of them by knockout. He is the only Latino to have defeated three Olympic gold medalists. Worldwide he is only surpassed by Muhammad Ali, who defeated four. From 1999 to 2001 he was considered the best pound-for-pound boxer in the world.

23.     On September 29, 2001, Tito had his first loss against Bernard Hopkins in the Middleweight World Championship Series (L 12). Tito then came back on May 11, 2002, to win over Hacine Cherifi (TKO 4). After that fight Tito announced his retirement. But in March 2004, Tito announced his comeback. On October 2, 2004, Tito fought and won against Ricardo Mayorga (TKO 8). Thereafter, following consecutive losses, on May 12, 2005 to Winky Wright (L 12), and on January 19, 2008 to Roy Jones Jr. (L 12), Tito definitely retired with a professional record of 42-3 (35 KOs).

24.     Tito won five World Weight Championships in three different weight divisions and holds the longest record as undefeated Welterweight Champion. Tito was a dynamic puncher, particularly with an explosive left hook. Tito is one of the world-recognized boxing's brightest

superstars that fought during the 1990s and 2000s. Boxing was Tito's sole source of work income. Tito is the best-paid Puerto Rican boxer (whose gross purse amounted to around $86,000,000).

25.     On October 7, 2012, Tito was inducted to the Puerto Rico Sport Hall of Fame. During the weekend of June 5-8th, 2014, Tito was inducted in the 25th Annual Hall of Fame, at Canastota, NY. In August 2015, Tito was inducted to the Las Vegas Boxing Hal of Fame. Most recently, during the weekend of August 20-22, 2021, Tito was inducted at the 5th Annual Induction Ceremony to the Boxing Hall of Fame "Class of 2021" at Atlantic City, New Jersey. The Puerto Rican people love and revere Tito as a local hero.

### B.  Juan Felix Trinidad-Rodriguez

26.     Don Felix, as he is cordially known, is of legal age, married to Ms. Blanca Nelly Lira-Rodriguez, and domiciled in Guaynabo, Puerto Rico. AT the times relevant herein, Don Felix had two minor child attending high school and/or University.

27.     Don Felix is 68 years old and retired from his professional boxing trainer and manager career. Don Felix trained, managed, and advised his son Tito. The Boxing Writers' Association of America ("BWAA") chose Don Felix as "Trainer of the Year" in 1995 & 2000. In the year 2000, Felix was also named "Manager of the Year" by the same organization. Don Felix has acted all his life in the most forthright and loyal manner towards his protégées, including his son Tito, in the handling of their boxing careers as recognized and stated by a great number of boxing professionals.

28.     In one of the most characteristic instances of his managing career, Don Felix as he is cordially known had to litigate with Don King in Court to protect his son from an oppressive contract that did not value his position as a champ. At that time, with barely any knowledge of the English language, and while Hurricane Georges was pounding the Island of Puerto Rico, Don Felix

was in the Southern District Court of New York, battling legally for two weeks until on late **1998** he obtained a settlement that guaranteed Tito a $42 million contract for four (4) years.

29.     In another instance, Don Felix incurred the wrath of the Boxing Institution and HBO, one of the biggest boxing promoters in that industry, and survived a boycott geared to fund a combat for Oscar de la Hoya against Tito and had Tito fight in another higher weight against David Reid that was much more beneficial to his son's health. Don Felix also fully backed his son's retirement.

30.     Don Felix was a great contributor to Tito's successful professional boxing career because he was Tito's trainer and manager throughout his career. Since the year **1994**, Felix' sole source of work income came from his boxing, trainer and manager career.

### 2.      The Defendants

31.     The anti-tying provisions of the Bank Anti-tying Act, 12 U.S.C. §1972 expressly apply to BPPR and its holding company BPOP.

32.     The tying arrangements alleged in this action are actionable against BPOP because, at the times relevant herein, it acted in its capacity as a bank holding company that tied the banking products provided to the Trinidads by its bank subsidiary BPPR to the investment products provided to them by its subsidiary PSL.

33.     The tying arrangements alleged in this action are actionable against BPPR, because at the times relevant herein, it acted in its capacity as a bank that tied the bank products that it provided to the Trinidad to the investment products provided to them by its affiliate PSL.

34.     The tying arrangements alleged in this action are actionable against PSL because at the times relevant herein it aided and abetted and conspired with BPOP and BPPR in the violation of the BHCA anti-tying provisions alleged in this Complaint.

### A. Popular, Inc.

35.    BPOP is a full-service financial provider based in Puerto Rico with operations in Puerto Rico and the United States. In Puerto Rico, BPOP is the leading banking institution by both assets and deposits and ranks among the largest 50 banks in the U.S. by assets.

36.    BPOP is a corporation organized and existing under the laws of Puerto Rico and with its principal place of business in San Juan, Puerto Rico.

37.    BPOP's principal place of business and headquarters are located at Popular Center, 208 Avenida de la Constitucion, San Juan, PR, 00917.

38.    BPOP, a bank holding company, is the holding and parent company of BPPR and PSL.

### B. Banco Popular de Puerto Rico

39.    BPPR is a subsidiary of BPOP and an affiliate of PSL, through which BPOP offers and provide the above-mentioned banking services.

40.    BPPR is a corporation organized and existing under the laws of Puerto Rico, with its principal place of business in San Juan, Puerto Rico.

41.    BPPR's principal place of business and headquarters are located at Popular Center, 208 Avenida de la Constitución, San Juan, PR, 00917.

### C. Popular Securities LLC

42.    PSL is a subsidiary of BPOP and an affiliate of BPPR. PSL is "registered broker dealer" and a member of FINRA. PSL is the subsidiary that BPOP uses to offer and provide investment advice and services.

43.    PSL is a corporation organized and existing under the laws of Puerto Rico, and with its principal place of business in San Juan, Puerto Rico.

44.     PSL's principal place of business and headquarters are located at Popular Center, 208 Avenida de la Constitucion, San Juan, PR, 00917.

## V.     THE PARTICIPANTS IN THE CONTINUING TYING VIOLATION AND CONSPIRACY

### 1.     Popular One

45.     Popular One is identified as the association in fact comprised of employees of BPPR, PSL and its other subsidiaries and existing at several BPOP's Offices that BPOP operates under that Trademark name. Through those Offices, BPOP presents a "one-stop platform" that it uses to offer and provide to high-net-worth clients, like the Trinidads, integrated banking services, through BPPR, that include loan and checking accounts, financial planning, and secured credit lines ("SCL"), and, through PSL, financial and investment advice and services to said clients.

46.     The association in fact formed by the Popular Entities' employees, aiders and abettors and co-conspirators, used Popular One Offices to meet, plan, formulate, orchestrate, organize, and assist in the adoption and implementation of part, or all, of the overt acts that form part of the ongoing Tying Arrangement Scheme, in violation of the BHCA.

47.     Popular One's principal place of business and headquarters are located at Popular Center, 208 Avenida de la Constitución, San Juan, 00917

### 2.     The Popular Entities' Participants

#### A.  The BPOP participants

48.     At all times relevant herein, BPOP aided and abetted BPPR and PSL in the perpetration of the continuing tying arrangement violation and incurred in the ongoing alleged overt acts in furtherance of the tying conspiracy, in violation of the BHCA anti-tying provisions, by the acts and omissions of its Chief Executive Officers ("CEOs") (1) Mr. Richard Carrion

("Carrion"); and (2) Mr. Ignacio Alvarez ("Alvarez"); and, by the acts and omissions of the officers, agents or employees of its subsidiaries BPPR and PSL, identified herein below.

49.     Carrion was the President and Chief Executive Officers ("CEO") of BPOP **from 1997 to July 2017**. Thereafter, he was the President of the BPOP's Board of Directors until the year **2019**, and since then he has been acting as a non-executive advisor to the Board.

50.     Alvarez was the Executive Vice President and Chief Legal Officer of BPOP **from June 2010 to September 2014**; and has been the President, CEO and Director of BPOP and BPPR **since July 2017**.

### B.  The BPPR participants

51.     At all times relevant herein, BPPR aided and abetted BPOP and PSL in the perpetration of the continuing tying arrangement violation and incurred in the ongoing alleged overt acts in furtherance of the tying conspiracy, in violation of the BHCA anti-tying provisions, by the acts and omissions of its officers, agents or employees: (1) Mr. Juan Guerrero ("Guerrero"); (2) Mr. Eli Sepulveda ("Sepulveda"); (4) Ms. Irmarilis Pedrosa ("Pedrosa"); (5) Ms. Maria Quintana ("Quintana"); and (6) Ms. Zaida Montalvo ("Montalvo").

52.     At the times relevant herein, Guerrero was an agent of BPOP, who acted in his capacity as Executive Vice President and Director of BPPR. Guerrero also was a director of BPPR's family of investment Funds, and director of the PRITFF Closed End Funds ("CEFs") that BPPR comanaged with UBS Financial Incorporated of Puerto Rico and UBS Financial Services, Inc., and that formed the greater part of the Trinidads' Pledge Collateral at BPPR under the management by PSL. Guerrero was also the ultimate supervisor of PSL's business activity, and he reported directly to BPOP's CEO.

53.     At the times relevant herein, Sepulveda was an agent of BPOP and the Senior Lending Officer at BPPR.

54.     At the times relevant herein, Pedrosa was and agent of BPOP and the Officer in Charge of BPPR's Wealth Management Banking Operations at the Popular One Office.

55.     At the times relevant herein, Quintana was an agent of BPOP and an employee of BPPR's Wealth Management Private Banking at the Popular One Office.

56.     At the times relevant herein, Montalvo was an agent of BPOP and a Wealth Advisor and Financial Planner for BPPR at the Popular One Office.

### C. The PSL participants

57.     At all times relevant herein, the PSL aided and abetted BPOP and BPPR, and incurred in the ongoing and continued alleged overt acts of the conspiracy, in violation of the BHCA anti-tying provisions, by the acts and omissions of its officers, agents or employees: (1) Michael McDonald ("McDonald"); (2) Alberto Castañer ("Castañer"); (3) Jaime Toro Lavergne ("Toro") and (4) Ramos.

58.     At the times relevant herein, McDonald was an agent of BPOP and the President of PSL.

59.     At the times relevant herein, Toro was an agent of BPOP, who on or around **January 2013**, came to be the Branch Manager at PSL and, on **February 2019**, became the President of PSL.

60.     Castañer was an agent of BPOP and the Branch Manager of PSL until on or around **January 2013**, when Toro came to be the Branch Manager.

61.     At the times relevant herein, Ramos, also known as "Pepe Ramos", was the Trinidads' Financial Advisor ("FA") with Wachovia.

## VI.    THE ACTION AGAINST PSL IS NOT SUBJECT TO ARBITRATION

62.    The Trinidads have investment services contracts with PSL that provide that the parties agreed,

- to resolve disputes concerning your relationship with us or NFS (other than class actions) through arbitration rather than in a court of law

63.    That arbitration clause does not apply herein because by its clear meaning it solely applies to resolve disputes concerning the Trinidads relationship with PSL. PSL is not being sued herein for the violation of any breach of its relationship with the Trinidads, or any statue or regulation concerning PSL's services or the securities industry.

64.    This action arises under the BHCA that regulates banks and bank holding companies. The BHCA does not directly apply to investment firms such as PSL. The BHCA applies to BPOP because it is the parent of the bank company BPPR that provided the banking service object of this action to the Trinidads. PSL is not a bank company subject to the jurisdiction of the BHCA. PSL is being sued herein, not because of its violation of any securities law, but because it aided and abetted and conspired to assist BPPR and BPOP to violate the banking law.

65.    This action is not subject to arbitration because it arises from the banking relationship between the Trinidads and BPOP/BPPR and does not involve any disputes concerning the investment relationship between the Trinidads and PSL. The Trinidads' disputes raised in this action are, thus, not concerning the Trinidads' relationship with PSL, but instead arise from their relationship with BPPR and BPOP. Thus, the arbitration clause is not susceptible of an interpretation that covers the disputes asserted in this action.

66.    Moreover, the factual allegations made by the Trinidads in support of their claims and the disputes that they raise in this action do not concern their relationship with PSL because

to prove these claims the Trinidads do not rely, in any way, on the terms and conditions of their investment services contract with PSL that contains the arbitration clause.

## VII. THE TYING VIOLATIONS OF THE BHCA

67.    In or around **November 2010**, the agents and/or employees of BPOP and its subsidiaries, the investment service company PSL and its banking company BPPR, through the Wealth Management Division of BPPR, aided and abetted, conspired and associated in fact between themselves, through the Popular One Office, to plan and execute the tying arrangements, and participate in the "tying conspiracy" by which BPPR extended credit to the Trinidads, on the conditions: that the Trinidads open accounts with and obtain additional investment services from PSL; that the Trinidads transfer their investment portfolios to these new accounts to be managed by PSL; that the Trinidads tie their investment portfolios at PSL, as Pledge Collateral, to the SCLs issued by BPPR to pay off their loans at Wachovia; that BPPR obtain total control of the Pledge Collateral of the Trinidads managed by PSL; and, that the Trinidads do not obtain such investment services from a competitor of PSL (the "Tying Arrangement"). **All these transactions are tying arrangements prohibited by the BHCA.**

68.    On or around the first week of **November 2010**, Ramos met with Montalvo at the Popular One's Office at Popular Center, in Hato Rey, PR.

69.    At the **November 2010** meeting, Montalvo, and Ramos, aided and abetted in the formulation and execution of the Tying Arrangement and acted in furtherance of the tying conspiracy, as follows:

(1)    Ramos proposed the Tying Arrangement Scheme he had planned to Montalvo;

(2)    the plan was that BPPR would acquire Ramos' loan purse, by granting SCLs to the Trinidads and Ramos' other clients at Wachovia, and, in exchange, PSL would acquire these clients' investment accounts and Ramos' AUM at Wachovia;

16

(3) Ramos' AUM were worth around **$54,000,000**, of which around **$48,581,507**, that is, around **90%**, came from the Trinidads' accounts**;**

(4) for the Tying Arrangement Scheme to succeed, Ramos had to induce the Trinidads and his other clients at Wachovia to obtain the SCLs from BPPR to pay off their loans with Wachovia, on the condition that these clients accepted to open investment accounts at PSL, to transfer there their assets, for those assets at PSL to be used as pledge collateral for the SCLs granted by BPPR;

(5) Ramos and Montalvo discussed the Tying Arrangements without the knowledge and authorization of the Trinidads;

(6) Montalvo agreed to recommend the Tying Arrangements to her supervisors at BPPR; and,

(7) Montalvo agreed to arrange a meeting between Ramos and Castañer to coordinate PSL's participation in the Tying Arrangement.

70.     Shortly after the **November 2010** meeting, without the knowledge, consent, or authorization from the Trinidads, Montalvo, aiding and abetting in the formulation and execution of the Tying Arrangement and acting in furtherance of the Tying conspiracy,

(1) recommended the Tying Arrangements to her BPPR supervisor at the Wealth Management Division at the Popular One Office, Pedrosa; and.

(2) arranged for Ramos to meet with Castañer to discuss the Tying Arrangement.

71.     On or around the first week of **November 2010**, in response to Montalvo's recommendation, Pedrosa, aiding and abetting in the formulation and execution of the Tying Arrangements and acting in furtherance of the Tying Conspiracy:

(1) requested Quintana to determine the Loan to Value ratio of the Trinidads portfolios at Wachovia, to assess whether the lending limits set by BPPR would allow it to issue a SCL that was sufficient to pay off the Trinidads' loans at Wachovia;

(2) determined the Loan to Value ratio and lending limits were sufficient to grant a **$22 million** loan to Trinidad-Garcia and a **$3 million** loan to Trinidad-Rodriguez that was sufficient for them to pay off their loans at Wachovia; and,

(3) requested Sepulveda's approval and authorization for BPPR to grant the SCL of **$22 million** for Trinidad-Garcia and of **$3 million** for Trinidad-Rodriguez to pay off the Wachovia debt, issue the SCLs' and have PSL acquire the Trinidads' investment portfolios that were to be used as Pledged Collateral for the SCLs granted by BPPR.

72.     On or around the first week of **November 2010**, Castañer, acting on behalf of PSL, met with Ramos and, aiding and abetting in the formulation and execution of the Tying Arrangements and acting in furtherance of the Tying Conspiracy, both discussed the following:

(1) Ramos proposed to Castañer the plan for PSL's participation in the Tying Arrangements; and

(2) Castañer agreed to seek authorization for PSL to participate in the Tying Arrangements.

73.     After that meeting, **November 2010** meeting with Ramos, Castañer, aiding and abetting in the formulation and execution of the Tying Arrangements and acting in furtherance of the Tying Conspiracy:

(1) met with McDonald and recommended tying arrangements to PSL; and.

(2) arranged a meeting between Ramos and McDonald to discuss the Tying Arrangement.

74.     On or around the first week of **November 2010**, McDonald scheduled a meeting with Ramos where, aiding and abetting in the formulation and execution of the Tying Arrangements and acting in furtherance of the Tying Conspiracy:

(1) Ramos and McDonald discussed PSL's participation in the Tying Arrangement; and,

(2) McDonald agreed to seek authorization for PSL to participate in the Tying Arrangement.

75.     On or around the first week of **November 2010**, McDonald met with Guerrero, aiding, and abetting in the formulation and execution of the Tying Arrangements and acting in furtherance of the Tying Conspiracy, they discussed the following:

(1) McDonald sought Guerrero's approval for PSL's participation in the Tying Arrangement proposed by Ramos:

(2) Guerrero, initially, opposed Popular's participation in the Tying Arrangement because: (i) the securities in the Trinidads' investment accounts that were to be used as pledged collateral were highly illiquid; (ii) these illiquid securities formed around **77%** of Trinidad-Garcia's investment portfolio and **74%** of Trinidad-Rodriguez's investment portfolio; (iii) the illiquidity of the pledged collateral created a high risk of default of the SCLs in the event of any change of circumstances that caused a decrease in the price of the securities; and, (iv) because the pledged securities used leverage, even a slight reduction in the price of the securities could cause a potential default due to the loan to value ratio of the SCLs;

(3) McDonald, however, insisted that Guerrero approved the Tying Arrangements because he was very interested in having PSL acquire Ramos' AUM and manage the Trinidads' accounts with a market value of around **$49 million**;

(4) McDonald persuaded Guerrero to grant his approval for PSL's participation in the Tying Arrangement; and,

(5) Guerrero authorized PSL to execute the Tying Arrangement.

76. On or around that time, Guerrero informed Carrion about the Trinidads Tying Arrangement and he gave Guerrero a go-ahead authorization.

77. On or around that same time, Sepulveda, aiding and abetting in the formulation and execution of the Tying Arrangements and acting in furtherance of the Tying Conspiracy, approved BPPR's participation in the Tying Arrangement, by which it was to grant the SCLs to pay off the Trinidads' Wachovia debt for PSL to acquire their investment purses.

78. Through Sepulveda's and Guerrero's approval and authorization, the tying transactions were structured in such a way that BPPR agreed to issue the SCLs to the Trinidads, for a **total of $25 million**, and to open the PMA bank accounts for them to withdraw the loaned funds, on the condition that they open the PSLs investment accounts to transfer there their gross assets of around **$48,581,507**, that were to be used as Pledged Collateral of the SCLs at BPPR.

79.     BPOP, aiding and abetting in the formulation and execution of the Tying Arrangements and acting in furtherance of the Tying Conspiracy, had BPPR and PSL authorize the tying transaction without there being any request from the Trinidads to obtain any SCL or to open any PMA bank accounts at BPPR, or to open any investment accounts at PSL.

80.     BPOP, aiding and abetting in the formulation and execution of the Tying Arrangements and acting in furtherance of the Tying Conspiracy, had BPPR approve these tying arrangements based solely upon the loan to value ratios set by BPPR as to the securities in the Trinidads portfolios at Wachovia. No consideration was given by Popular to the suitability of the strategy for the Trinidads to obtain the SCLs to use the funds to carry the securities from Wachovia to PSL, or the existence of any other source for the Trinidads to repay the SCLs besides the portfolios themselves.

81.     All the overt acts and transactions identified hereinabove that were performed by BPOP, BPPR and PSL transpired without the knowledge of the Trinidads and without them having personally requested any product, service, SCLs, PMA accounts or Pledge Agreements from BPPR, or any product, service, or any investment accounts from PSL.

82.     All the overt acts and transactions identified hereinabove by Ramos, Pedrosa, Quintana, Montalvo, Guerrero, Sepulveda, and McDonald were coordinated through the Popular One Office, were carried out through verbal and/or email communications between them and were performed to aid and abet in the formulation and implementation of the Tying Arrangement and in furtherance of the Tying Conspiracy.

83.     Shortly thereafter, BPOP, through BPPR and PSL, aiding and abetting in the implementation of ongoing Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, executed unlawful tying arrangements, by which:

(1)     On or around **November 8, 2010**, McDonald had PSL execute a Letter of Understanding with Ramos for him and PSL to participate in the tying arrangements. Through that understanding, in exchange for inducing the Trinidads to enter the tying arrangements with PSL and BPPR, Ramos was granted an FL of **$510 k**, to be effective upon transfer of his investment licenses and AUM to PSL. The Trinidads' accounts formed around **90%** of Ramos' AUM.

(2)     On or around **November 17, 2010**, Ramos arranged for Trinidad-Garcia to meet with him and Montalvo, at the Starbucks in Los Paseos, where they caused Trinidad-Garcia to: (i) sign in block the Attachment to the PMA bank account at BPPR with an opening date of **November 12, 2010**, where he was requesting a SCL for **$22 million that had already been approved**; (ii) sign a Pledge Agreement, dated **November 8, 2010**, by which, as a security to the SCL granted by BPPR, he pledged to BPPR all of the cash, securities and other assets that were to be deposited in the tied Pledge Collateral Investment Accounts at PSL, and he also transferred control to BPPR over the tied Pledged Collateral Investment Accounts at PSL; (iii) sign an inaccurate Federal Reserve Reg U Statement of Purpose Form, dated **November 15, 2010**, that stated that **the purpose of the $22 million SCL was not to acquire or maintain his securities portfolio**, when in fact, it was clearly for such purposes, as the proceeds were used to repay a line of credit at Wachovia which was secured by his securities portfolio; (iv) sign an Outgoing Transfer of Funds Authorization dated **November 18, 2010**, for BPPR to make withdrawals from the SCL to make two wire transfers, one for **$17,568041.67** and the other for **$4,223,269.42**, for a total of **$21,791,311.09**, to the Order of Wachovia for BPPR to acquire the management of the loans that he had at Wachovia, under the condition that, in exchange, Trinidad-Garcia was to transfer from Wachovia to PSL his tied investment portfolio; and, (v) sign, in the absence of any Financial Advisor from PSL, the PSL investment accounts opening documents, dated **November 16, 2010**, to have Wachovia transfer into these new PSL accounts his investment portfolio with gross assets in the amount of around **$38,928,955** in exchange of the bank accounts opened with and the SCLs obtained by him from BPPR.

(3)     That same day (**November 17**), Ramos arranged for Trinidad-Rodriguez to meet with him and Montalvo, at the residence of Trinidad-Rodriguez, where they caused him to: (i) sign in block the Attachment to BPPR's PMA account opening dated **November 12, 2010** where he was requesting a SCL for **$3 million that had already been approved**; (ii) sign a Pledge Agreement dated **November 8, 2010** by which, as a security to the SCL granted by BPPR, he pledged to BPPR all of the cash, securities and other assets deposited in the tied Pledge Collateral Investment Accounts at PSL, and transferred control to BPPR over the tied Pledged Collateral Investment Accounts at PSL; (iii) sign an inaccurate Federal Reserve Reg U Statement of Purpose Form, dated **November 15, 2010**, that **stated that the purpose of the SCL, mistakenly listed for $43 million, was not to acquire or maintain his securities portfolio**, when in fact it was clearly for such purposes, as the proceeds were used to repay a line of credit at Wachovia

which was secured by his securities portfolio; (iv) make, on or around **November 18, 2010**, through BPPR, a withdrawal from Trinidad-Rodriguez's SCL for a wire transfer for **$1,511,860** to the Order of Wachovia for BPPR to acquire the management of the loans that he had at Wachovia, under the condition that, in exchange, Trinidad-Rodriguez was to transfer from Wachovia to PSL his tied investment portfolio; and (v) sign, in the absence of any Financial Advisor from PSL, the PSL investment accounts opening documents dated **November 16, 2010** to have Wachovia transfer into these new PSL accounts his investment portfolio with gross assets in the amount of around **$9,652,552** in exchange of the bank accounts opened with and the SCLs obtained by him from BPPR.

(4)   On **November 19, 2010**, after Ramos induced the Trinidads to open the investment accounts at PSL and the bank accounts and SCLs' at BPPR, and in exchange for having done that, McDonald had PSL enter an Employment Contract with Ramos, that formalized the above stated Letter of Understanding.

84.   The foregoing tying arrangements were documented by an email communication sent on **November 18, 2010, at 5:20:29 PM**, by Irmarilis Pedrosa Roche, <ipedrosa@bppr.com>, to: Zaida Montalvo Diaz, <zmontalvo@bppr.com>, Maria Quintana Roman, <maquintana@bppr.com>, Eli Sepulveda, <elsepulveda@bppr.com>, Alberto Castaner, <acastaner@bppr.com>, Juan Guerrero Preston, <jguerrero@bppr.com>, that states as follows,

About 9 **clients with securities accounts in Wachovia, with an approximate value of $54,000,000 will be transferred to Popular Securities as part of the acquisition of the [Jose Ramos] portfolio**. **Those clients have lines of credit collateralized with those investments**. I have been working with Zaida Montalvo to transfer those loans to the Bank. So far, through **Frank Berrios, the openings of two guaranteed lines of credit for Juan Trinidads father and son, for $3,000,000 and $22,000,000 respectively, have been processed manually**. **The collateral for these lines will be the clients' investments that will be transferred to PSL once the loans are paid off**. Today we **have to process three wire transfers totaling $23,201,625.93 to pay off customer debts at Wachovia**. The money to process these transfers will be disbursed from the aforementioned lines of credit. It is my duty to clarify that, as long as we have not received the investments, we are granting a loan without collateral. However, and after a telephone conversation between Zaida, - Awilda and Mr. [] this morning, it was agreed that the transfers will be processed after receiving a certification from Wachovia indicating that there are no other debts tied to these investments, and once the payment is received they will transfer the investments to Popular. That letter was received and I accompany it in this email.

(Emphasis supplied).

85.     The following chart illustrates the way the tying arrangements were structured by BPOP:



86.     By reason of the above-identified tying arrangements executed by BPOP, BPPR granted the SCLs for **$23,201,625** to the Trinidads, on the tied conditions: that they accepted to open the investment accounts at PSL and transfer into those accounts their investment portfolios with joint gross assets of around **$48,581,507** for its management; that those investment accounts were to be tied as Pledge Collateral to the SCLs in BPPR; and that those investment services or products were not to be provided by any of PSL' competitors.

87.     By reason of these Tying Arrangements BPOP, through BPPR and PSL, obtained complete control of the Trinidad's investment accounts at PSL that were tied, as Pledge Collateral, to the SCLs in favor of BPPR, and of the SCLs at BPPR.

## VIII.     DEFENDANTS' CONTINUING VIOLATION AND CONTINUING CONSPIRACY TO VIOLATE THE BHCA

88.     Since the **November 2010** execution of the Tying Arrangement, and up to today, Popular has incurred, through BPPR and PSL, in an ongoing violation of the BHCA's anti-tying provisions and a Continuing Tying Conspiracy to violate the BHCA, to keep the Tying Arrangements in continuous existence to this date.

89.     The violation has been continuing because since the **November 2010** execution of the Tying Arrangement, and up to today, Popular has engaged in the continuous acts alleged in detail hereinbelow that have kept the Trinidads' bank accounts at BPPR tied, through the SCLs, to their investment accounts at PSL, pledged as collateral in favor of BPPR, and prevented the Trinidads from paying off the SCLs at BPPR to withdraw their investments accounts at PSL to transfer them to a PSL's competitor.

### A.  BPOP

90.     On **October 22, 2013**, at the request of the Trinidads, Carrion held a meeting with them, Guerrero, and Montalvo, at the Carrion's offices at Popular Center. At the meeting were present, Carrion, Guerrero, Zaida Montalvo, where the Trinidads:

    (1)    informed Carrion about the circumstances of Trinidad-Garcia's SCL and default caused by Ramos' mismanagement of his accounts;

    (2)    presented a proposal to Carrion to solve Trinidad-Garcia's dire financial situation caused by such mismanagement of his accounts;

    (3)    requested Carrion to take any action at his disposal to resolve it; and,

(4) provided to Carrion personal notice of the facts giving rise to the then existing unlawful tying arrangements.

91. Carrion, however, did nothing to put an end to the Tying Arrangements. Instead, Carrion went along with the continuing tying violations and ongoing conspiracy.

92. BPOP, through Carrion, adopted and authorized, at least until **July 2017**, when he ceased to be BPOP's CEO, the continuous acts to aid and abet the Tying Arrangement, in furtherance of the continuing Tying Conspiracy to violate the BHCA.

93. **From July 2017 and up this day,** BPOP, through Alvarez, who was then and still is the CEO for BPOP and BPPR, has adopted, ordered, and authorized the continuous acts that are alleged in greater detail hereinbelow to aid and abet the Tying Arrangement, in furtherance of the continuing Tying Conspiracy to violate the BHCA.

## B. BPPR

94. BPPR, through Guerrero, has continued to aid and abet the Tying Arrangement and to act in furtherance of the Tying Conspiracy in violation of the BHCA, by his adoption and authorization of the continuous acts that are alleged in greater detail hereinbelow. This misconduct has been ongoing, continuous, and uninterrupted up to this day.

95. BPPR, through Pedrosa, Quintana and Montalvo, has continued to aid and abet the Tying Arrangements and to act in furtherance of the Tying Conspiracy in violation of the BHCA, by their joint day-to-day work to supervise and maintain the loan to value ratio of the SCLs pledged collateral, and to supervise and authorize any sale or substitution of the pledged collateral. This misconduct has been ongoing, continuous, and uninterrupted up to this day.

## C. PSL

96. PSL, through McDonald, continued to aid and abet the Tying Arrangement and to act in furtherance of the Tying Conspiracy in violation of the BHCA, by his adoption and

authorization of the continuous acts that are alleged in greater detail hereinbelow. This misconduct was ongoing, continuous, and uninterrupted until **September 2012**, when he left PSL to become the Executive Vice President and Group Director at FirstBank, Puerto Rico.

97.     PSL, through Castañer, continued to aid and abet the Tying Arrangements and to act in furtherance of the Tying Conspiracy in violation of the BHCA, by his authorization of the day-to-day continuous acts that are alleged in greater detail hereinbelow. This misconduct was ongoing, continuous, and uninterrupted until in or around **January 2013**, when he concluded his Branch Manager's post.

98.     **Since January 2013**, PSL, through Toro, continued to aid and abet the Tying Arrangement and to act in furtherance of the Tying Conspiracy in violation of the BHCA, first, as Branch Manager, by his ongoing authorization of the day-today continuous acts that are alleged in greater detail hereinbelow; and after **February 2019**, as the President of PSL, in his supervision and authorization of the ongoing acts that are alleged in greater detail hereinbelow. This misconduct has been ongoing, continuous, and uninterrupted until this day.

99.     PSL, through Ramos, aided and abetted the Tying Arrangement and acted in furtherance of the Tying Conspiracy in violation of the BHCA, by his *de facto* day-to-day control and management of the Trinidads' Pledged Securities at PSL and of the balance of the SCLs at BPPR for which they served as collateral.

100.    Ramos used this day-to-day management and control of the Trinidads' accounts to aid and abet the Tying Arrangements and to act in furtherance of the Tying Conspiracy in violation of the BHCA, by: (i) maintaining the Trinidad's PSL's investment accounts tied with the Pledged Collateral and their SCLs' at BPPR; (ii) precluding the Trinidads from selling any securities at PSL to make any substantial payments to reduce or payoff the balance owed by the SCLs at BPPR;

and, (iii) precluding the Trinidads from moving their investment accounts from PSL to any of PSL's Brokerage House competitors. This misconduct of Ramos was ongoing, continuous, and uninterrupted until **late 2013**, when he was removed by the Trinidads from the management of their accounts.

### IX. THE ONGOING AND UNINTERRUPTED ACTS OF AIDING AND ABETTING

101.    Once the Tying Arrangements was executed in **November 2010**, the plan agreed to by BPOP, BPPR and PSL was to maintain it in place indefinitely by: (i) keeping the Trinidads PSL's investment accounts tied, as Pledged Collateral, to their SCLs' at BPPR; (ii) precluding the Trinidads from selling any securities at PSL to make any substantial payments to reduce or payoff the balance owed by the SCLs at BPPR; and (iii) precluding the Trinidads from moving their investment accounts from PSL to any of PSL's Brokerage House competitors, such as HJ Sims and FirstSouthern. *See, infra.*

102.    Since that juncture, Popular has aided and abetted the ongoing tying violation and engaged in the overt acts alleged hereinafter in furtherance of the continuing Tying Conspiracy in violation of the BHCA.

103.    As alleged hereinbelow, this is a **continuing unlawful Tying Arrangement** by Popular of the Trinidads' SCLs at BPPR with their investment accounts at PSL, in violation of the BHCA, that has **inflicted uninterrupted, continuing, and accumulating harm** upon the property of the Trinidads.

## X. THE TYING ARRANGEMENT AND OVERT ACTS IN FURTHERANCE OF THE CONTINUING TYING CONSPIRACY IN VIOLATION OF THE BHCA

104.    Each of the acts alleged hereinbelow was done to aid and abet the continuing violation and ongoing conspiracy in violation of the BHCA. The continuation of this integrated pattern of wrongdoing by Popular constitutes a single, actionable wrong.

105.    This single ongoing violation of the BHCA that injures the Trinidads' property rights commenced in **November 2010**, and continues until today,

### 1.    The unauthorize sale and purchase of Pledged Securities and failure to pay off Trinidad-Rodriguez's SCL

106.    In or around **early 2012**, Trinidad-Rodriguez instructed PSL that he wanted to sell Pledged Securities in his investment accounts to pay off the balance of his SCL with BPPR. In response, in furtherance of the Tying Conspiracy, PSL misrepresented to Trinidad-Rodriguez that the securities could not be sold at that time.

107.    Later, in **December 2013**, Trinidad-Rodriquez learned that, in **December 2012**, PSL had made unauthorized sales of Pledged Securities in his investment account at PSL that generated **$2,127,307.35** and that, instead of using those proceeds to pay off the SCL as he had requested, PSL had used the proceeds of **$2,143,063.05** to make new purchases of similar highly illiquid PR securities.

108.    As a result, thereof, by letter dated **December 18, 2013**, Trinidad-Rodriguez formally requested PSL to revert all those transactions and to refund their value as of the date they were made, to apply the proceeds of the sales to pay off the balance of the SCL as of that day, and to deposit the surplus in his Money Market account. In response, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, PSL failed to take any action to correct the situation.

2.     **The retention and use of PMA to carry out the legal overt acts**

109.    Pietrantoni Mendez & Alvarez LLC ("PMA") is a PR Law Firm founded in 1992. Alvarez is one of the six founding partners of the Firm that still bears his name.

110.    For many years past, Alvarez has retained PMA to provide legal services to BPOP, BPPR and PSL.

111.    Since **April 2014**, when the Injunction Action was filed by Trinidad-Garcia against BPOP, BPPR and PSL, PMA has been acting as counsel for BPOP and BPPR in all the litigation existing between the parties.

112.    Since **April 2014**, and up to date, Alvarez, acting on behalf of BPOP BPPR and PSL, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, has used the legal services of PMA to execute the overt acts alleged hereinbelow.

113.    Since **April 2014**, and up to date, as per the Trinidads good faith belief, BPOP, BPPR and PSL have around **$4 million** to PMA for its legal services to execute and keep in place the Tying Arrangement and to engage in the overt acts alleged hereinbelow in furtherance of the Tying Conspiracy.

114.    Since **April 2014**, and up to date, Alvarez, either directly or indirectly, has received substantial money or economic benefits **from the millions of dollars** that BPOP, BPPR and PSL have paid to PMA for its legal services to execute and keep in place the Tying Arrangement and to engage in the overt acts alleged hereinbelow in furtherance of the Tying Conspiracy.

3.     **Popular's refusals to allow the Trinidads to withdraw monies from their money market accounts**

115.    On **March 24, 2014**, Trinidad-Garcia requested PSL to send him a check for the money market balance and, from that date forward, to send him by check the dividends and interest accrued monthly in the money market of his investment accounts.

116.    On **March 31, 2014**, BPOP, through PSL, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, refused Trinidad-Garcia's request because the investment accounts at PSL were Pledge Collateral that was tied to the SCLs at BPPR that had a $2.9 million deficiency at the time. PSL also notified Trinidad-Garcia that it had 20 days to pay off the deficiency or it could start selling securities to pay off the deficit.

117.    On N**ovember 7, 2018**, in another similar instance, Trinidad-Rodriguez requested information from PSL, via email, as to why he had not received the **October 15 and November 1, 2018**, transfers of the "money market" fund from his investment accounts at PSL to his PMA account at BPPR.

118.    On **November 15, 2018**, BPOP, through PSL, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, denied the Trinidad-Rodriguez's request because the investment accounts at PSL were Pledge Collateral that was tied to the SCLs at BPPR that had a deficiency at the time.

**4.      Popular's refusal to allow the Trinidads to transfer the Pledge Collateral from PSL to any other Broker Dealer**

119.    On **May 5, 2017**, the Trinidads notified BPPR and PSL, through their counsel in related actions between the parties, copy of letters received from Mr. Luis E. Sanchez and Mr. German Ramirez de Arellano from HJ Sims, wherein

> (1)    HJ Sims had offered to the Trinidads its investment services and its willingness to receive in transfer and take over the management of the pledged accounts of the Trinidads at PSL; and,
>
> (2)    HJ Sims informed that, after the transfer, the accounts' assets would continue collateralized in favor of BPPR and subject to any other conditions that the parties would agree upon to allow the transfer and to protect BPPR's collateral for its loans with them.

120.     BPPR and PSL were advised that, as they were aware, the Trinidads' accounts at PSL had been in house accounts, since on or around **October 1, 2013**, and PSL had refused to provide any investment advice to the Trinidads since then, with knowledge that their portfolios had investments with a high risk of loss of capital or that were not generating income. At that time, the account of Trinidad-Garcia had over **two million dollars** in a money market account that was not generating a suitable income.

121.     On **May 26, 2017**, BPOP, through both BPPR and PSL, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, denied the Trinidad's request to move to HJ Sims the Pledged Collateral for its proper management by PSL's competitor.

122.     In addition, **since October 2013**, and up to date, BPOP, through BPPR and PSL, failed to take any action to prevent the loss or deterioration of the Trinidad's investment portfolios that PSL managed and that BPPR held tied, as Pledged Collateral, to the SCLs.

123.     On **October 21, 2021**, the Trinidads notified BPPR and PSL, through their counsel in related actions between the parties, copy of letters received from Mr. Luis E. Sanchez and Mr. Manuel Gonzalez of FirstSouthern Investments, wherein:

(1)     FirstSouthern offered its investment services to the Trinidads that included its willingness to receive in transfer and take over the management of their accounts at PSL; and,

(2)     FirstSouthern stated that, after the transfer, the accounts' assets would continue to be pledged in favor of BPPR and subject to any other conditions that the parties could agree upon to allow the transfer and to protect BPPR's collateral for its loans with the Trinidads.

124.     The Trinidads reminded Popular that since on or around **October 1, 2013**, PSL had refused to provide investment advice to them, with the knowledge that their portfolios had investments with a high risk of loss of capital or that were not generating income and that, as a

result, the Trinidads' accounts had sustained and kept sustaining substantial loss of income. The Trinidads requested Popular to review the request and to contact them to arrange for their accounts to be transferred ASAP to FirstSouthern.

125.    Thereafter, Popular, aiding and abetting the Tying Arrangements and acting in furtherance of the continuing Tying Conspiracy, refused to allow the transfer of the Trinidads' accounts from PSL's to its competitor FirstSouthern.

### 5.    On two occasions Popular stopped making monthly payments owed to Trinidad-Garcia and instituted multiple frivolous appellate proceedings

#### A.  First Occasion

126.    On **April 2, 2014**, the Trinidads filed a Claim against the Popular Entities and others with the Financial Industry Regulatory Authority ("FINRA"), Case No. 14-00487, to request compensation for the losses caused by them to their investments portfolios at PSL that were held tied, as Pledged Collateral, to their SCLs by BPPR (the "FINRA action").

127.    On **April 10, 2014**, faced with the sudden ultimatum by BPPR to execute the collateral and the imminent risk of losing all its assets, Trinidad-Garcia also filed with the PR CFI a Petition for Preliminary Injunction against Popular in Civil Action # SJ2014CV00063 (904) (the "Injunction Action"). The action was filed to request a restraining order to prevent, during the pendency of the FINRA action, the liquidation of his tied portfolio at PSL by BPPR to pay off the deficiencies of the SCL.

128.    On **April 15, 2014**, before appearing at the hearing, BPOP and BPPR notified FINRA that they were not going to submit to its jurisdiction; and BPPR, aiding and abetting the Tying Arrangements and acting in furtherance of the continuing Tying Conspiracy, filed a complaint for collection of money against Trinidad-Garcia with the PR CFI, in the case number KCD 2014-0827 (602) (the "Collections Action"). Trinidad-Garcia answered and presented a

Counterclaim against BPPR alleging that it was at fault for the deficiencies and the losses caused to his investment portfolio at PSL that it held tied, as Pledged Collateral, to his SCL.

129.    That same day, a hearing was held in the Injunction Action to elucidate the merits of the preliminary injunction that concluded with a judgment issued by the court, that incorporated the essential agreements reached by the parties to put an end to the proceeding (henceforth the "2014 Agreement").

130.    On **May 15, 2014**, at the request of the parties, the CFI issued a Judgment by Stipulation, adopting the terms of the Agreement reached by the parties (henceforth the "2014 Stipulation Judgment").

131.    As to what is pertinent here, in the **2014 Stipulation Judgment**, the CFI adopted the **2014 Agreement,** where BPOP and Trinidad-Garcia agreed on the following essential terms and conditions:

(1)    to maintain the *status quo* while the parties continued processing their respective claims in the FINRA Action and in the Collections Action;

(2)    that PSL was to deposit monthly the sum of $90,000 in Trinidad-Garcia's PMA account at BPPR, to be used by BPPR to make the interest and principal payments of the SCL and of four of his mortgages;

(3)    that PSL was to continue to pay $63,550 monthly to Trinidad-Garcia to cover his personal obligations:

(4)    that **BPPR would not liquidate the Trinidad-Garcia's securities that serve as collateral for the loan**; and,

(5)    that Trinidad-Garcia was to continue receiving the agreed monthly payments until otherwise was provided by agreement of the parties or final resolution on the merits of the pending cases.

132.    Despite the clarity of the terms of the Stipulation Judgment, beginning in **November 2015**, Popular, aiding and abetting the Tying Arrangement and acting in furtherance

of the continuing Tying Conspiracy, had failed to comply with its obligations thereunder. In manifest breach of the terms of Stipulation Judgment:

(1)    in November 2015, PSL started to transfer to Trinidad-Garcia sums well below the agreed amount of $63,550;

(2)    in February 2016, BPPR began to gradually increase the interest rate on the balance of the credit line from 3% to 4.5%;

(3)    in July 2017, PSL stopped transferring any monies to Trinidad-Garcia;

(4)    since August 2017, Popular failed to comply with the obligation to transfer to the PMA account the $90,000 of the accumulated money market to make the payment of interest and principal of the SCL, as well as the obligation to to pay the four mortgages – including one held by BPPR that encumbers Trinidad-Garcia's Apartment in the Galaxy Condominium, in Isla Verde, PR (the "Galaxy Apartment") -- exposing some mortgage payments and causing Trinidad-Garcia charges for penalties and other collateral damage; and,

(5)    by January 31, 2018, Popular owed Trinidad-Garcia the sum of $873,659.55, and the amount continued to increase monthly.

133.    After Popular, in bad faith, forced the Trinidads to file multiple requests with the CFI to compel payment, all opposed by Popular, on **March 19, 2018**, the CFI issued a Resolution finding that BPPR could not unilaterally modify the monthly interest in force on the date of the Judgment. Consequently, it ordered BPPR to pay Trinidad-Garcia the monthly payments until then unpaid, bring the mortgage payments up to date, adjust the interest rate on the credit line to 3%, retroactive to the date in which BPPR began its increase, and return to Trinidad-Garcia the items paid in excess.

134.    On **May 2, 2018**, Popular, in bad faith, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, resorted to the PR Courts of Appeal ("CA"), to review the Payment Order, through Certiorari No. KLCE201800600. On **August 20, 2018**, the CA issued a Resolution denying the Certiorari.

135.    On **September 18, 2018,** in furtherance of the continuing Tying Conspiracy, on, the Popular Entity conspirators, aiding and abetting each other, in bad faith, resorted from the CA's denial to the PR Supreme Court ("SC"), by certiorari CC-2018-832, to review the abovementioned decisions. The petition was denied by Resolution of **September 21, 2018**; that was the subject of two subsequent requests for Reconsideration, where finally the last one was denied on **November 21, 2108**.

136.    Popular, through this appeals process, in bad faith, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, breached its compliance with the **March 19, 2018**, Payment Order, until after **November 21, 2108**, when it became final and unreviewable. Thereafter, Popular was forced to comply with said order and paid Trinidad-Garcia over **$2 million** that it owed him as of that date.

## B. Second Occasion

137.    In **March 2020**, Popular, in bad faith, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, stopped paying the monthly installments to Trinidad-Garcia forcing him to once again file a motion to compel payment.

138.    After Popular forced the Trinidad-Garcia to file multiple requests with the CFI to compel payment in compliance with the 2014 Stipulation Judgment, all opposed by Popular to delay its compliance, on **November 16, 2020**, the CFI ordered Popular to, **within the final term of 24 hours**, proceed to deposit:

> (1)    $720,000 in the Trinidad-Garcia's PMA account at BPPR, to cover the $90,000 monthly installments owed as of November 2020, plus the accumulated interest at a rate of 4.25%;
>
> (2)    $ 444,800 in Trinidad-Garcia's Oriental Bank Account, to cover the $63,500 monthly installments owed as of November 2020, as well as the accumulated interest at a rate of 4.25%; and,

(3) $30,000 dollars in attorney's fees as a penalty because of its reckless litigation conduct (the "2020 Payment Order").

139.    Once again, on **November 18, 2020**, Popular, in bad faith, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing tying conspiracy, to delay payment resorted from the 2020 Payment Order by certiorari to the CA in Case # KLCE202001170. On **December 28, 2020**, the CA refused to issue the certiorari. Subsequently, Popular, in bad faith, requested Reconsideration and, on **January 25, 2021**, the CA issued a Resolution denying it.

140.    On **February 22, 2021**, Popular, in bad faith, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, filed a certiorari petition with the SC in Case # CC-2021-0ll5. The petition was denied on **March 23, 2021**. Popular then, in bad faith, presented a First Motion for Reconsideration that was denied on **May 21, 2021**; and thereafter, a Second Motion for Reconsideration that was denied on **August 11, 2021**.

141.    Once the case returned to the CFI, Trinidad-Garcia requested the Court to order Popular to comply with the 2020 Payment Order.

142.    In response thereto, begging on **August 17, 2021**, Popular, in bad faith, aiding and abetting the Tying Arrangements and acting in furtherance of the continuing Tying Conspiracy, filed with the CFI multiple motions refusing to pay or deposit with the Court the money amounts owed to Trinidad-Garcia, as per the 2020 Payment Order that then was final and unreviewable.

143.    On **August 18, 2020**, the CFI denied Popular's motions and ordered it to deposit with the Court, within 24 hours, the sum of **$2,916,087.92**, advising Popular that if the Order was not complied with within the established term, it would proceed to order the attachment of funds and securities belonging to Popular.

144. Notwithstanding that order, on **August 19, 2021**, Popular, in bad faith, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, instead filed an Urgent Motion for Reconsideration.

145. On **August 20, 2021**, the CFI ordered BPPR to deposit with the Court the **$2,916,087.92**, the following day before 12:00 pm.

146. That same day, faced with the order of attachment of assets in the event of noncompliance, Popular made two deposits in Court, one for $358,407 and the other for $2,557,680, for the total of **$2,916,087**.

147. Notwithstanding having made the deposits, Popular, in bad faith, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, did so under protest, and since then has opposed Trinidad-Garcia's multiple requests to withdraw the funds, delaying thereby, until this day, his receipt of the funds.

**6. Popular's adamant breach of the CFI order for it to pay Trinidad-Garcia the monthly installments from its own funds once the funds available in the money market accounts at PSL were depleted**

148. In the **2020 Payment Order** issued by the CFI in the Injunction Action the Court construed its 2014 Stipulation Judgment to find that once the funds available in the Trinidad-Garcia's money market accounts at PSL were depleted Popular had to pay those installments from its own funds until otherwise was decided by a final decision in the Collections Action, the FINRA action or by agreement of the parties. That order came to be final unreviewable and *res judicata* with regards to that finding. *Supra.* As per this order, this agreement will be effective until one of the abovementioned forums expressly indicate otherwise.

149. Notwithstanding that the matter was already adjudicated against it by prior final judgment and that the same was *res judicata*, on **August 19 and 20, 2021**, Popular, aiding and

abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, liquidated **$2,542,310.95** worth of Trinidad-Garcia's securities from his investment accounts at PSL that were tied, as Pledged Collateral, to the SCLs by BPPR. Popular then deposited those proceeds in Court to cover the monthly instalments that it owed Trinidad-García and that it had been ordered to pay with its own monies.

150.    The last hearings before FINRA took place on **September 30, 2021**. On **October 28, 2021,** the Panel of Arbitrators submitted their Award, effectively concluding the FINRA proceeding. The FINRA Panel found PSL liable to the Trinidads for its violation of the securities law claims made in that action. In the Award the Panel ordered PSL to pay **$4,229,298.02** to Trinidad-Garcia and **$2,388,033.77** to Trinidad-Rodriguez for compensatory damages, plus **$258,771.46** for costs. The Award limited itself specifically to the abovementioned subjects.

151.    The Panel did not make any findings regarding the SCL debt, inasmuch BPPR was not a party to the action. The damages granted by the Award were limited in nature to those available in FINRA arbitration. As the FINRA award did not decide otherwise as to the **2020 Payment Oder**, thus, the terms of this order are still in place.

**7.    Popular filed on June 26, 2019, a collection and mortgage execution action against Trinidad-García with the CFI, Carolina Part, in Civil Case # CA2019CV02387 in breach of the *status quo* imposed by the 2014 Stipulation Judgment**

152.    As part of its breaches of the 2014 Stipulation Judgment and the **2020 Payment Order**, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, Popular also stopped making the monthly mortgage payments for the Galaxy Apartment. Mortgage payments that as pert the 2014 Stipulation Judgment were owed by Popular to BPPR. As a result, the mortgage debt fell on default.

153.    Because of the default, on **June 26, 2019**, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, BPPR, filed with the CFI, Carolina Part, in Civil Case # CA2019CV02387, a collection and mortgage execution action against Trinidad-Garcia for the non-payment caused by BPPR's failure to comply with the 2020 Payment Order. Popular filed this action against Trinidad-Garcia in a manifest breach of the *status quo* imposed by the 2014 Stipulation Judgment. This civil action is still pending before the CFI.

8.      **Popular filed on November 14, 2019, with the CFI, San Juan Part, in Civil Case # KCD 2014-0827 (602), an Urgent Request for Provisional Remedy to Secure Judgment against Trinidad-Garcia**

154.    On **November 14, 2019**, Popular, aiding and abetting the Tying Arrangements and acting in furtherance of the continuing Tying Conspiracy, filed in the Collections Action an Urgent Request for Provisional Remedy to Secure Judgment against Trinidad-Garcia. BPPR requested therein an Order to seize all Trinidad-Garcia's assets to secure collection of the balance owed by him of the SCL tied to his investment accounts at PSL.

155.    Because of the request, on **February 12, 2021**, the Court entered an Order that, among other matters, prohibits Trinidad-Garcia from engaging, without prior Court authorization, in any monetary transaction that transfers assets greater than $100,000 in favor of any corporations, legal persons or partnerships. That Order is still in force.

9.      **Popular opposed Trinidad-Garcia's authorization request to the CFI to payoff, at substantial discount, a mortgage that encumbers one of his real estate properties**

156.    On **April 20, 2021**, Trinidad-Garcia filed with the CFI in the Collections Action a petition requesting Court authorization for him to payoff, at substantial discount, a mortgage that encumbers one of his real estate properties. That mortgage is in default and if the authorization is

not granted Trinidad-Garcia remains exposed to a potential lawsuit against him for collection of a substantial amount of money and the foreclosure of the property.

157. On **April 29, 2021**, Popular, through BPPR, in bad faith, aiding and abetting the Tying Arrangements and acting in furtherance of the continuing Tying Conspiracy, filed an opposition to said request, preventing Trinidad-Garcia from resolving the issue and leaving him exposed to a default and potential collection lawsuit. As a result, thereof, the adjudication of the matter is still pending before the CFI.

**10. Popular has exercised, up to this date, total control over the management of the Trinidads' investment accounts at PSL tied, as Pledged Collateral, to their bank accounts and SCL's at BPPR**

158. Popular, aiding and abetting the Tying Arrangements and acting in furtherance of the continuing Tying Conspiracy, since November 2010, and up to this day, has continuously exercised its absolute control over the management of the Trinidads' investment accounts at PSL and their Pledged Collateral at BPPR to maintain in place the Tying Arrangement. That is, Popular has continuously exercised its absolute control over the management of the Trinidads' SCLs to have them remain unpaid at BPPR, to maintain and their investment accounts tied at PSL, and kept as pledged collateral for BPPR.

**11. Popular breach of the Confidential Settlement Agreement**

159. After many years of the litigation of the FINRA and Collections Action, the parties engaged in an intensive and long-lasting negotiation process. That process led the parties to reach a Confidential Settlement Agreement to put an end to all claims and controversies then existing between them.

160. Thereafter, Popular, in bad faith, aiding and abetting the Tying Arrangement and acting in furtherance of the continuing Tying Conspiracy, tried to impose upon the Trinidads

certain arbitrary and non-agreeable conditions, and engaged in other bad faith negotiation tactics that obstructed, derailed, and breached the execution of the Settlement Agreement.

161.    These negotiations are subject to a confidentially understanding. In addition, under PR law these settlement negotiations are to be maintained confidential unless otherwise provided. *See* PR CC, Article 1271.

162.    Wherefore, because of their confidential nature, the Trinidads file these allegations under seal in a separate Confidential Appendix. Those factual allegations are incorporated by reference herein. *See*, Confidential Appendix filed under seal.

**12.    Ramos requested and obtained an unlawful personal loan from Trinidad-Rodriguez**

163.    In a manifest violation of the applicable securities regulations, on or around **December 9, 2011**, Ramos requested and obtained a personal loan from Trinidad-Rodriguez in the principal amount of **$175,000** that was disbursed from his SCL with BPOP/BPPR, and that is still owed to him.

164.    Popular has been on notice of this unlawful act by Ramos since at least **April 2014**, when the FINRA Action was filed.

165.    Since then, Popular, aiding and abetting the Tying Arrangements and acting in furtherance of the continuing Tying Conspiracy, maintained Ramos under its employment and failed to take any action to repay those monies unlawfully taken by Ramos from Trinidad-Rodriguez.

**13.    Toro falsely testified and committed perjury at the FINRA Action**

166.    Aiding and abetting the tying arrangements and acting in furtherance of the continuing tying conspiracy, Popular had Toro falsely testify and commit perjury at the FINRA Action, when:

(1) on **August 6, 2021**, Toro falsely declared that in or around **December 2012** he met Trinidad-Garcia and talked about his investment positions and risks involved regarding his investment accounts; and,

(2) on **September 23, 2021**, Toro falsely declared that at the foregoing meeting that never took place when he showed Tito the cash then existing in the account, Tito jokingly stated - let's cash that out before my wife Sharon sees that.

## XI.     THE TRINIDADS LEARNED ABOUT THE BHCA VIOLATIONS WITHIN THE FOUR YEARS PRECEDING THE FILING OF THIS ACTION

167.     The Trinidads learned about the BHCA violations through the discovery produced by Popular in the Collections Action and within the four years preceding the filing of this action.

## XII.     THE STATUTE OF LIMITATIONS FOR THE BHCA COMMENCED TO RUN FROM THE DATE OF THE OCCURRENCE OF EACH CONTINUING AIDING AND ABETING ACT AND OVERT ACT IN FURTHERANCE OF THE CONSPIRACY

168.     12 U.S.C. 1977 (C) (g) of the BHCA provides that any action to enforce any cause of action under that section shall be barred unless commenced within four years after the cause of action accrued. The Courts construing this statute have adopted the same tolling provisions found under the statute of limitations contained in the antitrust laws. Pursuant to the applicable law when there is a continuing violation of the BHCA, such as the one alleged in this action, "the four-year statute of limitations governing anti-tying provisions of the BHCA begins to run no later than the date on which the bank's alleged violations end." *See*, 159 Am. Jur. Trials 513 (Originally published in 2019).

169.     In addition, where, as here, a continuing conspiracy in violation of the BHCA has been alleged, the statute of limitations runs from the date that each continuing overt act in furtherance of the conspiracy occurs. *See, Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 572-73 (4th Cir. 1976); *Lancianese v. Bank of Mount Hope,* 783 F.2d 467 (4th Cir. 1986), quoting in support from *Zenith Radio Corp. v. Hazeltine Rsch., Inc.,* 401 U.S. 321, 338-41 (1971) as to the accrual of the claim in a continuing conspiracy to violate the antitrust laws.

**XIII.    THE START OF THE STATUTE OF LIMITATIONS PERIOD FOR THE TRINIDAD'S BHCA ACTION HAS CONTINUED UNINTERRUPTED UP TO DATE**

170.    The statute of limitations for the Trinidads' BHCA action commenced to run in November 2010, when the Tying Arrangements was executed and, thereafter, has continued running uninterruptedly with the occurrence of the ongoing overt acts alleged hereinabove that have continued up to date. *Supra.*

## XIV.    CAUSES OF ACTION

### 1.    First Claim for Relief - The BHCA Violations

171.    The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

172.    Pursuant to the anti-tying provisions of the BHCA, BPOP and BPPR should not "in any manner extend credit … of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement (B) that the [Trinidads would] obtain some additional … service from … any other subsidiary of such bank holding company [such as, PSL]; (D) that the [Trindad would] provide some additional … property [their investment accounts], … to any other subsidiary of such bank holding company [such as, PSL]; or (E) that the [Trindad would] not obtain some other … service [investment service] from a competitor of … any subsidiary of such bank holding company [such as, PSL], other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit." 12 U.S.C. § 1972 (1)(A)-(E).

173.    The purpose of Section 1972 is "to prohibit anti-competitive [banking] practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service that they desire." *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 469 (4th Cir. 1986).

174.    To establish a violation of § 1972, a plaintiff must show that (1) the banking practice in question was unusual in the banking industry, (2) a tying arrangement existed, and (3) the practice benefits the bank. *Bieber v. State Bank of Terry,* 928 F.2d 328, 330 (9th Cir.1991).

### A.   The Banking Practice In Question Was Unusual In The Banking Industry

175.    BPOP offered to the Trinidads, through the Popular One Office, a "one-stop platform", to provide them, through its subsidiary BPPR, integrated banking services, that including loan and checking accounts and financial planning, among others, and to provide them, through its subsidiary PSL, investment advice and services, constituted an unusual cross-selling of services to gain a competitive advantage, and is *a per se* violation of the BHCA. That is an unusual practice in the banking industry.

176.    Federal Interagency Banking Guidelines and other Regulatory directives and guidance also clearly delineate and identify the components of a safe and sound loan approval and loan management function. These include comprehensive and board approved policies and procedures governing overall loan policies and credit administration procedures. *See,* the Comptroller's Handbook; Federal Reserve Commercial Bank Examination Manual; Sec: 2040.1; Code of Federal Regulations Title 12. Bank and Banking, Chapter II, Sub Chapter A, Part 221.2

177.    The allegations made in this action show that Popular did not follow usual bank industry practices because there is no documented evidence of any formally, well-defined, comprehensive and board approved policies and procedures governing the Trinidads' bank transaction. That is an unusual practice in the banking industry.

178.    Also, Popular also failed follow usual bank industry practices when it did not comply with the applicable Federal Interagency Guidelines regarding its credit origination and management processes of the Trinidads' bank transaction, in the following manner:

- Popular failed to request and obtain a completed formal loan application and supporting financial information;

- Popular failed to prepare a formal credit presentation and approval document;

- Popular failed to request and obtain any signed evidence of debt or loan agreement;

- Popular failed to engage in an ongoing loan management and supervision beyond looking at the loan to value ratio; and,

- Popular failed to prepare a complete and comprehensive credit file that should contain the above listed documentation.

179.    These exceptions are unusual and critical in the banking industry. Popular is missing information and documentation regarding the Trinidads bank transaction that is basic in any normally functioning federally regulated bank credit process. That is an unusual practice in the banking industry.

180.    A loan would normally originate with a completed loan application and supporting credit and financial information. The application would be presented to an appropriate approval authority and would include a thorough analysis of the financial strength of the borrower, the expected sources of repayment, specific repayment terms and conditions and any potential regulatory issues. This process was not followed by Popular in the approval of the Trinidads' bank transaction. That is an unusual practice in the banking industry.

181.    When as here, securities were the collateral for the SCLs, BPPR's own guidelines required that for loans for more than $25 k two (2) credit report had to be obtained. If approved, there would be documentation of approval along with supporting analysis. Once approved, the borrower would sign the appropriate evidence of debt and any applicable loan agreements. All this information and material would be incorporated in an official credit file. **None of the foregoing**

**information or documentation was here requested or obtained by Popular for the approval of the SCLs.** That is an unusual practice in the banking industry.

182.    The entire structure and administration of the SCLs granted by Popular to the Trinidads was highly unusual. Typically, lines of credit are a mode of short-term financing usually extended for 1 year and eligible for an annual review and renewal. The debt would be due at the end of the initial term, usually 1 year, unless renewed or extended. While a fixed repayment schedule is not required it is inherent in the approval, that the line of credit is due at the end of the term unless renewed or extended. Here, to the contrary, Popular granted the Trinidads SCLs for **$25 million**, that were not extended as short term and without any due date. That is an unusual practice in the banking industry.

183.    SCLs are normally subject to annual reviews and renewals. Here there were no annual reviews and renewals. That is an unusual practice in the banking industry.

184.    The entire structure and administration of the SCLs granted by Popular to the Trinidads was highly unusual because they were for **$25 million**, granted as an evergreen loan subject to demand, without any due date, without consideration for the credit quality of the Pledged Collateral, and without consideration of any credit reports to consider any other source for repayment. That is an unusual practice in the banking industry.

185.    Popular approved the SCLs without there being any loan approval documentation. The Bank Officer Sepulveda approved the tying transaction without there being any Bank policy that allowed him to approve the SCLs in such a manner. That is an unusual practice in the banking industry.

186.    The absence of signed evidence of debt or loan agreement was aggravated by the highly unusual banking practice that, from inception of the Trinidad-Garcia's PMA, account

statements showed a **$0 debt** balance in the Guaranteed Credit Line input line. That continued to be so until **October 2011.** This provided incorrect and misleading information to Trinidad-Garcia showing a **$0 debt** balance when the debt of the SCL throughout that time fluctuated around in **$22 million.** That is an unusual practice in the banking industry.

187.    Popular approved issuing the SCLs to the Trinidads for a **total of $25 million** and the opening and funding of the PMA bank accounts for them to withdraw the funds to pay off Wachovia, on the condition that they opened the PSLs investment accounts, to transfer there from Wachovia their gross assets of **$48,581,507**, that were to be used as Pledged Collateral of BPPR's SCLs. That is an unusual practice in the banking industry.

188.    Popular authorized the Trinidads tying transaction, in violation of its bank guidelines, **without there being any written or verbal application by the Trinidads to obtain any SCL from, or to open any PMA bank account with, BPPR**. That is an unusual practice in the banking industry.

189.    Popular authorized the tying transaction and it had PSL open the investment accounts for the Trinidads, **without there being any written or verbal application by the Trinidads to open them, and before the Branch Manager authorized their opening.** That is an unusual practice in the banking industry.

190.    Popular approved these tying arrangements to acquire in bulk the investments and loan portfolios managed by Ramos, **based solely upon the compliance of the loan to value ratios set by Popular as to the securities in the Trinidads' portfolios at PSL**. **No consideration was given by Popular to the suitability of the investment strategy of using the SCLs to carry the securities to be pledged, nor the existence of any other source from the Trinidads to repay the SCLs besides the portfolios themselves.** That is an unusual practice in the banking industry.

191.    In this highly unusual bank transaction, Popular granted to the Trinidads SCLs for **$25 million**, using as Pledge Collateral PR securities, after Wachovia refused to continue to extend credit secured by that collateral due in part to its concentration in PR obligations that mostly consisted of highly illiquid and leveraged PR Closed End Funds (PRCEFs). That is an unusual practice in the banking industry.

192.    Popular's management and oversight of the Trinidads relationship was also highly unusual because it was delegated by the BPPR to Ramos, who also served as the financial consultant for the Trinidads at PSL. This created an untenable and entirely inappropriate conflict of interest. That is an unusual practice in the banking industry.

193.    As a result, thereof, BPPR, PSL and Ramos abused their fiduciary responsibility towards the Trinidads for their own benefit and that of to the detriment of the Trinidads. That is an unusual practice in the banking industry.

194.    It was also highly unusual that in the management of the Trinidads' investment and bank accounts, that PSL with Popular's explicit approval, periodically sold higher quality pledged securities and, without applying any sale proceeds to the SCLs, replaced them with PR concentrated securities of lesser quality and lesser liquidity causing thereby, the deterioration or diminishment of the value of the pledged securities. That is an unusual practice in the banking industry.

195.    In another highly unusual banking practice, and in violation of applicable federal regulations, at the signing of the bank account and SCLs opening documents, Popular had the Trinidads sign, under penalty of perjury, inaccurate information provided in a Federal Reserve Reg U Purpose Form. The Form that was prepared by Popular for the Trinidads to sign indicated the incorrect information that the purpose of the SCLs was not to acquire or maintain their securities

portfolios, when, to the contrary, the purpose of the SCLs granted by BPPR was, in fact, clearly for such purposes, as the proceeds were used to repay the SCLs that secured the Trinidads' securities portfolios at Wachovia, so that they could carry their portfolios to PSL. That is an unusual practice in the banking industry.

196.    When the Reg U was signed by the Trinidads, the Bank's signing officer, Pedrosa, was not present. **The document that was signed was in English and was never fully translated or explained to the Trinidads, who do not read or speak English.** That is an unusual practice in the banking industry.

197.    The same situation occurred with the Trinidads signing of BPPR's Pledge Agreements. That is an unusual practice in the banking industry.

198.    When Pedrosa signed the Reg U form on behalf of BPPR, she falsely certified, under penalty of perjury that to the best of her knowledge and belief all the information given in the document was true, accurate and complete. That was false because the Reg U form stated that the loan was for "personal use" and not to carry securities. Popular and Pedrosa knew or should have known that the statement was not true because the proceeds of the loan were used to repay a line of credit at Wachovia, to carry and leverage the investment portfolio of the Trinidads, from Wachovia to PSL. That is an unusual practice in the banking industry.

### B.  The Tying Arrangement

199.    As it has been alleged in great detail herein above, since on or around **November 18, 2010**, BPOP, and its subsidiaries, PSL and BPPR, aided and abetted each other, for BPPR to extend credit to the Trinidads, on the conditions that: the Trinidads obtain additional investment services from PSL; the Trinidads transfer the management of their investment portfolios -- that is, their property -- to PSL; and the Trinidads do not obtain such investment services from a

competitor of PSL. All these are tying arrangements committed by BPOP that are prohibited by the BHCA. *Supra.*

200.    The aiding and abetting of the tying arrangements acts commenced on **November 2010**, when implemented by BPOP, and have continued uninterruptedly up to date.

## C. The Tying Arrangements Benefitted Popular

201.    Aiding and abetting the Tying Arrangements, and in furtherance of the Tying Conspiracy, Popular had BPPR approve the issuing of the SCLs to the Trinidads for a **total of $25 million** and open the PMA bank accounts for them to withdraw the funds, on the condition that they opened the PSLs investment accounts, to transfer there their gross assets of **$48,581,507**, that were to be used as Pledged Collateral of BPPR's SCLs.

202.    These transactions economically benefitted Popular because since **November 2010**, BPPR has received over **$5,026,183** in interest payments for Trinidad-Garcia's SCL and over **$437,670** in interest payments for Trinidad-Rodriguez' SCL. That is, by reason of the Tying Arrangement, BPPR has received a grand aggregate total of around **$5,463,853** in interest payments from the **Trinidads**.

## D. The Tying Arrangements Caused Injury to The Trinidads' Property

203.    The Trinidads have sustained injury to their property by reason of each of the above-mentioned aiding and abetting overt acts incurred by BPOP, BPPR and PSL, in violation of the anti-tying provisions of the BHCA.

204.    As per the loss calculations made by the Trinidads' experts, Trinidad-Garcia has sustained injury to his property as follows:

| | |
|---|---|
| TG Market Adjusted unrealized losses to his investment portfolios at PSL | $22,741,722 |
| The cost of the unlawful SCL | $21,791,301 |
| Interest paid on the unlawful SCL | $5,026,183 |
| **Sub-total:** | **$49,559,206** |

205.     As per the loss calculations made by the Trinidads' experts, Trinidad-Rodriguez has sustained injury to his property as follows:

| | |
|---|---|
| TR Market Adjusted unrealized losses to his investment portfolios at PSL | $6,359,214 |
| The cost of the unlawful SCL | $1,862,202 |
| Interest paid on the unlawful SCL | $437,670 |
| **Sub-total:** | **$8,659,086** |

### E.  The Trinidads' Request for Compensation

206.     Pursuant to 12 U.S.C. 1975, the Trinidads seek in this action fair and adequate monetary compensation for these losses, to be trebled under the BHCA. That is, no less than **$148,677,618**, for Trinidad-Garcia and no less than **$25,977,258** for Trinidad-Rodriguez, for a grand total of no less than **$174,654,876**, plus an award for reasonable costs and attorney's fees.

### 2.     Second Claim – Conspiracy in Violation of the BHCA

207.     The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

### A.  The Tying Conspiracy

208.     As it has been alleged in detail hereinabove, since on or around **November 18, 2010**, BPOP, and its subsidiaries, PSL and BPPR, conspired with each other for BPPR to extend

credit to the Trinidads, on the conditions that: the Trinidads obtain additional investment services from PSL; that the Trinidads transfer the management of their investment portfolios to PSL; and that the Trinidads do not obtain such investment services from a competitor of PSL. All these are tying arrangements committed by Popular that are prohibited by the BHCA.

209.    The overt acts in furtherance of the Tying Conspiracy commenced in **November 2010**, when the Tying Arrangement was implemented by Popular, and have continued uninterruptedly up to date.

### B. The Tying Conspiracy Overt Acts Benefitted Popular

210.    Aiding and abetting the Tying Arrangement and in furtherance of the Tying Conspiracy, Popular had BPPR approve the issuing of the SCLs to the Trinidads for a **total of $25 million** and open the PMA bank accounts for them to withdraw the funds, on the condition that they opened the PSLs investment accounts, to transfer there their gross assets of **$48,581,507**, that were to be used as Pledged Collateral of BPPR's SCLs.

211.    These transactions economically benefitted Popular because since **November 2010**, BPPR has received over **$5,026,183** in interest payments for Trinidad-Garcia's SCL and over **$437,670** in interest payments for Trinidad-Rodriguez' SCL. That is, by reason of the Tying Arrangements, BPPR has received a grand aggregate total of around **$5,463,853** in interest payments from the Trinidads.

### C. The Continuing Tying Conspiracy Overt Acts Caused Injury to The Trinidads' Property

212.    The Trinidads have sustained injury to their property by reason of each of the above-mentioned overt acts incurred by BPOP, BPPR and PSL in furtherance of the continuing Tying Conspiracy to violate the anti-tying provisions of the BHCA.

213.     As per the loss calculations made by the Trinidads' experts, Trinidad-Garcia and Trinidad-Rodriguez have sustained, after taxes, market adjusted economic injuries of around **$49,559,206,** and **$8,659,086**, respectively, for a combined total of **$58,218,292**.

### D.  The Trinidads' Request for Compensation

214.     Pursuant to 12 U.S.C. 1975, the Trinidads seek in this action fair and adequate monetary compensation for their losses, to be trebled under the BHCA. That is, no less than **$148,677,618**, for Trinidad-Garcia and no less than **$25,977,258** for Trinidad-Rodriguez, for a grand total of no less than **$174,654,876**, plus an award for reasonable costs and attorney's fees.

### 3.     Third Claim – Pendent Claim for Fault in Causing the Loss in Value of the Pledge Collateral

215.     The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

216.     Aiding and abetting the Tying Arrangements and in furtherance of the Tying conspiracy, Popular had the Trinidads sign and execute Pledge agreements that provide,

### 1.     PLEDGE AND GRANT OF SECURITY INTEREST

As security for any and all loans previously granted or that may be granted in the future or continued or for any other credit or financial accommodations previously granted, continued or granted in the future, including loans enumerated in form "Authorization Letter for Securities Used as Collateral" (PS-025), without considering them as a limitation between Bank and the Customer, or between Bank, the Customer and the Guarantor (Guarantor and Customer collectively referred to as Customer), including any interest, late charges, penalties, costs and attorneys' fees related thereto (collectively, the "Secured Obligation") Customer hereby grants to Bank, a security interest in, and pledges to Bank all of the cash, securities and other assets deposited in the Collateral Account desc1ibed below, together with all dividends and distributions thereon and proceeds there from (hereafter collectively referred to as "Pledged Collateral".

## 2. TRANSFER OF CONTROL

Customer agrees to transfer control over the Pledged Collateral deposited in the Collateral Account to the Bank. The term "Pledge Collateral" shall also include any security, investment property or other assets pledge to the Bank by the Customer in addition to, or substitution and that is transferred to the Collateral Account through the form Authorization Letter for Securities Used as Collateral (PS--025) Each form shall form part of and be governed by this Agreement.

217.     As per the foregoing transfer of control and in furtherance of the Tying Conspiracy, BPOP had BPPR exercise absolute control to make or permit any changes to the Pledged Collateral.

218.     The PR Civil Code governs the Pledge Agreements. It explicitly provides that Popular had the duty to "take care of the thing pledged with the diligence of a prudent administrator." PR Civil Code, Article 1003.

219.     The foregoing duties are imposed by law upon BPPR, as pledgee of the Trinidad's securities. *Id.* The following caselaw and Civil Law authorities explain the nature of BPPR's fiduciary duties to the Trinidads to prevent the deterioration or diminishment of the value of the pledged securities:

"'Like the mortgage and the antichresis, the pledge is a real [property] right of guarantee, but it is distinguished from those by the transfer of the possession of the guarantor to the creditor. This possession transfer is not accompanied by a correlative displacement holder, so the **Civil Law requires the creditor to assume certain obligations towards the pledged property**. Art. 1768 of the Civil Code, **31 L.P.R.A. sec. 5027. In front of the debtor of the obligation', … 'the pledgee ... is subject to the obligations of every possessor, especially to that of diligent conservation of the thing**. As a consequence, **it is obliged to maintain a prudent conduct in order to hold it, avoiding any act that could impair it, and must perform the acts of protection and security that defend the thing against events that may put it in detriment or destruction'**. … **The Civil Code imposes on the pledgee the general duty to 'take care of the thing given in pledge with the diligence of a good father** ...'. Art. 1766 of the Civil Code, 31 L.P.R.A. sec. 5025." (*Emphasis supplied*) *E. Sands, Inc. v. Riog Comm. Bank*, 140 D.P.R. 703, 1996 WL 605254 (P.R. 1996)

"**The Restrictions on the use and destination of the lien are aimed at preserving the integrity of the pledged property, with the expectation that once the credit is**

**satisfied, the thing given in pledge will revert to the person who incorporated it**. In this return consists the last obligation of the pledgee: the restitution. Restitution is nothing other than the return of the property given in pledge to the person who constituted it as security for the payment of a debt." (*Emphasis supplied*) *E. Sands, Inc. v. Riog Comm. Bank*, 140 D.P.R. 703, 1996 WL 605254 (P.R. 1996).

(*Internal citations omitted*) (*emphasis supplied*) *Davila v. Agrait*, 116 D.P.R. 549, 1985 WL 301217, at *2 (P.R. 1985).

220.     This statue imposed upon Popular the fiduciary duty to protect and monitor the credit quality of the securities managed by PSL and pledged in favor of BPPR and imposed upon them the duty to make any changes as needed to preserve the integrity of the pledged property, taking into consideration the rapidly deteriorating changing economic circumstances of the Puerto Rico credit that responded for the pledged securities.

221.     As of **December 2012**, Popular had the Trinidads' Pledged Collateral invested in an extremely high concentration of PR Bonds as follows. It had Trinidad-Garcia's Pledged Collateral invested **77%** in PR CEFs that, because of leverage used by the fund, had his Pledged Collateral invested **214%** in PR Bonds, as follows:



## Popular Invested 214% of Juan Felix Trinidad-Garcia's Portfolio in Puerto Rican bonds; 63% in ERS bonds and 62% in COFINA bonds

### (December 31, 2012)

| PR Bond Funds | | PR Bonds | ERS | COFINA |
|---|---|---|---|---|
| Puerto Rico AAA Portfolio Target Maturity Fund | $15,900 | $20,103 | $426 | $150 |
| Puerto Rico Fixed Income Fund | $3,615,537 | $5,155,262 | $2,037,409 | $1,131,415 |
| Puerto Rico Fixed Income Fund II | $2,927,963 | $4,392,872 | $1,594,510 | $1,239,788 |
| Puerto Rico Fixed Income Fund III | $5,161,824 | $7,573,305 | $2,841,394 | $1,506,490 |
| Puerto Rico Fixed Income Fund IV | $5,515,094 | $8,174,597 | $2,871,306 | $2,085,954 |
| Puerto Rico Fixed Income Fund V | $200,000 | $321,030 | $122,667 | $75,381 |
| Puerto Rico Investors Bond Fund I | $1,411,631 | $1,846,126 | $369,279 | $660,266 |
| Puerto Rico Investors Tax-Free Fund | $873,766 | $1,235,063 | $244,769 | $505,763 |
| Puerto Rico Investors Tax-Free Fund II | $887,586 | $1,236,085 | $256,823 | $499,122 |
| Puerto Rico Investors Tax-Free Fund IV | $921,921 | $1,432,377 | $259,482 | $761,942 |
| Puerto Rico Investors Tax-Free Fund V | $1,732,387 | $2,347,854 | $473,796 | $760,043 |
| Puerto Rico Investors Tax-Free Fund VI | $2,390,993 | $3,248,244 | $555,192 | $1,541,681 |
| Puerto Rico Mortgage-Backed & U.S. Gov. Securities Fund | $995,000 | $1,293,615 | $156,327 | $62,875 |
| Tax-Free Puerto Rico Fund | $1,337,124 | $1,967,844 | $285,119 | $752,819 |
| Tax-Free Puerto Rico Fund II | $376,215 | $543,634 | $96,029 | $278,368 |
| Tax-Free Puerto Rico Target Maturity Fund | $82,600 | $162,154 | $18,866 | $101,414 |
| Popular Income Plus Fund Cl A * | $606,358 | $830,016 | $55,963 | $120,387 |
| Popular High Grade Fixed Income Fund Cl A * | $290,250 | $417,530 | $0 | $71,060 |
| | $29,312,147 | $42,197,711 | $12,241,354 | $12,154,917 |
| Individual Puerto Rico Municipal Bonds | $1,183,807 | $1,183,807 | $450,098 | $327,130 |
| Total | $30,495,954 | $43,381,518 | $12,691,452 | $12,482,047 |
| Portfolio Securities Value | $37,934,689 | | | |
| Cash | $3,723,792 | | | |
| Margin | -$21,514,199 | | | |
| Equity | $20,256,069 | | | |
| As a % of Equity | 151% | 214% | 63% | 62% |

*Holdings and leverage data of Popular High Grade Fixed Income Fund Cl A, and ERS and COFINA holdings data of Popular Income Plus Fund Cl A are as of June 30, 2013.

February 2019                                                                                     25

222.    As of **December 2012**, Popular had the Trinidads' Pledged Collateral invested in an extremely high concentration of PR Bonds as follows. It had Trinidad-Rodriguez' Pledged Collateral invested **74%** in PR CEFs that, because of leverage used by the fund, had his Pledged Collateral invested **123%** in PR Bonds, as follows:



**Popular Invested 123% of Juan Felix Trinidad-Rodriguez's Portfolio in Puerto Rican bonds; 35% in ERS bonds and 39% in COFINA bonds**

(December 31, 2012)

| | | PR Bonds | ERS | COFINA |
|---|---|---|---|---|
| PR Bond Funds | | | | |
| Puerto Rico Fixed Income Fund | $45,760 | $65,248 | $25,787 | $14,320 |
| Puerto Rico Fixed Income Fund II | $598,193 | $897,479 | $325,764 | $253,293 |
| Puerto Rico Fixed Income Fund III | $1,227,248 | $1,800,590 | $675,555 | $358,175 |
| Puerto Rico Fixed Income Fund IV | $809,574 | $1,199,969 | $421,486 | $306,202 |
| Puerto Rico Investors Bond Fund I | $134,218 | $175,530 | $35,111 | $62,778 |
| Puerto Rico Investors Tax-Free Fund | $287,280 | $406,068 | $80,476 | $166,287 |
| Puerto Rico Investors Tax-Free Fund II | $226,283 | $326,154 | $67,765 | $131,698 |
| Puerto Rico Investors Tax-Free Fund III | $895,385 | $1,187,370 | $256,245 | $465,056 |
| Puerto Rico Investors Tax-Free Fund IV | $285,094 | $442,947 | $80,242 | $235,622 |
| Puerto Rico Investors Tax-Free Fund V | $823,912 | $1,116,624 | $226,286 | $361,471 |
| Puerto Rico Investors Tax-Free Fund VI | $761,475 | $1,034,489 | $176,816 | $490,989 |
| Puerto Rico Mortgage-Backed & U.S. Gov. Securities Fund | $179,100 | $232,851 | $28,139 | $11,317 |
| Tax-Free Puerto Rico Fund | $147,470 | $217,032 | $31,446 | $83,028 |
| Tax-Free Puerto Rico Fund II | $394,625 | $570,238 | $100,728 | $291,990 |
| Tax-Free Puerto Rico Target Maturity Fund | $99,120 | $194,584 | $22,639 | $121,696 |
| Popular Income Plus Fund CI A * | $330,290 | $452,119 | $30,484 | $65,576 |
| | $7,245,027 | $10,319,291 | $2,584,967 | $3,419,500 |
| Individual Puerto Rico Municipal Bonds | $500,427 | $500,427 | $450,098 | $0 |
| Total | $7,745,455 | $10,819,718 | $3,035,065 | $3,419,500 |
| Portfolio Securities Value | $9,773,646 | | | |
| Cash | $761,936 | | | |
| Margin | -$1,753,917 | | | |
| Equity | $8,781,665 | | | |
| As a % of Equity | 88% | 123% | 35% | 39% |

223.    On **December 13, 2102**, Moody's Investors Service issued the following communication regarding a downgrade of the credit quality of the PR Bonds to one notch above "junk" status, as follows:

# Moody's
## INVESTORS SERVICE

**Rating Action:** Moody's downgrades Puerto Rico general obligation and related bonds to Baa3 from Baa1 and certain notched bonds to Ba1

Global Credit Research - 13 Dec 2012

**Approximately $38 billion of debt affected; outlook is negative**

New York, December 13, 2012 -- Moody's Investors Service has downgraded the general obligation rating of the Commonwealth of Puerto Rico to Baa3 from Baa1. The downgrade also applies to those ratings that are based on or capped at the G.O. rating of the commonwealth (see list later in the report). The outlook is negative.

## SUMMARY RATING RATIONALE

The downgrade to Baa3 and the assignment of a negative outlook reflect four primary rating drivers:

- Economic growth prospects remain weak after six years of recession and could be further dampened by the commonwealth's efforts to control spending and reform its retirement system, both of which are needed to stabilize the commonwealth's financial results. The lack of significant economic growth drivers and the commonwealth's declining population have also reduced prospects for a strong economic recovery.

- Debt levels are very high and continue to grow.

- Financial performance has been weak, including lackluster revenue growth and large structural budget gaps that have led to a persistent reliance on deficit financings and serial debt restructurings to support operations in recent years.

- Lack of meaningful pension reform and no clear timetable to do so. Reform of the commonwealth's severely underfunded retirement systems is needed to avoid asset depletion and future budget pressure.

224.    As of **December 2012**, Popular had set a **$10 million cap** on PSL's own inventory of the CEFs. On or around December 13, 2012, after the Moody's above referenced downgrade -- because of the downgrade and growing concerns in the investment community that was increasingly cautious regarding Puerto Rico's credit -- PSL, through its Managing Director, Capital Markets Sales & Trading at Popular Securities, José Blasini, decided not to purchase any CEFs for its inventory and to reduce its then inventory to avoid the credit risks that they entailed at that time.

225.    Shortly thereafter, Mr. Marvin Diaz, Vice President, of Popular Investment Banking, participated in the drafting of a Popular presentation named a Closer Look, dated **December 19, 2012**. In that presentation, Popular presented the following then existing concerns about the PR credits,

> • Over the course of 2012, investors have grown increasingly cautious with regard to Puerto Rico's credit

**Recent News**

• A number of major investors and analysts have released research and commentary that has been critical of Puerto Rico's ongoing challenges and trading levels
- UBS, Jan. 11: Wealth Management Research note
- Capital "Rico's Challenge"
- Breckenridge Capital, March: Puerto Rico s Challenge
- Wells Fargo, May 24: "Puerto Rico: Failure of the State"
- Janney Capital Markets, Jul. 27: "Puerto Rico's Debt Overload"
- Municipal Market Advisors, Nov. 16: "Puerto Rico Conference Call"
• Several news articles from national media before and after the election have drawn attention to Puerto Rico's debt burden and pension funding status
• November election results in a change of administration
• On December 11, the new administration announced its financial team
- Strong and reputable team with field experience, faces significant challenges
• Moody's rating actions on December 13 and 14
- GO and related credits downgraded from Baa1 to Baa3, negative outlook
- PFC, PRASA (Senior Lien), PR Highways (Subordinate) and University of Puerto Rico bonds downgraded to Ba1, negative outlook
• December 17: New administration's leadership promised to hit the ground running to address the island's financial problems

Investor Concerns Regarding Puerto Rico Debt

• **Weak Economy:** Six years of no economic growth. Net contraction of 17% economic output since 20051; significant underground economic activity and limited private
investment growth.
• **Underfunded Pensions:** Lowest funding ratio of all state-level public pension systems in the country at 7% for ERS, 21% for TRS and 17% for JRS
• **Debt Burden:** Debt per capital and debt as a percentage of personal income continue to grow at an unsustainable rate
- Moody's metrics for Puerto Rico list Gross Tax-Supported Debt at $15,667 and Gross Debt/Personal Income at 97.7%
- Next highest state for Gross Debt per capita is Connecticut at $7,157 and for Debt/Personal Income is Hawaii at 13.3%
• **Liquidity:** Whether the central government and authorities have sufficient liquidity to pay operating expenses and debt service in the short term and whether GDB is in a position and willing to support these entities.

226.    As of **December 2012**, Popular was aware of the risks that the holding of PR securities entailed and took action to protect itself against losses by reducing its inventory of these securities.

227. Popular put its economic interest before that of the Trinidads when, since that time, it failed to take any action to prevent the foreseeable deterioration and loss in value of the Trinidads' Pledged Collateral that was under its absolute management and control.

228. As a result, thereof, on or around **September and October 2013**, the value of the Trinidads' Pledged Collateral started to sustain a substantial unrealized loss in value.

229. As per the loss calculations made by the Trinidads' experts, Trinidad-Garcia and Trinidad-Rodriguez have sustained, after taxes, market adjusted economic injuries of around **$49,559,206**, and **$8,659,086**, respectively.

230. Wherefore, pursuant to PR law, the Trinidads request, jointly and severally, against BPOP, BPPR and PSL, adequate compensation for the deterioration of the Pledged Securities in the amount of no less than **$49,559,206** to Trinidad-Garcia and **8,659,086** to Trinidad-Rodriguez, for a combined total of **$58,218,292**.

**4. Fourth - Pendent Claim for Damages Caused By Popular's Aiding and Abetting Overt Acts In Furtherance Of The Continuing Tying Conspiracy**

231. The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

232. The Popular conspirators, aiding and abetting the ongoing Tying Arrangement and in furtherance of the continuing Tying Conspiracy engaged, through fault, in the overt acts alleged in detail hereinabove and that are listed below, when:

    (1) Popular has continuously refused to allow the Trinidads to withdraw moneys from their money market accounts;

    (2) Popular has continuously refused to allow the Trinidads to transfer the pledge collateral from PSL to any other broker firm;

    (3) on two occasions, Popular stopped making monthly payments owed to Trinidad-Garcia and instituted multiple frivolous appellate proceedings;

(4) Popular adamantly breached the CFI orders to pay Trinidad-Garcia the monthly installments from its own funds once the funds available in the money market accounts at PSL were depleted;

(5) Popular filed on **June 26, 2019**, a collection and mortgage execution action against Trinidad-Garcia with the CFI, Carolina part, in civil case # CA2019cv02387, which is still pending, in breach of the *status quo* imposed by the 2014 Stipulation Judgment;

(6) Popular filed on **November 14, 2019**, with the CFI, San Juan part, in civil case # KCD 2014-0827 (602), an urgent request for provisional remedy to secure judgment against Trinidad-Garcia that led to the still pending restrictions over his assets;

(7) Popular still opposes Trinidad-Garcia's authorization request to the CFI to payoff, at substantial discount, a mortgage that encumbers one of his real estate properties;

(8) after the parties reached a settlement agreement, Popular has, in bad faith, tried to impose upon the Trinidads certain arbitrary and non-negotiable conditions and engaged in bad faith negotiation tactics that obstructed, derailed, and breached the execution of the settlement agreement, as alleged in the confidential factual allegations set forth in the attached appendix filed under seal;

(9) Popular has continuously exercised, up to this date, total control over the management of the Trinidads' investment accounts at PSL tied, as pledged collateral, to their bank accounts and SCLs at BPPR;

(10) in manifest violation of the applicable securities regulations, on or around **December 9, 2011**, Popular allowed Ramos to request and obtain a personal loan from Trinidad-Rodriguez in the principal amount of **$175,000** that was disbursed from his SCL with BPOP/BPPR, and is still owed to him;

(11) on **August 6, 2021**, Popular had Toro falsely testify and commit perjury, at the FINRA Action, when he declared that in or around **December 2012** he met Trinidad-Garcia and talked about his investment positions and risks involved in one of his investment accounts;

(12) in an adamant breach of the CFI order commanding Popular to pay Trinidad-Garcia the monthly installments from its own funds once the funds available in the money market accounts at PSL were depleted, on **August 18 and 19, 2021**, Popular started to liquidate his securities portfolio at PSL to make those payments; and,

(13) In furtherance of the Tying Conspiracy, Popular had PMA file all the above-mentioned legal proceedings.

233.    Through the foregoing aiding and abetting acts in the continuing Tying

Arrangements and overt acts in furtherance of the Tying Conspiracy, **since November 2010**, and

up to date, Popular has incurred in fault and *dolus* that contravenes the tenor of the contractual

banking obligations it has with the Trinidads. Popular's continuing fault in contravention of its

contractual obligations is actionable pursuant to Articles1158, 1163, 1164 and 1536 of the PR

Civil Code.

### A.  Request for compensation for property losses

234.    Pursuant to Articles 1167 and 1168 of the Civil Code, the Trinidads are entitled to

obtain monetary compensation from Popular for all the losses caused by the breaches of its

obligation.

235.    As per the loss calculations made by the Trinidads' experts, Trinidad-Garcia and

Trinidad-Rodriguez have sustained, after taxes, market adjusted economic injuries of around

**$49,559,206**, and **$8,659,086**, respectively.

236.    Wherefore, pursuant to PR law, the Trinidads request, jointly and severally, against

BPOP, BPPR and PSL, adequate compensation for these losses to their property in the amount of

no less than **$49,559,206** to Trinidad-Garcia and **8,659,086** to Trinidad-Rodriguez, for a combined

total of **$58,218,292**.

### B.  Request for compensation for mental and emotional anguish, suffering and distress

237.    Since **November 2010**, and up to date, the Trinidads have, continuously and

constantly, been under undue stress and mental and emotional burden caused by the uncertainty

of their economic situation that could leave them without sufficient assets to meet even their basic

living expenses and obligations, and by their dealings with the consequences of each continuous and ongoing breach of its obligation by Popular.

238.    Since **November 2010**, and up to date, the Trinidads have continuously and constantly been under the undue stress and mental and emotional burden caused by the abusive and bad faith conduct at all times displayed by Popular in their dealings with them.

239.    As a result, thereof, since **November 2010**, the Trinidads have been deprived of their capacity to enjoy their retirement and their lives in peace, together with their loved ones. Instead, since then, they have been devoting most of their available time to defend themselves against Popular and to prosecute their claims, to put an end to the Tying Arrangement, and obtain monetary compensation for the losses caused by Popular to their property.

240.    Since **November 2010**, the Trinidads have sustained, and still sustain, the continuous mental and emotional pain, anguish and distress caused by the ongoing, continuous and uninterrupted misconduct by Popular.

241.    Wherefore, pursuant to PR law, the Trinidads request no less that **$5 million** each, jointly and severally, against BPOP, BPPR and PSL, as adequate monetary compensation for their mental and emotional anguish, suffering and distress.

### C.  Request for compensation for loss of image or good will

242.    Since **November 2010**, and up to date, the Trinidads have, continuously and constantly, been under the abusive and bad faith conduct publicly displayed against them by Popular in their dealings with them.

243.    This abusive and bad faith conduct publicly displayed by Popular against the Trinidads has injured the good image and goodwill of Trinidad-García as the successful retired

professional boxer that he is, and of Trinidad-Rodriguez, as the successful retired professional boxing trainer and manager that he is.

244. The Trinidads request, jointly and severally, against BPOP, BPPR and PSL, adequate and fair compensation of no less than **$25 million** for Trinidad-Garcia and **$10 million** for Trinidad-Rodriguez for this loss of image and goodwill.

**5. Fifth Claim - Pendent Claim for Breach of Contract Incorporated in the 2014 Stipulation Judgment**

245. The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

246. The Injunction Action was filed by Trinidad-Garcia to request a restraining order to prevent the liquidation of his tied portfolio at PSL by BPPR to pay off the deficiencies of the SCL during the pendency of the FINRA Action.

247. The 2014 Stipulation Judgment expressly stated that the agreements of the parties adopted by the Court established a *status quo* that would be in force subject to the result of the claims pending before the relevant FINRA and Court forums and until something else is resolved in any of those forums.

248. That notwithstanding, as to what is relevant herein, Popular repeatedly breached the 2014 Stipulation Judgment when it acted against the established *status quo* without having requested either a FINRA or Court order to do so. Popular breached it when it:

    (1) stopped paying the monthly mortgage payments on Trinidad-Garcia's Galaxy Apartment and then, on **June 26, 2019**, filed a collection and mortgage execution action against him with the CFI, Carolina Part, in Civil Case # CA2019CV02387; and,

    (2) in an adamant breach of the CFI order commanding it to pay Trinidad-Garcia the monthly installments from its own funds once the funds available in the money market accounts at PSL were depleted, on **August 18 and 19, 2021**, Popular started to liquidate his securities portfolio at PSL to make those payments.

249.     By these breaches BPOP, through BPPR and PSL, incurred in fault and *dolus* that contravenes the tenor of their contractual and Judgment obligations with the Trinidads, that is actionable pursuant to Articles 1158, 1163, 1164 and 1536 of the Civil Code.

250.     As a result, thereof, pursuant to Article 1167, the Trinidads are entitled to obtain fair and adequate compensation from Popular for all damages and losses caused by the breach of the obligation, that include consequential damages and loss of profits.

251.     Pursuant to Article 1168, because of Popular's *dolus* the Trinidads are entitled to obtain compensation from Popular for all damages and losses arising from the breaches.

252.     Popular's breach in failing to pay the monthly mortgage installments of the Galaxy Apartment has caused an injury to the credit history of Trinidad-Garcia, caused him to incur in expenses to defend himself and exposed him to liabilities for which Popular is responsible to him. Trinidad-Garcia requests fair and adequate compensation for these damages against Popular, in the monetary amount to be proven at the trial of this case.

253.     Byb reason of Popular breach of the 2014 Stipulation Judgment and partial liquidation of the Pledged Collateral, Trinidad-Garcia has sustained **realized losses** in the amount of no less than **$7,102,171.**73, for which he requests compensation, jointly and severally against, BPOP, BPPR and PSL**.**

254.     In addition, Popular has adamantly stated its intent to continue to liquidate Trinidad-Garcia's Pledged Collateral in breach of the 2014 Stipulation Judgment.

255.     Wherefore, Trinidad-Garcia requests compensation, jointly and severally, against BPOP, BPPR and PSL, for the losses to be sustained by him because of Popular's future liquidation of his Pledged Collateral.

**6. Sixth Claim - Pendent Claim for Breach of Confidential Settlement Agreement, Requesting Strict Compliance and Monetary Compensation**

256. The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

257. After the parties reached a Confidential Settlement Agreement, Popular, in bad faith, tried to impose upon the Trinidads certain arbitrary and non-agreeable conditions and engaged in bad faith negotiation tactics that obstructed, derailed, and breached the execution of the Settlement Agreement.

258. Wherefore, pursuant to Article 1255 of the Civil Code, the Trinidads request against Popular, in the alternative, either the strict compliance of the Confidential Settlement Agreement, or fair and adequate compensation for the damages caused by the breach, opting for the remedy that will result in the largest compensation for the injuries caused to their property.

259. In addition, when the Confidential Settlement Agreement was reached, for the first time since **November 2010**, the Trinidads felt some relief from the undue stress and mental and emotional burden caused by the uncertainty of their economic situation that could leave them without sufficient assets to meet even their basic leaving expenses and obligations, and by their dealings with the consequences of each continuous and ongoing breach by Popular. That relief ceased to exist and commenced anew with Popular's breach of the Confidential Settlement Agreement.

260. Wherefore, the Trinidads also request monetary compensation in the amount to be proven at trial, jointly and severally, against BPOP, BPPR and PSL, for their mental and emotional anguish, suffering and distress caused by this additional breach.

261.    Because of this breach, the Trinidads also request compensation in the monetary amounts to be proven at trial, jointly and severally, against BPOP, BPPR and PSL, for all monetary expenses incurred by them in the continuing litigation against Popular since the breach.

262.    Lastly, the Trinidads request payment, jointly and severally, against BPOP, BPPR and PSL, for prejudgment interest to be computed over the compensatory award, since the day of the breach and until the Judgment is entered.

### 7.    Seventh Claim – Pendent Claim for Fault – *"culpa in contrahendo"*

263.    The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

264.    In the alternative, if the trier of fact decides that there is no binding Confidential Settlement Agreement, pursuant to Articles 1271 through 1273 of the PR CC, the Trinidads claim, jointly and severally, against BPOP, BPPR and PSL, compensation for the damages caused to them because of their fault and bad faith in the precontractual negotiations or *culpa in contrahendo*.

265.    These Articles of the Civil Code trigger a social relationship that imposes on the parties the duty to act and negotiate any contract in good faith. This doctrine required Popular to act in good faith in its dealings and negotiations prior to the perfection of the Confidential Settlement Agreement. BPOP, BPPR and PSL had a duty to bargain in good faith and refrain from misconduct during their confidential settlement negotiations with the Trinidads. They had the good faith duty to collaborate in the formation of the contract until it was finalized.

266.    Instead, Popular breached these duties and incurred in *"culpa in contrahendo"* when it:

> (1)    arbitrarily and unilaterally attempted to impose unagreeable conditions that broke up the negotiations;
>
> (2)    failed to respect the agreements already reached;

(3) revoked a binding offer after it was accepted by the Trinidads; and,

(4) in bad faith, tried to impose upon the Trinidads certain arbitrary and non-agreeable conditions and engaged in bad faith negotiation tactics that obstructed, derailed, and caused that the agreement could not be finalized.

267.	BPOP, BPPR and PSL are jointly liable and should be ordered to monetarily compensate the Trinidads for the expenses incurred to enter into the Confidential Settlement Agreement and the damage suffered by them for having relied on the valid conclusion of the agreement.

268.	As a direct result of the aborted confidential settlement agreement, the Trinidads had failed to receive the economic benefits agreed thereunder. Thus, BPOP, BPPR and PSL are jointly liable and should be ordered to compensate the Trinidads, in the amounts to be proven at the trial of this action, for the monetary losses sustained by them not receiving the economic benefits agreed to in the failed Confidential Settlement Agreement.

269.	In addition, because of the Popular Entities' misconduct alleged in this claim, the Trinidads have each sustained mental and emotional suffering, anguish and distress.

270.	Therefore, the Trinidads also request monetary compensation, jointly and severally, against BPOP, BPPR and PSL, for their mental and emotional anguish, suffering and distress caused by this breach, in the monetary amounts to be proven at trial.

## 8.	Eight Claim – Pendent Claim for Punitive Damages

271.	The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

272.	BPOP, BPPR and PSL engaged in the fault, breaches and misconduct alleged in this action, with serious contempt to the Trinidads' property. As a result, thereof, they should be

found liable to pay punitive damages to the Trinidads in an amount equal to the compensatory damages that are to be proven at the trial of his action.

### 9. Ninth Claim – Pendent Claim for Attorney's Fees, Expenses and Interests

273. The Trinidads reproduce and reaffirm, as if alleged herein, each one of the preceding and subsequent allegations.

274. Pursuant to Puerto Rico Rule of Civil Procedure 44.1(a), the prevailing party in litigation is entitled to an award for the costs and expenses necessarily incurred in the litigation.

275. In addition, pursuant to Puerto Rico Rule of Civil Procedure 44.1(d),[1] a finding of obstinacy must be made against a losing party that take actions that result in a litigation that could have been avoided, that raises groundless claims or defenses, that needlessly protracts or prolongs the litigation, that refuses to recognize liability or an obligation, that obliges the other party to embark on needless procedures, or that otherwise incurs in reckless, obstinate or frivolous litigation conduct. *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 451-452 (1st Cir. 2010).

276. Once the threshold determination of obstinacy or frivolousness is met, the imposition of attorneys' fees is mandatory. *Correa v. Cruisers, a Div. of KCS Int'l, Inc.*, 298 F.3d 13, 30 (1st Cir. 2002). The award of attorney's fees has the purpose to punish, discourage and deter reckless, obstinate, or frivolous litigation conduct. *Nieves Huertas v. Padilla*, 189 D.P.R. 698, 701 (2013).

277. When calculating the attorneys' fees that the obstinate or frivolous losing party shall bear, the award amount should be determined in accordance to the degree or intensity of the obstinate or frivolous conduct. In addition, the court may consider factors such as the nature of the

---

[1] Rule 44.1(d) states that, "[i]n the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct."

action, the questions of law involved and the amounts at issue, the time spent, the efforts and professional activity needed for the case, and the skills and reputation of the lawyers involved. *IOM Corp.*

278.    Moreover, pursuant to the laws of the Commonwealth of Puerto Rico, any person or legal entity that is adjudged obstinate is also liable for pre-judgment interest over any monetary award to be accrued since the date of the filing of the claim in any action for damages, and since the time the cause of action arises in every case of collection of money. *See,* Rule 44.3 of the PR Rules of Civil Procedure, *supra.*

279.    In the event Popular denies liability, then it should be found obstinate and liable to pay the Trinidads reasonable attorney's fees and prejudgment interest to be computed over the Judgment amount, since the day of the breach and until the day that Judgment is entered.

## XV.   THE TRINIDAD'S HAVE MADE EXPRESS RESERVES TO TRY BEFORE THIS COURT THE FEDERAL CLAIM MADE IN THIS COMPLAINT

280.    In the other litigation against the Defendants discussed herein above prosecuted, or being prosecuted before other Courts or forums, the Trinidads have made an express reserve to try before this Court the federal claim made in this Complaint. See, England v. Medical Examiners, 375 U.S. 411 (1964).

## XVI.      PRAYER FOR RELIEF

**WHEREFORE,** the Trinidads respectfully request the Court to:

A.    Find the Defendants, jointly and severally, liable for the continuing violation of the anti-tying provisions of the BHCA.

B.    Find the Defendants, jointly and severally, liable for engaging in the continuing conspiracy in violation of the anti-tying provisions of the BHCA.

C.    Find the Defendants, jointly and severally, liable for property damages caused to the Trinidads, reasonably estimated in no less than **$49,559,206** to Trinidad-Garcia and **$8,659,086** to Trinidad-Rodriguez, for a combined total of **$58,218,292**.

D.     Treble under the BHCA the damages sustained and find the Defendants, jointly and severally, liable in no less than **$148,677,618** for Trinidad-Garcia and **$25,977,258** for Trinidad-Rodriguez, for a grand total of no less than **$174,654,876**, plus an award for reasonable costs and attorney's fees.

E.     Find the Defendants, jointly and severally, liable for the losses caused to the property of the Trinidads because of the deterioration of the Pledged Securities, in the amount of no less than **$49,559,206** to Trinidad-Garcia and **$8,659,086** to Trinidad-Rodriguez, for a combined total of **$58,218,292**.

F.     Find the Defendants, jointly and severally, liable for the damages caused to the Trinidads by their aiding and abetting overt acts in furtherance of the continuing tying conspiracy; and grant the Trinidads request for monetary compensation for their mental and emotional anguish, suffering and distress in the amount of no less than **$5 million** each.

G.     Find the Defendants, jointly and severally, liable for the damages caused to the Trinidads in loss of image and goodwill for no less than **$25 million** for Trinidad-Garcia and **$10 million** for Trinidad-Rodriguez.

H.     Find the Defendants, jointly and severally, liable, in the alternative, either for the strict compliance of the Confidential Settlement Agreement, or a fair and adequate compensation for the damages caused by the breach, opting for the remedy that will result in the largest compensation for the injuries caused to their property.

I.     Find the Defendants, jointly and severally, liable in the amount to be proven at trial, for the mental and emotional anguish, suffering and distress caused to the Trinidads by the breach of the Confidential Settlement Agreement.

J.     In the alternative, find the Defendants, jointly and severally, liable for precontractual fault in the negotiation of the Confidential Settlement Agreement, and order them to monetarily compensate the Trinidads for the expenses incurred and the damage suffered by them for having relied on the valid conclusion of the agreement, including for the mental and emotional sufferings, anguish, and distress sustained by them, in the amounts to be proven at the trial of this action.

K.     Find the Defendants, jointly and severally, liable for punitive damages to the Trinidads in an amount equal to the compensatory damages that are to be proven at the trial of this action.

L.     Award the Trinidads reasonable attorneys' fees and prejudgment interest.

M.     Grant the Trinidads any such other and further relief, as the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED, in San Juan, Puerto Rico, this 4th day of October 2021.**

/s/Eric M. Quetglas Jordan

ERIC M. QUETGLAS-JORDAN
USDC-PR #202514
**QUETGLAS LAW OFFICES, P.S.C.**
1353 Luis Vigoreaux Ave.
PMB 669
Guaynabo, PR 00966
Tel. (787) 548-1410
QuetglasLaw@gmail.com

/s/José F. Quetglas Jordan

JOSÉ F. QUETGLAS-JORDÁN
USDC-PR #203411
QUETGLAS LAW FIRM, P.S.C.
1353, Luis Vigoreaux Ave.
PMB 657
Guaynabo, PR 00966
Tel: (787) 406-8915
Email: jfquetglas@gmail.com;
quetglaslawpsc@gmail.com