## FEDERAL RESERVE SYSTEM

[Docket No. OP–1158]

### Anti-Tying Restrictions of Section 106 of the Bank Holding Company Act Amendments of 1970

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Proposed interpretation and supervisory guidance with request for public comment.

**SUMMARY:** The Board proposes to adopt an interpretation of the anti-tying restrictions of section 106 of the Bank Holding Company Act Amendments of 1970 and related supervisory guidance. The interpretation describes the scope and purposes of section 106, the elements of a tying arrangement prohibited by section 106, and the statutory and regulatory exceptions to the prohibitions of section 106. The interpretation also includes examples of the types of conduct, actions and arrangements by banks that are prohibited and permissible under section 106. The Board believes that adoption of the interpretation will assist banks and their customers in understanding the scope of the anti-tying restrictions of the statute. The related supervisory guidance discusses the types of internal controls that should help banks comply with section 106. The proposed interpretation and guidance reflect the principles that the Board will apply in enforcing section 106 and conducting anti-tying reviews at banking organizations.

**DATES:** Comments must be received on or before September 30, 2003.

**ADDRESSES:** Comments should refer to Docket No. OP–1158 and may be mailed to Ms. Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System, 20th Street and Constitution Avenue, NW., Washington, DC 20551. However, because paper mail in the Washington area and at the Board of Governors is subject to delay, please consider submitting your comments by e-mail to *regs.comments@federalreserve.gov* or faxing them to the Office of the Secretary at 202–452–3819 or 202–452–3102. Members of the public may inspect comments in Room MP–500 of the Martin Building between 9 a.m. and 5 p.m. on weekdays pursuant to section 261.12, except as provided in section 261.14, of the Board's Rules Regarding Availability of Information (12 CFR 261.12 and 261.14).

**FOR FURTHER INFORMATION CONTACT:** Scott G. Alvarez, Associate General Counsel (202–452–3583), Kieran J. Fallon, Senior Counsel (202–452–5270), Mark E. Van Der Weide, Counsel (202–452–2263), or Andrew S. Baer, Counsel (202–452–2246), Legal Division; or Michael G. Martinson, Associate Director (202–452–3640), or Michael J. Schoenfeld, Senior Supervisory Financial Analyst (202–452–2836), Division of Banking Supervision and Regulation; Board of Governors of the Federal Reserve System, 20th Street and Constitution Avenue, NW., Washington, DC 20551. For users of Telecommunications Device for the Deaf (TDD) only, contact 202–263–4869.

**SUPPLEMENTARY INFORMATION:**

### Background

Section 106 of the Bank Holding Company Act Amendments of 1970 (section 106) generally prohibits a bank from conditioning the availability or price of one product on a requirement that the customer also obtain another product from the bank or an affiliate of the bank.[1] Thus, for example, the statute prohibits a bank from conditioning the availability of a loan from the bank (or a discount on the loan) on the requirement that the customer also purchase an insurance product from the bank or an affiliate.[2]

Congress adopted section 106 in 1970 at the same time that it expanded the ability of bank holding companies to engage in nonbanking activities under section 4(c)(8) of the Bank Holding Company Act (BHC Act).[3] Congress expressed concern that banks might use their ability to offer bank products—credit in particular—in a coercive manner to gain a competitive advantage in markets for nonbanking products and services (such as insurance sales).[4] Congress therefore decided to impose the special anti-tying restrictions in section 106 on banks.

Section 106 does not apply to the nonbank affiliates of a bank or other nonbank entities.[5] The nonbank affiliates of banks, as well as banks themselves, however, are subject to the anti-tying restrictions contained in the Federal antitrust laws (the Sherman and Clayton Acts).[6]

Although section 106 prohibits banks from imposing certain types of tying arrangements on their customers, the statute also expressly permits banks to engage in other forms of tying and authorizes the Board to grant additional exceptions to the statute's restrictions by regulation or order. For example, section 106 and the Board's regulations expressly permit a bank to condition the availability or price of a product or service on a requirement that the customer also obtain a "loan, discount, deposit, or trust service" (a "traditional bank product") from the bank or an affiliate of the bank.[7]

Although the general prohibitions of section 106 can be stated fairly simply, determining whether a violation of the statute has occurred often requires a careful analysis of the facts and circumstances associated with the particular transaction (or proposed transaction) at issue. For example, as noted above, several important exceptions exist to the statute's prohibitions. Moreover, the actions, statements and policies of the bank involved in the particular transaction often play an important role in determining whether the bank has violated section 106.

The Federal banking agencies have long required that banking organizations establish and maintain appropriate policies and procedures to ensure compliance with the anti-tying restrictions of section 106,[8] and the agencies monitor these policies and procedures through the supervisory process. For example, the anti-tying policies and procedures of bank holding companies and state member banks are reviewed and evaluated by Federal Reserve examiners as part of the compliance examinations of these organizations. In addition, examiners may conduct more targeted examinations of the marketing programs, anti-tying training materials, internal reports and internal tying investigations of a banking organization.

Over the past several months, Board staff also has met with customers of

---

[1] 12 U.S.C. 1972. Although part of the Bank Holding Company Act Amendments of 1970, section 106 applies to a bank whether or not the bank is owned or controlled by a bank holding company.

[2] Section 106 also generally prohibits a bank from conditioning the availability or price of one product on a requirement that the customer (i) *provide* another product to the bank or an affiliate of the bank or (ii) *not obtain* another product from a competitor of the bank or a competitor of an affiliate of the bank. 12 U.S.C. 1972(1)(C), (D) and (E). The arrangements prohibited by section 106 are collectively referred to as "tying arrangements."

[3] 12 U.S.C. 1843(c)(8).

[4] *See* S. Rep. No. 1084, 91st Cong., 2d Sess. (1970).

[5] In 1971, the Board by regulation extended the anti-tying restrictions of section 106 to bank holding companies and their nonbank subsidiaries. In 1997, however, the Board rescinded this regulatory extension of the statute. *See* 62 FR 9290, Feb. 28, 1997.

[6] 15 U.S.C. 1 *et seq.*; 15 U.S.C. 12 *et seq.*

[7] *See* 12 U.S.C. 1972(1)(A); 12 CFR 225.7(b)(1).

[8] *See, e.g.*, Federal Reserve Board Bank Holding Company Supervision Manual 3500.0; Office of the Comptroller of the Currency Insurance Activities Handbook, Federal Prohibitions on Tying (June 2002); Office of the Comptroller of the Currency Bulletin 95–20 (April 14, 1995).

banks, professional associations representing customers of banks, competitors of banks, and banking organizations and their trade associations concerning the scope, effectiveness and impact of the anti-tying restrictions of section 106 and related issues. In addition, the Board has received inquiries from banks, competitors of banks, customers of banks and a member of Congress regarding section 106 and its application to specific situations.

In light of these events, the complexities associated with section 106, and the increasing importance of section 106 in the wake of the Gramm-Leach-Bliley Act,[9] the Board believes it would be useful and appropriate at this time to publish, and seek public comment on, an official interpretation of section 106 and supervisory guidance for banks concerning section 106. In supervising compliance by banking organizations with section 106 and this interpretation, the Board will take into account whether the manner of applying section 106 or the Board's interpretation in the context of a particular practice was unclear before this document was issued.

**Outline of the Proposed Interpretation and Supervisory Guidance**

The proposed statement explains the Board's interpretation of section 106. The statement also sets forth the principles that the Board will apply in enforcing the statute and in assessing the anti-tying policies, procedures and systems of banks during the supervisory process. The Board has consulted extensively with the Office of the Comptroller of the Currency in developing the interpretation and supervisory guidance.

The statement is divided into several parts. The first six parts (Parts I–VI) are a proposed Board interpretation of section 106. These parts describe the types of bank conduct that are prohibited by section 106 (Part II), explain the essential elements of a tying arrangement prohibited by section 106 (Part III), and describe the statutory and regulatory exceptions to the anti-tying prohibitions of section 106 (Part IV). The remainder of these six parts provide an introduction to the statement (Part I) and discuss the scope of the terms "bank" and "affiliate" for purposes of section 106 and the statement (Parts V and VI).

The final part of the statement (Part VII) discusses the policies, procedures and systems that should help banks ensure and monitor their compliance with section 106. This section is guidance that the Board proposes to follow in its supervision of banking organizations going forward.

The interpretation discusses a wide variety of issues related to section 106. Among other matters, the Board's interpretation addresses (i) the scope of the statutory and regulatory traditional bank product exceptions, including the types of products that would qualify as a traditional bank product (*i.e.,* a "loan, discount, deposit, or trust service") for purposes of the exceptions; (ii) the permissibility under section 106 of relationship banking programs that involve both traditional bank products and other products (referred to in the interpretation and guidance as "mixed-product arrangements"); and (iii) whether tying arrangements voluntarily sought or demanded by a customer are permissible under section 106. The interpretation also includes examples of the types of conduct, actions and arrangements by banks that are prohibited and permissible under section 106. These examples, which are included for illustrative purposes, are based solely on the facts stated in the example. Because the determination of whether a violation of section 106 has occurred is fact specific, these examples by themselves do not represent a finding that any past action by a particular bank violated the statute.

The Board seeks comment on all aspects of the proposed interpretation and supervisory guidance. In addition, the Board asks commenters to identify and discuss any section 106 interpretive or compliance issues that are not addressed in the statement but that, in the view of commenters, would be of sufficient importance and general interest to address either in the Board's interpretation or supervisory guidance.

The proposed interpretation and related supervisory guidance follows.

**Interpretation of the Anti-tying Restrictions of Section 106 of the Bank Holding Company Act Amendments of 1970 and Related Supervisory Guidance**

*I. Introduction*

The anti-tying provisions of section 106 of the Bank Holding Company Act Amendments of 1970 ("section 106" or the "anti-tying prohibitions") prohibit certain forms of tying by banks.[10] The statute is intended to prevent banks from using their ability to offer bank products, credit in particular, in a coercive manner to gain a competitive advantage in markets for other products and services. Although section 106 sets forth an absolute bar to certain forms of tying by banks, the statute permits other types of tying and permits the Board to grant additional exceptions to its prohibitions. Violations of section 106 may be addressed by the bank's appropriate Federal banking agency through an enforcement action, by the Department of Justice through a request for an injunction, or by a customer or other person injured by the illegal tying arrangement through a request for an injunction or an action for damages.[11]

This statement explains the Board's interpretation of the prohibitions of, and statutory and regulatory exceptions to, section 106. This statement also reflects the principles and factors that the Board will apply in conducting anti-tying reviews at banking organizations and enforcing section 106. In addition, Part VII of this statement includes supervisory guidance outlining the types of anti-tying policies, procedures and systems that the Board believes will help banks ensure compliance with section 106.

Banks and their affiliates also are subject to the tying restrictions contained in the Sherman Act and the Clayton Act that apply to all persons acting in interstate commerce.[12] This statement does not address the applicability of these general antitrust laws, which are within the jurisdiction of the Department of Justice. This statement also does not address the treatment of arrangements involving customers and banks and their affiliates under other Federal or state laws, including sections 23A and 23B of the Federal Reserve Act (12 U.S.C. 371c, 371c–1) and the Real Estate Settlement Procedures Act (12 U.S.C. 2601 *et seq.*).

*II. What Conduct Is Prohibited by Section 106?*

Section 106 prohibits a bank from extending credit, leasing or selling any property or furnishing any service, or fixing or varying the consideration for any of the foregoing, on the condition or requirement that the customer do any of the following:

1. Obtain some additional credit, property or service from the bank, *other than* a loan, discount, deposit or trust service;

2. Provide some additional credit, property or service to the bank, *other than* those related to and usually provided in connection with a loan, discount, deposit or trust service;

---

[9] Pub. L. No. 106–102, 113 Stat. 1338 (1999).

[10] 12 U.S.C. 1972(1).

[11] 12 U.S.C. 1972, 1973, 1975 and 1976.

[12] 15 U.S.C. 1 *et seq.*; 15 U.S.C. 12 *et seq.*

3. Obtain from or provide to an affiliate of the bank some additional credit, property or service; or

4. *Not* obtain some additional credit, property or service from a competitor of the bank or of an affiliate of the bank, *unless* the condition is reasonably imposed in a credit transaction to ensure the soundness of the credit.[13]

As this list illustrates, section 106 prohibits banks from imposing certain tying arrangements as well as certain reciprocity and exclusive dealing arrangements on their customers.[14] Thus, for example, section 106 prohibits a bank from imposing a condition on a prospective borrower that requires the borrower to do any of the following in order to obtain a loan from the bank—

• Purchase an insurance product from the bank or an affiliate of the bank (a prohibited tie);

• Obtain corporate debt or equity underwriting services from an affiliate of the bank (a prohibited tie);

• Sell the bank or an affiliate of the bank a piece of real estate unrelated to the requested loan (a prohibited reciprocity arrangement); or

• Refrain from obtaining insurance products or securities underwriting services from a competitor of the bank or from a competitor of an affiliate of the bank (a prohibited exclusive dealing arrangement).

For ease of reference, this statement uses the phrase ''tying arrangement'' to refer to all types of tying, reciprocity and exclusive dealing arrangements described in section 106. In addition, although section 106 generally refers to ''credit,'' ''property'' or ''service'' in describing the items sought or required to be obtained from (or provided to) the bank or an affiliate, this statement uses the term ''product'' to refer to any type of credit, property or service.

There are several noteworthy points about the anti-tying prohibitions of section 106. First, section 106 does not require a bank to extend credit or provide any other product to any customer. That is, section 106 does not prohibit a bank from declining to provide credit or any other product to a customer so long as the bank's decision is not based on the customer's failure to satisfy a condition or requirement prohibited by section 106. Thus, for example, section 106 does not prohibit a bank from denying credit to a customer on the basis of the customer's financial condition, financial resources or credit history, or because the bank does not offer (or seeks to exit the market for) the type of credit requested by the customer.

Second, section 106 applies only to tying arrangements that are imposed by a *bank.* The statute does *not* apply to tying arrangements imposed by a nonbank affiliate of a bank.[15] For example, section 106 prohibits a bank from requiring a person to purchase insurance from the bank's insurance affiliate in order to obtain a reduced interest rate on a loan from the bank. Importantly, such an arrangement is prohibited by section 106 even if the customer is informed of the bank's reduced-rate offer by the bank's insurance affiliate (for example, when the customer applies to the insurance affiliate to obtain insurance). In either case, it is the bank that is varying the price of a bank product (the loan) based on a requirement that the customer obtain another product (insurance) from an affiliate. Such action by the bank violates section 106.

On the other hand, section 106 does not apply to the insurance agency affiliate of the bank.[16] Thus, section 106 would *not* prohibit the insurance agency affiliate of a bank from offering a discount on the premiums the affiliate charges to customers that purchase more than one type of insurance (*e.g.,* homeowners and automobile insurance) from the affiliate. In addition, section 106 would *not* prohibit the insurance agency affiliate from offering discounts on premiums to customers who also have a loan from, or deposit account with, the bank. In both of these cases, it is the affiliate (and not the bank) that has imposed the condition governing the sale of its products.[17]

Third, section 106 covers some activities that are not included in the conventional notion of tying. Namely, section 106 prohibits banks from granting certain types of price discounts—that is, varying the price of a product on the condition that the customer purchase one or more other products from the bank or an affiliate. Thus, section 106 may restrict the ability of banks to provide price discounts (including rebates) on bundled products depending on what products are in the bundle and which ones are discounted. Section 106 does not, however, prohibit a bank from discounting the price of an individual product for reasons that are unrelated to another product. For example, a bank may offer a customer a discount on the purchase of an individual product in light of the amount of the individual product proposed to be purchased by the customer, the creditworthiness of the customer, or the unique features of the product or transaction.

Fourth, several important exceptions exist to the general prohibitions of section 106. For example, the statute itself expressly permits a bank to condition the availability or price of a product on a requirement that the customer also obtain a loan, discount, deposit or trust service from the bank. The statute also expressly permits a bank to condition the availability or price of a product on a requirement that the customer provide the bank some additional product that is related to and usually provided in connection with a loan, discount, deposit or trust service. The Board, acting pursuant to authority conferred by section 106, also has adopted by regulation several important exceptions to the statute's anti-tying restrictions.[18] The statutory and regulatory exceptions to section 106 are discussed in Part IV of this statement.

Because of the statute's complexity and the importance of the actions, statements and policies of the bank in analyzing whether section 106 has been violated, the determination of whether a violation of section 106 has occurred often requires a careful review of the specific facts and circumstances associated with the relevant transaction (or proposed transaction) between the bank and the customer. Banks should establish and maintain policies, procedures and systems that, in light of the nature, scope and complexity of the bank's activities, are reasonably designed to ensure that the bank's employees and representatives are trained appropriately concerning the

---

[13] For a discussion of the definition of the terms ''bank'' and ''affiliate,'' see Parts V and VI, respectively.

[14] ''Tying arrangements'' are arrangements that require a customer to *obtain* a product from the bank or one of its affiliates as a condition of the bank providing another product to the customer. ''Reciprocity arrangements'' are arrangements that require a customer to *provide* a product to the bank or one of its affiliates as a condition of the bank providing another product to the customer. ''Exclusive dealing arrangements'' are arrangements that require a customer *not to obtain* a product from a competitor of the bank or of an affiliate as a condition of the bank providing another product to the customer.

[15] Tying arrangements imposed by a nonbank affiliate of a bank are, however, subject to the anti-tying restrictions of the general antitrust laws.

[16] There is one exception to the general rule that affiliates of a bank are not subject to section 106. This exception is discussed in Part V.

[17] A bank, however, may not evade the prohibitions of section 106 by engaging jointly with an affiliate in a transaction in which the affiliate nominally imposes a condition on the customer that the bank is prohibited from imposing on the customer under section 106. Part VI of this statement provides some examples of situations when a tie that is nominally imposed by an affiliate of a bank will be viewed as a tie imposed by the bank for purposes of section 106.

[18] 12 U.S.C. 1972(1). The exceptions to section 106 adopted by the Board by regulation are codified in section 225.7 of the Board's Regulation Y (12 CFR 225.7).

anti-tying prohibitions of section 106 and that the bank complies with the statute. Part VII of this statement discusses the types of policies, procedures and systems that should help banks comply with the anti-tying restrictions of section 106.

Bank customers that believe they have been the object of a tying arrangement prohibited by section 106 are encouraged to contact the appropriate Federal banking agency for the bank involved. These agencies are the Office of the Comptroller of the Currency for national banks, the Board for state-chartered banks that are members of the Federal Reserve System (''state member banks''), and the Federal Deposit Insurance Corporation for state-chartered banks that are not members of the Federal Reserve System (''state non-member banks'').

Savings associations are subject to anti-tying restrictions under the Home Owners' Loan Act (HOLA) that are virtually identical to those applicable to banks under section 106.[19] Customers of a savings association that believe the savings association has violated the anti-tying restrictions of the HOLA should contact the Office of Thrift Supervision.

*III. What Are the Essential Elements of an Impermissible Tying Arrangement Under Section 106?*

Congress modeled section 106 on the anti-tying principles developed under the general antitrust laws (the Sherman and Clayton Acts), which apply to all companies, including banks and their affiliates, that act in interstate commerce. As a general matter, a tying arrangement violates the Sherman and Clayton Acts if:

(1) The arrangement involves two or more separate products;

(2) The seller forces a customer seeking to purchase one of the products (the ''desired product'') also to purchase the other product;

(3) The seller has sufficient economic power in the market for the desired product to enable it to restrain trade in the market for the other product;

(4) The arrangement has anti-competitive effects in the market for the other product; and

(5) The arrangement affects a ''not insubstantial'' amount of interstate commerce.[20]

Although tying arrangements by banks are subject to the general antitrust laws, Congress determined to subject tying arrangements by a *bank* to a stricter standard. As a general matter, there are only two essential elements that must be shown to establish that a tying arrangement by a bank violates section 106:

(1) The arrangement must involve two or more separate products: the customer's desired product(s) and one or more separate tied products; and

(2) The bank must force the customer to obtain (or provide) the tied product(s) from (or to) the bank or an affiliate in order to obtain the customer's desired product(s) from the bank.[21]

This Part III discusses the essential elements of any prohibited tying arrangement under section 106.[22] Part IV discusses the statutory and regulatory exceptions to these general rules, as well as special issues that arise in applying these exceptions.

A. Arrangement Must Involve Two Products—a Desired Product and a Tied Product.

In order for a tying arrangement to exist under section 106, the arrangement must involve two or more separate products. A bank does not violate section 106 by requiring a customer to obtain (or provide) two or more aspects of a single product from (or to) the bank or an affiliate, or by conditioning the availability or varying the price of a product on the basis of the characteristics or terms of that product.[23] For example, a bank does not violate section 106 by requiring—

• A prospective borrower to provide the bank specified collateral in order to obtain the loan or to obtain the loan at a favorable interest rate; or

• An existing borrower to post additional collateral, accept a higher interest rate, or provide updated or additional financial information as a condition of renewal of the loan.

In such circumstances, the bank's conditions relate to the single product sought by the customer (a loan) and do not involve separate, distinguishable products.[24]

In applying section 106, it is useful to identify which of the separate products is the ''tied product'' and which is the ''desired product.'' The ''tied product'' is the product that the customer is required to obtain (or provide) in order to have access to or get a price discount on the ''desired product.'' Section 106 is premised on the notion that the ''desired product'' is the product the customer really seeks.

To illustrate, suppose a customer seeks a mortgage loan (the desired product) from a bank. Section 106 prohibits a bank from requiring that the customer purchase homeowners insurance (the tied product) from the bank or an affiliate of the bank as a condition to granting the customer the mortgage loan or a discount on the loan. However, as discussed in Part IV, some exceptions from the statute's prohibitions are available where the tied product is a traditional bank product (that is a loan, discount, deposit or trust service). The Board notes that certain types of derivative products, such as interest rate and foreign exchange swaps, often are sold by banks and purchased by customers in connection with lending transactions. The Board

---

[19] *See* 12 U.S.C. 1464(q); *Integon Life Insurance Corp.* v. *Browning,* 989 F.2d 1143, 1149 (11th Cir. 1993).

[20] *See Yentsch* v. *Texaco, Inc.,* 630 F.2d 46 (2d Cir. 1980); *Tic-X-Press, Inc.* v. *Omni Promotions Co.,* 815 F.2d 1407 (11th Cir. 1987); *see also* 9 Phillip Areeda, *Antitrust Law* at ¶1702 (1991). A tying arrangement may be found to be *per se* illegal under the general antitrust laws without any showing of anti-competitive effects in the market for the other product if the seller has sufficiently strong economic power in the market for the desired product. *See Jefferson Parish Hospital District No. 2* v. *Hyde,* 466 U.S. 2 (1984). In these cases, the courts essentially assume that the tying arrangement, combined with the seller's strong economic position in the market for the desired product, has or will produce anti-competitive effects. *Id.* at 16, n. 25.

In conventional antitrust parlance, the desired product is known as the ''tying product,'' because it is customers' desire to obtain it that allows a producer to tie other, possibly unwanted products—the tied products—to it. In the interest of clarity, this statement uses the term ''desired product'' instead of ''tying product.''

[21] Legislative history indicates that economic power, anti-competitive effects, and effects on interstate commerce are not necessary elements of a section 106 claim. *See* S. Rep. No. 1084, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 5519, 5558 (''Senate Report'') (Supplementary views of Sen. Brooke); Senate Report at 5547 (Supplementary views of Senators Bennett, Tower, Percy and Packwood); *see also Integon Life Insurance Corp.* v. *Browning,* 989 F.2d 1143 (11th Cir. 1993); *Amerifirst Properties, Inc.* v. *FDIC,* 880 F.2d 821 (5th Cir. 1989); 62 FR 9290, 9313, Feb. 28, 1997; 59 FR 65473, Dec. 20, 1994.

[22] The exclusive dealing prohibition in section 106 (12 U.S.C. 1972(1)(E)) also prohibits a bank from requiring that a customer refrain from obtaining another product from a competitor of the bank or of an affiliate in order to obtain the customer's desired product. Although exclusive dealing arrangements are not specifically discussed in this Part III, the elements discussed in this Part III are equally applicable to exclusive dealing arrangements prohibited by section 106.

[23] As a general matter, two products are separate and distinct for purposes of section 106 only if there is sufficient consumer demand for each of the products individually that it would be efficient for a firm to provide the two products separately. *See Eastman Kodak Co.* v. *Image Technical Services, Inc.,* 504 U.S. 451, 462 (1992); *Jefferson Parish Hospital District No. 2* v. *Hyde,* 466 U.S. 2, 19 (1984). Determining whether sufficient consumer demand exists for the two products separately often is a highly fact-intensive inquiry that depends on the nature and character of the products and markets involved. *See* 2 Joseph P. Bauer and William H. Page, Kintner Federal Antitrust Law 13.17 (2002).

[24] A tying arrangement, however, may exist where a bank imposes a condition that involves two separate products of the same type (*e.g.,* two separate insurance products).

requests comment on how interest rate swaps, foreign exchange swaps, and other derivative products that often are connected with lending transactions should be treated under section 106.

B. Bank—Imposed Condition or requirement.

Section 106 applies only if a bank provides or offers to provide a customer one product (the desired product), or a discount on the desired product, ''*on the condition or requirement*'' that the customer obtain (or provide) an additional product (the tied product) from (or to) the bank or an affiliate. This element of section 106 was modeled on the tying prohibitions in the general antitrust laws.

Under the general antitrust laws, an illegal tie exists only where the seller forces the customer to purchase the tied product in order for the customer to obtain its desired product.[25] Accordingly, a seller engages in an illegal tie under the general antitrust laws only if it requires the customer to purchase the tied product to obtain the customer's desired product.[26] Moreover, the evidence must demonstrate that the seller imposed the arrangement on the customer through some type of coercion.[27] Thus, the courts have held that a seller's bundled sale of multiple products to a customer does not violate the general antitrust laws if the customer *voluntarily* decided to purchase the package of products from the seller.[28] In such circumstances, the seller has not coerced or forced the buyer to purchase any product from the seller.

The language and legislative history of section 106 indicate that this distinction between an arrangement imposed by the seller and one voluntarily sought by the customer also is embedded in section 106.[29] Accordingly, section 106 applies only if each of two requirements are met: (1) A condition or requirement exists that ties the customer's desired product to another product; and (2) this condition or requirement was imposed or forced on the customer by the bank.[30]

1. *Existence of a condition or requirement.*

First, a violation of section 106 may occur only when a customer is *required* to obtain an additional product from, or provide an additional product to, the bank or an affiliate in order to obtain the customer's desired product or a discount on the desired product.[31] It is the existence of such a requirement that forms the heart of an illegal tying arrangement. Absent a requirement that the customer obtain a separate product from, or provide a separate product to, the bank or an affiliate, there is no ''tie'' between the customer's desired product and another product.

Thus, for example, a bank would violate section 106 if the bank informs a customer seeking only a loan from the bank that the bank will make the loan only if the customer commits to hire the bank's securities affiliate to underwrite an upcoming bond offering for the customer. In this example, the bank has conditioned the availability of credit to the customer on a requirement that the customer obtain another product (bond underwriting services) from an affiliate of the bank.

Section 106, however, does not prohibit a customer from deciding on its own to award some of its business to a bank or an affiliate as a reward for the bank previously providing credit or other products to the customer. Using the example in the previous paragraph, if the bank made the loan to the customer *without* conditioning it on a requirement that the customer obtain one or more additional products from the bank or an affiliate, then no tie actionable under section 106 would exist if the customer later voluntarily decides to award some of its securities underwriting business to the bank's securities affiliate.

In addition, section 106 does not prohibit a bank from granting credit or providing any other product to a customer based solely on a *desire* or *hope* (but not a requirement) that the customer will obtain additional products from the bank or its affiliates in the future. This is true even if the bank conveys to the customer this desire or hope for additional business. Section 106 also does *not* prohibit a bank from cross-marketing the full range of products offered by the bank or its affiliates to a customer or encouraging an existing customer to purchase additional products offered by the bank or its affiliates. Cross-marketing and cross-selling activities, whether suggestive or aggressive, are part of the nature of ordinary business dealings and do not, in and of themselves, represent a violation of section 106. However, bank actions that go beyond cross-marketing or cross-selling and that

---

[25] *See Times-Picayune Publishing Co.* v. *United States,* 345 U.S. 594, 614 (1953) (''The common core of . . . unlawful tying arrangements is the *forced* purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product'')(emphasis added); *see also Datagate, Inc.* v. *Hewlett-Packard Co.,* 60 F.3d 1421 (9th Cir. 1995), *cert. denied* 517 U.S. 1115 (1996); *Thompson* v. *Multi-List, Inc.,* 934 F.2d 1566, 1577–78 (11th Cir. 1991), *reh'g en banc denied* 946 F.2d 906 (1991); *Yentsch* v. *Texaco, Inc.,* 630 F.2d 46, 56–57 (2d Cir. 1980); *Response of Carolina, Inc.* v. *Leasco Response, Inc.,* 537 F.2d 1307, 1327 (5th Cir. 1976); *American Manufacturers Mut. Ins. Co.* v. *American Broadcasting-Paramount Theatres, Inc.,* 446 F.2d 1131, 1137 (2d Cir. 1971), *cert. denied* 404 U.S. 1063 (1972).

[26] *See, e.g., Northern Pacific Ry.* v. *United States,* 356 U.S. 1, 5–6 (1958) (''a tying arrangement may be defined as an agreement by one party to sell one product *only on the condition* that the buyer also purchases a different (or tied) product'') (emphasis supplied); *Tic-X-Press, Inc.* v. *Omni Promotions Co.,* 815 F.2d 1407, 1415–17 (11th Cir. 1987); 9 Phillip Areeda, *Antitrust Law* at ¶1752 (1991) (''There is no tie for any antitrust purpose unless the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one.'')

[27] *See, e.g., Thompson* v. *Multi-List, Inc.,* 934 F.2d 1566, 1577–78 (11th Cir. 1991), *reh'g en banc denied* 946 F.2d 906 (1991); *Tic-X-Press, Inc.* v. *Omni Promotions Co.,* 815 F.2d 1407, 1415 & 1418–19 (11th Cir. 1987); *Unijax, Inc.* v. *Champion Int'l, Inc.,* 683 F.2d 678, 685 (2d Cir. 1982) (''Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation.''); *Bob Maxfield, Inc.* v. *American Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir.) (''actual coercion is an indispensable element of a tie-in charge''), *cert. denied* 454 U.S. 860 (1981).

[28] *See, e.g., Tic-X-Press, Inc.* v. *Omni Promotions Co.,* 815 F.2d 1407, 1417 (11th Cir. 1987) (''two products are not tied as a matter of antitrust law if the buyer voluntarily purchases the tied product''); *Sports Form, Inc.* v. *United Press International, Inc.,* 686 F.2d 750, 754 (9th Cir. 1982) (''Where a company is simply sold what it wishes to buy, there can be no tying problem.''); *Dunkin Donuts of America, Inc.* v. *Dunkin Donuts, Inc.,* 531 F.2d 1211, 1224 (3d Cir.), *cert. denied* 429 U.S. 823 (1976) (''a voluntary purchase of two products is simply not a tie-in''); *Capital Temporaries, Inc.* v. *Olsten Corporation,* 506 F.2d 658, 662 (2d Cir. 1974) (''We do not think that there can be any question that no tying arrangement can possibly exist unless the person aggrieved can establish that he has been required to purchase something which he does not want to take.'')

[29] *See* Conf. Rep. No. 1747, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.C.C.A.N. 5561, 5569 (''Conference Report'').

[30] As discussed in Part IV, exceptions to section 106 *allow* a bank to impose a condition on a customer in certain circumstances where the tied product is a traditional bank product. In addition, as discussed in Part IV, arrangements that allow the customer the option to satisfy a condition imposed by the bank through the purchase of traditional bank products *or* other products do not force a customer to purchase a non-traditional product in violation of section 106 if the customer has a meaningful choice of satisfying the condition solely through the purchase of traditional bank products.

[31] *See* Conference Report at 5580 (Section 106 ''prohibits any subsidiary bank from providing any credit, property or service for a customer on the condition that he must obtain from, or provide to, the holding company or any other subsidiary thereof some additional credit, property or service.''); Senate Report at 5535 (''The purpose of [the anti-tying provisions] is to prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or services they desire.''); *see also Integon Life Insurance Corp.* v. *Browning,* 989 F.2d 1143 (11th Cir. 1993); *Tose* v. *First Pennsylvania Bank,* 648 F.2d 879 (3rd Cir. 1981), *cert. denied* 454 U.S. 893 (1981); *Duryea* v. *Third Northwestern National Bank,* 606 F.2d 823 (8th Cir. 1979); *Stefiuk* v. *First Union,* 61 F. Supp.2d 1294 (S.D. Fla. 1999), *aff'd without opinion* 207 F.3d 664 (11th Cir. 2000).

indicate that the bank will not provide the customer the desired product unless the customer obtains (or provides) another product from (or to) the bank or an affiliate do raise issues under section 106.

Importantly, a prohibited tying arrangement does not exist if the bank offers the customer the opportunity to obtain the customer's desired product (or a discount on the desired product) from the bank separately from the allegedly tied product. That is, if the customer was offered the option of obtaining the customer's desired product or discount from the bank *without* also obtaining (or providing) the allegedly tied product from (or to) the bank or an affiliate, then the customer was not *required* to obtain (or provide) the other product to obtain the desired product or discount. In such circumstances, no ''tie'' would exist between the two products for purposes of section 106.[32]

2. *Condition or requirement was imposed or forced on the customer by the bank.*

Even if a condition or requirement exists tying the customer's desired product to another product, a violation of section 106 may occur only if the condition or requirement was imposed or forced on the customer by the bank.[33] In this regard, section 106 was intended to prohibit banks from using their ability to offer bank products, and credit in particular, as leverage to force a customer to purchase (or provide) another product from (or to) the bank or an affiliate.[34] It was *not* the purpose of the statute to prohibit bank customers from using their own bargaining power to obtain a package of desired products from a bank and its affiliates or a price discount on those products. Similarly, it was not the purpose of the statute to prohibit customers from *voluntarily* seeking and obtaining multiple products that the customer desires from a bank or its affiliates.[35]

Accordingly, if a condition or requirement exists, further inquiry may be necessary to determine whether the condition or requirement was imposed or forced on the customer by the bank. If the condition or requirement resulted from coercion by the bank, then the condition or requirement violates section 106, unless an exemption is available for the transaction.[36] Prohibited coercive actions may be explicit or implicit. In some cases, a bank's coercive behavior may be clear from the agreement or conversations between the bank and the customer. In other cases, coercion may be implicit and reasonably inferred from the facts and circumstances surrounding the transaction.

On the other hand, if a condition or requirement was voluntarily sought or imposed by the customer, then the arrangement results from the free choice of the customer and no violation of section 106 has occurred. Thus, for example, a violation of section 106 does not occur if a large corporate customer of a bank demands that the bank provide the customer one product (such as a loan) in order for the bank or its affiliates to obtain other business from the customer (such as bond underwriting business), and the bank agrees to the customer's condition. In such circumstances, it is the *customer* that is using its business as leverage to obtain the products it desires—an action that does not implicate the purposes or proscriptions of section 106. Likewise, a violation of section 106 does not occur if a customer seeking to engage in a multi-faceted corporate transaction voluntarily solicits a bid from a bank and its securities affiliate for a package of products related to the transaction (such as a bridge loan, strategic advisory services, and bond underwriting services) and the bank and the securities affiliate offer to provide the customer all of the requested products.

3. *Factual inquiry required.*

As the foregoing illustrates, the specific facts and circumstances surrounding the bank-customer relationship often will be critical in determining whether a prohibited condition or requirement existed and whether the condition or requirement was imposed or forced on the customer by the bank or was volunteered or sought by the customer. Typically, the terms of the bank's offer to the customer or the agreement entered into between the bank and the customer will provide the best evidence of whether the customer was required to purchase (or provide) an additional product as a condition of obtaining the customer's desired product. The timing and sequence of the offers, purchases or other transactions between the customer and the bank or its affiliates that form the basis of the alleged tying arrangement, and the nature of the condition or requirement itself, also may be particularly relevant in determining whether the customer was required to obtain (or provide) the tied product in order to obtain the desired product.

Other information that may be useful in determining whether a condition or requirement exists and, if so, whether the bank coerced the customer into accepting the condition or requirement include any correspondence and conversations between the bank and the customer concerning the transaction; the marketing or other materials presented to the customer by the bank or an affiliate; the bank's course of dealings with the customer and other similarly situated customers; the banking organization's policies and procedures; the customer's course of dealings with the bank and other financial institutions; the financial resources and level of sophistication of the customer; and whether the customer was represented by legal counsel or other advisors.

---

[32] *See John Doe* v. *Norwest Bank Minnesota, N.A.,* 107 F.3d 1297, 1304 (8th Cir. 1997); *Stefiuk* v. *First Union Nat'l Bank,* 61 F. Supp. 2d 1294, 1299 (S.D. Fla. 1999), *aff'd without opinion* 207 F.3d 664 (11th Cir. 2000); *Nordic Bank PLC* v. *Trend Group, Ltd.,* 619 F. Supp. 542, 553 (S.D.N.Y. 1985).

[33] *See* 116 Cong. Rec. S15708 (daily ed. Sept. 16, 1970) (''The bill as amended would require that a condition or requirement imposed by the bank must be demonstrated in order to prove that a violation of [section 106] has occurred.'') (Statement of Sen. Bennett).

[34] *See* Conference Report at 5569 (''Section 106 of the bill, which has become known as the anti-tie-in section, will largely prevent coercive tie-ins and reciprocity.''); 116 Cong. Rec. S20647 (daily ed. Dec. 18, 1970) (Statement of Sen. Brooke) (violation of section 106 occurs ''where the totality of the circumstances indicates that the customer has not voluntarily entered into the transaction, but rather has been induced into doing so through coercion''); 116 Cong. Rec. S15709 (daily ed. Sept. 16, 1970) (attaching letter from Arthur Burns, Chairman of the Board of Governors of the Federal Reserve System, noting that section 106 ''would prohibit coercive tie-ins involving banks, bank holding companies, and their subsidiaries'').

[35] *See* Conference Report at 5569; 116 Cong. Rec. S16316 (daily ed. Sept. 23, 1970) (Remarks of Donald I. Baker, Deputy Director of Policy Planning, Antitrust Division, Department of Justice, submitted by Senator Proxmire). The statute's legislative history, for example, indicates that a voluntary tie-in may occur when a customer believes that it stands a better chance of ''securing a scarce and important commodity (such as credit) by 'volunteering' to accept other products or services'' from the bank or its affiliates. Although the statute's legislative history characterizes this type of voluntary tying as generally being undesirable, it also explicitly states that such voluntary tying is not prohibited by section 106. *See* Conference Report at 5569. The Board also has noted previously that section 106 prohibits coercive tying arrangements, but does not prohibit voluntary tying. *See, e.g., Mercantile Bancorporation,* 66 Federal Reserve Bulletin 799 (1980); *Barnett Banks, Inc.,* 61 Federal Reserve Bulletin 678 (1975).

[36] The Board recognizes that some courts have held that a tying arrangement may violate section 106 without a showing that the arrangement resulted from any type of coercion by the bank. *See, e.g., Dibidale of Louisiana, Inc.* v. *American Bank & Trust Company,* 916 F.2d 300 (5th Cir. 1990). After carefully reviewing the language, legislative history and purposes of the statute, the Board believes the better interpretation of section 106 is that a violation may exist only if a bank forces or coerces a customer to obtain (or provide) the tied product as a condition to obtaining the customer's desired product.

### IV. What Are the Exceptions to the Anti-Tying Prohibitions of Section 106?

Section 106 contains several exceptions to its anti-tying prohibitions. Congress also authorized the Board to grant additional exceptions from the statute's prohibitions, by regulation or order, if the Board determines the exception "will not be contrary to the purposes of [section 106]."[37] The exceptions adopted by Congress and the authorization granted to the Board to grant additional exceptions were intended in part to ensure that section 106 did not interfere with the conduct of appropriate traditional banking practices.[38]

#### A. Tying Arrangements Involving Traditional Bank Products.

1. *Statutory and regulatory exceptions.*

Section 106 specifically allows a bank to condition both the availability and price of any bank product (the desired product) on the requirement that the customer obtain a "traditional bank product" (the tied product) from the bank. One of the purposes of this exception was to allow banks and their customers to continue to negotiate their fee arrangements on the basis of the customer's entire banking relationship with the bank.[39] The Board has extended this exception by regulation to include situations where the tied product is a traditional bank product offered by an affiliate of the bank, rather than by the bank itself.[40] Taken together, these exceptions allow a bank to restrict the availability or vary the price of *any* bank product on the condition that the customer also obtain a traditional bank product from the bank or an affiliate of the bank.

Several facts are important in determining whether the traditional bank product exceptions apply in a given situation. First, the exceptions are available only if the *tied* product is a traditional bank product. The availability of the exceptions, however, does *not* depend on the type of *desired* product involved; the desired product may or may not be a traditional bank product.

Second, the exceptions apply only if the tied product is a *defined* traditional bank product. The statute defines a traditional bank product to be a "loan, discount, deposit, or trust service."[41] The statute also defines a "trust service" to mean any service customarily performed by a bank trust department.[42] Products that fall within the scope of these terms include, among other things, the following:

• All types of extensions of credit, including loans, lines of credit, and backup lines of credit;[43]
• Letters of credit and financial guarantees;
• Lease transactions that are the functional equivalent of an extension of credit;[44]
• Credit derivatives where the bank or affiliate is the seller of credit protection;
• Acquiring, brokering, arranging, syndicating and servicing loans or other extensions of credit;
• All forms of deposit accounts, including demand, negotiable order of withdrawal ("NOW"), savings and time deposit accounts;
• Safe deposit box services;
• Escrow services;
• Payment and settlement services, including check clearing, check guaranty, ACH, wire transfer, and debit card services;
• Payroll services;
• Traveler's check and money order services;
• Cash management services;[45]
• Services provided as trustee or guardian, or as executor or administrator of an estate;
• Discretionary asset management services provided as fiduciary;[46]
• Custody services (including securities lending services); and
• Paying agent, transfer agent and registrar services.

Thus, for example, the traditional bank product exceptions permit a bank to condition the availability or price of a particular loan on a requirement that the customer maintain a specified amount of deposits with the bank or its affiliates. Similarly, a bank may inform a customer that it will lend (or continue lending) to the customer only if the customer obtains cash management services from the bank or its affiliates. In both cases, the bank's actions are permissible because the tied products (deposits and cash management services) are traditional bank products.

A bank, however, may *not* require a customer seeking an auto loan from the bank to purchase automobile insurance from the bank or from an insurance agency affiliate of the bank. Although the desired product (an auto loan) in this case is a traditional bank product, the tied product (automobile insurance) is not and, accordingly, the traditional bank product exceptions are not available for this transaction.

2. *Mixed-product arrangements.*

As discussed above, section 106 does not prohibit a bank from conditioning the grant of a loan to a customer on a requirement that the customer also obtain one or more traditional bank products, or a specified amount of traditional bank products, from the bank or its affiliates. In some cases, however, a bank may wish to provide a customer the freedom to choose whether to satisfy a condition imposed by the bank through the purchase of one or more traditional bank products *or* other "non-traditional" products (a "mixed-product arrangement").[47] Allowing a bank to offer the customer the *option* of satisfying a condition by purchasing either traditional bank products *or* non-traditional products can provide benefits to the customer (by increasing the choices available to the customer) *without* requiring the customer to purchase any non-traditional product from the bank or an affiliate in violation of section 106.[48]

---

[37] 12 U.S.C. 1972(1). The exceptions that the Board has adopted by regulation are set forth at section 225.7(b) of the Board's Regulation Y (12 CFR 225.7(b)). Regulation Y expressly permits the Board to terminate the eligibility of a bank to operate under any exception set forth in section 225.7(b) if the Board finds the activities conducted by the bank under the exception result in anti-competitive practices. 12 CFR 225.7(c).

[38] *See* 116 Cong. Rec. S15708 (daily ed. Sept. 16, 1970) (Statement of Sen. Bennett); *see also* Senate Report at 5535.

[39] *See id.*

[40] *See* 12 CFR 225.7(b)(1)(i).

[41] 12 U.S.C. 1972(1)(A).

[42] *Id.* at section 1971. A product that meets this "trust service" standard is a traditional bank product even if the bank or affiliate providing the product does not have, or does not provide the product through, a trust department.

[43] An "extension of credit" for this purpose does not include underwriting, privately placing or brokering debt securities.

[44] "CEBA leases" that are entered into by banks pursuant to 12 U.S.C. 24 (Tenth) are *not* considered to be the functional equivalent of an extension of credit.

[45] The term "cash management services" refers generally to the payment and collection services that are provided to customers to speed collection of receivables, control payments and efficiently manage deposit balances. Cash management services may include one or more of the traditional bank products listed separately above, such as deposit, payment and lockbox services.

[46] A bank has discretionary authority over an account for these purposes if the bank, acting in a fiduciary capacity, has sole or shared authority (whether or not that authority is exercised) to determine what assets to purchase or sell on behalf of the account. *See* 12 CFR 9.2(i).

[47] As used in this discussion, a mixed-product arrangement involves a choice among traditional bank products and non-traditional products. The term does not apply to arrangements that involve only traditional bank products (which, as discussed in Part IV.A.1., are permissible under section 106) or arrangements that involve only non-traditional products (which, as discussed throughout this statement, may be prohibited by section 106).

[48] The Board previously has noted that the addition of non-traditional products to a menu of traditional bank products offered a customer may, in some circumstances, increase customer choice in a manner consistent with the purposes and intent of section 106. *See* 60 FR 20186, 20187–88, April 25, 1995. Indeed, this rationale formed the basis of the safe harbor that the Board adopted in 1995, as

Accordingly, where a bank offers a customer a mixed-product arrangement, further analysis may be necessary to determine whether the offer constitutes a tying arrangement prohibited by section 106. If the customer that is offered the mixed-product arrangement has a meaningful option to satisfy the bank's condition solely through the purchase of the traditional bank products included in the arrangement, then the bank's offer would not, in fact, require the customer to purchase any non-traditional product from the bank or its affiliates in violation of section 106.[49] In these circumstances, the customer has been provided a meaningful choice in determining whether to satisfy the bank's condition through the purchase of traditional bank products or non-traditional products, and the bank's inclusion of non-traditional products within the range of tied products may be viewed as giving the customer additional flexibility in determining how it may choose to satisfy a condition that the bank is permitted by law to impose.

If, on the other hand, the customer does not have a meaningful option to satisfy the bank's condition solely through the purchase of the traditional bank products included in the arrangement, then the arrangement violates section 106 because the arrangement effectively requires the customer to purchase one or more non-traditional products in order to obtain the customer's desired product or a discount on the desired product. A mixed-product arrangement also would violate section 106 if the facts indicate that the bank did not provide the customer the freedom to choose to satisfy the bank's condition solely through the purchase of one or more of the traditional bank products included in the mixed-product arrangement.[50]

To illustrate a mixed-product arrangement, assume Company, a large manufacturing concern with an investment-grade credit rating, has a backup credit facility with Bank that will shortly come up for renewal. Assume also that Bank and its affiliates periodically review the overall profitability of their combined business relationships with their large corporate customers to determine whether the profitability of the customers' aggregate business relationships with Bank and its affiliates meets the internal profitability threshold (the ''hurdle rate'') established by Bank and its affiliates for that customer or type of customer. In accordance with this policy, Bank conducts a review of the overall profitability of Company's relationships with Bank and its affiliates and determines that the profitability of Company's existing relationships with Bank and its affiliates (*i.e.,* the credit facility with Bank) does not meet the hurdle rate.

In light of this review, Bank informs Company that Bank will not renew Company's credit facility unless Company commits to provide Bank or its affiliates sufficient additional business to allow Company's overall relationships with Bank and its affiliates to meet the hurdle rate. Bank does *not* tie renewal of the credit to the purchase by Company of any *specific* product or package of products from Bank or its affiliates. Rather, Bank informs Company that Company is free to choose from among all of the products offered by Bank and its affiliates in determining how Company may seek to meet the hurdle rate. Bank and its affiliates offer a wide variety of products, including deposits, trust services, cash management services and several other traditional bank products as well as bond underwriting services and several other non-traditional products.

Bank's actions would be permissible under section 106 if, for example, Company could reasonably obtain sufficient cash management services from Bank to permit Company to meet the hurdle rate. In such circumstances, Company would have a meaningful option to satisfy the hurdle rate solely through the purchase of one or more of the traditional bank products that are offered by Bank and its affiliates (cash management services in this example),[51] and Bank's actions would not effectively require Company to purchase any non-traditional product in order to obtain renewal of the credit facility. This is true regardless of the product(s), if any, that Company ultimately chooses to obtain from Bank or its affiliates.

On the other hand, Bank's actions would violate section 106 if, for example, Company could satisfy the hurdle rate only by obtaining insurance, securities underwriting or strategic advisory services from Bank or an affiliate of Bank. In such circumstances, Company would not have a meaningful option to satisfy the hurdle rate solely through the purchase of one or more of the traditional bank products that are offered by Bank and its affiliates.

As the foregoing illustrates, the determination of whether a mixed-product arrangement comports with section 106 often will depend on the nature and characteristics of the arrangement itself and the customers to whom the arrangement is offered. Part VII of this statement discusses the types of policies, procedures and systems, including internal audit and recordkeeping systems, that should help banks offering mixed-product arrangements ensure that these arrangements are structured and offered in a manner consistent with section 106. The Board will review these policies, procedures and systems during the supervisory process as part of its examination and review of bank anti-tying policies, procedures and systems.

B. Reciprocity Exceptions

The reciprocity restrictions of section 106 generally prohibit a bank from conditioning the availability or price of a product (the desired product) on a requirement that the customer *provide* another product (the tied product) to the bank or an affiliate.[52] Section 106, however, contains an exception for situations where the tied product is to be provided to the bank and is ''related to and usually provided in connection with a loan, discount, deposit, or trust service'' (a ''usually connected product'').[53] The Board has extended this exception by regulation to include situations where a bank requires the customer to provide a usually connected product to an *affiliate* of the bank, rather than to the bank itself.[54] Taken together, these exceptions allow a bank to restrict the availability or vary the price of any bank product on the condition that the customer provide a usually connected product to the bank or an affiliate of the bank.

Both the statutory and regulatory reciprocity exceptions are intended to ensure that section 106 does not restrict appropriate traditional banking

---

an exception to section 106, for certain types of combined-balance discount programs. *Id.* This safe harbor is discussed further in Part IV.D.

[49] *Cf. Tic-X-Press, Inc.* v. *Omni Promotions Co.*, 815 F.2d 1407, 1416–17 (11th Cir. 1987) (a tying arrangement does not exist under the Sherman Act if the buyer had ''meaningful freedom of choice'' in deciding whether or not to purchase allegedly tied product from the seller); *Stephen Jay Photography, Ltd.* v. *Olan Mills, Inc.*, 903 F.2d 988, 991 (4th Cir. 1990) (tying arrangement does not exist if customer had the option to purchase, or not purchase, the allegedly tied product).

[50] Thus, a bank would violate section 106 if it ostensibly offered a customer a mixed-product arrangement, but informed the customer that the customer could satisfy the bank's condition only by purchasing one or more of the non-traditional products included in the arrangement.

[51] Company would have a meaningful option even though Company had a long-standing cash management arrangement with another financial institution so long as Company may legally transfer its cash management business to Bank and Bank is able to satisfy Company's cash management needs.

[52] 12 U.S.C. 1972(1)(C) and (D).

[53] *Id.* at 1972(1)(C).

[54] *See* 12 CFR 225.7(b)(1)(ii).

practices. Thus, for example, the exceptions permit a bank to condition the availability of secured credit on a requirement that the customer obtain insurance, for the benefit of the bank, that protects the value of the bank's security interest in the collateral securing the loan.[55] Similarly, the exceptions permit a bank to take a wide variety of steps to protect the bank's financial interest in its credit relationships, such as, for example, requiring the affiliated parties of a troubled borrower to pay down their loans with the bank prior to renewing or advancing additional credit to the troubled borrower or requiring the owners of a corporate borrower to provide a personal guarantee of the corporation's debt to the bank.

Facts that may be relevant in determining whether a bank's demand that a customer provide an additional product is usual and appropriate and, thus, permissible under the exceptions include the relationship between the tied product and the desired product; whether the practice protects the value of the bank's credit or other exposures to the customer and associated parties; whether the practice is usual in the banking industry in connection with the type of product involved; and whether the condition was imposed by the bank principally to reduce competition or allow it to compete unfairly in the market for the tied product. The Board notes, however, that a reciprocity arrangement involving a loan or other product does not violate section 106 simply because the arrangement is not frequently imposed in banking transactions. Contractual agreements between banks and their customers, and loan agreements in particular, often are tailored to account for the characteristics of the individual customer and the specific transaction at issue. Accordingly, even though a particular reciprocal arrangement is uncommon, it still may reflect an appropriate banking practice in light of the facts and circumstances surrounding the transaction.[56]

### C. Exclusive Dealing Exception

The statute's exclusive dealing restriction generally prohibits a bank from conditioning the availability or price of a bank product (the desired product) on a requirement that the customer *not obtain* another product (the tied product) from a competitor of the bank or a competitor of an affiliate of the bank.[57] This restriction, for example, prohibits a bank that has a securities affiliate engaged in bond underwriting activities from threatening a corporate customer that the bank will terminate the bank's credit relationships with the customer if the customer uses the bond underwriting services of a competitor of the bank's securities affiliate.

Section 106 contains an exception to its exclusive dealing restriction for situations where the condition was reasonably imposed by the bank in a credit transaction to ensure the soundness of the credit.[58] This exception, like the statutory reciprocity exception, was intended to preserve the ability of banks to take appropriate steps to protect their credit extensions to customers.

This exception, for example, permits a bank, when consistent with appropriate banking standards, to condition the availability of a loan to a customer on the requirement that the customer not borrow from other sources (or pledge any collateral securing the loan to other entities) during the term of the loan.[59] Similarly, this exception would permit a bank to condition the availability of floating-rate credit on a requirement that the prospective borrower hedge its floating-rate exposure by purchasing a fixed-to-floating interest rate swap, and limiting the permitted swap counterparties to those with a certain minimum credit rating. Although this condition may prevent the borrower from obtaining the swap from some less creditworthy competitors of the bank, the condition would appear to be reasonably designed to enhance the collectibility of the credit.

### D. Regulatory Safe Harbors

1. *Combined-balance discount safe harbor.*

The Board has granted a regulatory safe harbor for combined-balance discount packages, provided that they are structured in a way that does not, as a practical matter, obligate customers to purchase non-traditional products in order to obtain the discount.[60] This safe harbor allows a bank to vary the consideration for a product or package of products based on a customer's maintaining a combined minimum balance in certain products specified by the bank if three conditions are met: the bank offers deposits; all deposits are eligible to be counted toward the minimum balance; and deposits count at least as much as nondeposit products toward the minimum balance.[61] Although the products included in the combined-balance discount program must be specified by the bank, the products may be offered by the bank or by an affiliate of the bank.

2. *Foreign transaction safe harbor.*

The Board also has granted a regulatory safe harbor for bank transactions with foreign persons.[62] The foreign transaction safe harbor provides that the anti-tying prohibitions of section 106 do not apply to transactions between a bank and a customer if: (i) The customer is a company that is incorporated, chartered, or otherwise organized outside the United States and has its principal place of business outside the United States (a ''foreign company''); or (ii) the customer is an individual who is a citizen of a country other than the United States and is not resident in the United States.

The foreign transaction safe harbor would generally be available for a loan transaction entered into by a bank with a foreign company even if the loan is partially guaranteed by a U.S. incorporated affiliate of the foreign company, or the foreign company directs the bank to disburse a portion of the loan proceeds to a U.S. incorporated affiliate of the foreign company that is not a party to the loan agreement. Such a loan transaction with a foreign company, however, would *not* qualify for the foreign transaction safe harbor if

---

[55] The bank, however, may not require that the customer obtain the insurance from the bank or an affiliate of the bank.

[56] For example, as one court has noted, debtors in ''serious financial straits, working with their creditors, [often] enter into numerous types of transactions that protect the creditors' investments while permitting the debtors' businesses to continue. The complexity of the transactions and special needs of the parties involved determine the type of arrangement that will be made to secure the joint aims of the debtor and creditor. Due to the complicated circumstances of many bailout cases, the specific banking transactions utilized may appear uncommon, yet, in the milieu of bailouts, they constitute appropriate banking practices. As such, they do not violate [section 106].'' *See Continental Bank of Pennsylvania* v. *Barclay Riding Academy, Inc.,* 93 N.J. 153, 459 A.2d 1163, *cert. denied* 464 U.S. 994 (1983).

[57] 12 U.S.C. 1972(1)(E).

[58] *Id.*

[59] *See* 116 Cong. Rec. S15708 (daily ed. Sep. 16, 1970) (Statement of Sen. Bennett).

[60] 12 CFR 225.7(b)(2).

[61] The Board recently issued an interpretive letter clarifying that any financial product, including insurance products, may be included in a combined-balance discount program and explaining the permissible methods for weighting insurance products within a combined-balance discount program. *See* Letter dated May 16, 2001, from J. Virgil Mattingly, Jr., General Counsel of the Board, to Carl Howard. The Board also recently issued a letter indicating that, for purposes of applying the regulatory safe harbor for combined-balance discount programs, the term ''customer'' may include separate individuals who are all members of the same immediate family (as defined in 12 CFR 225.41(b)(3)) and who all reside at the same address. *See* Letter dated November 26, 2002, from J. Virgil Mattingly, Jr., General Counsel of the Board, to Oliver I. Ireland.

[62] 12 CFR 225.7(b)(3).

the facts and circumstances surrounding the transaction indicate that the borrower, in substance, was the U.S. incorporated affiliate and not the foreign company. The safe harbor also would *not* protect tying arrangements where the customer itself is a U.S. incorporated subsidiary of a foreign company.

3. *Transactions outside a ''safe harbor''.*

The combined-balance discount and foreign transaction provisions discussed above are regulatory safe harbors. Accordingly, some combined-balance discount programs that are outside the regulatory safe harbor still may not be covered by section 106 because the arrangement does not satisfy the essential elements of a prohibited tying arrangement under section 106 or qualifies for another statutory or regulatory exception from section 106. In addition, some tying arrangements that are outside the foreign transaction safe harbor still may not be covered by section 106 because the transactions involved are so foreign in nature that they do not raise the competitive concerns that section 106 was designed to address.

*V. What Is a ''Bank'' for Purposes of Section 106?*

Section 106 applies, by its terms, to any depository institution that meets the definition of ''bank'' in section 2(c) of the Bank Holding Company Act (BHC Act), including a grandfathered ''nonbank bank'' that is controlled by a company under section 4(f) of the BHC Act.[63] The statute also applies to any depository institution that is described in section 2(c)(2)(D), (F), (G), (H), (I) or (J) of the BHC Act and, thus, excluded from the definition of ''bank'' under the BHC Act.[64] As a result, virtually every type of institution that is chartered as a bank, including every ''insured bank'' (as defined in section 3 of the Federal Deposit Insurance Act), is subject to section 106.[65] This is true whether or not the covered depository institution is owned or controlled by a bank holding company registered under the BHC Act.

Section 106 also applies to any U.S. branch, agency, or commercial lending company of a foreign bank (as those terms are defined in section 8 of the International Banking Act).[66] In addition, although affiliates of a bank generally are not subject to section 106, the BHC Act specifically provides that an affiliate of an institution controlled pursuant to section 4(f) or described in section 2(c)(2)(D), (F), (G), (H), (I), or (J) of the BHC Act is subject to the anti-tying prohibitions of section 106 in connection with any transaction involving the products of both the affiliate and the institution as if the affiliate were a bank and the institution were an affiliate.[67]

Section 106 also applies to most, but not all, subsidiaries of banks. In particular, section 106 applies to all subsidiaries of a bank—other than a financial subsidiary—in exactly the same manner as the statute applies to the bank itself. A financial subsidiary of a national bank or a state member bank, however, is treated as an affiliate of the bank, and not as a subsidiary of the bank, for purposes of the statute.[68]

This statement uses the term ''bank'' to refer to all entities that are subject to section 106. As noted above, savings associations are subject to anti-tying restrictions that are virtually identical to those applicable to banks under section 106.[69]

*VI. What Is an ''Affiliate'' for Purposes of Section 106?*

Section 106 prohibits a bank from requiring that a customer obtain any additional product from, or provide any additional product to, ''a bank holding company of such bank, or * * * any other subsidiary of such bank holding company.''[70] For purposes of these restrictions, any company that controls a bank that is subject to section 106 is treated as a bank holding company (even if the company is not a bank holding company under the BHC Act), and any subsidiary of such a company is treated as a subsidiary of a bank holding company.[71] In addition, for purposes of section 106, any *natural person* that controls a bank that is subject to section 106 is treated as a ''bank holding company'' of the bank, and any other company controlled by such a natural person is treated as a subsidiary of the ''bank holding company'' of such bank.[72]

To reflect the scope of section 106, the term ''affiliate'' as used in this statement with respect to a bank means any company or natural person that controls the bank, and any company that is controlled by such company or person (other than the bank itself).

As noted previously, section 106 generally does not apply to tying arrangements imposed by an affiliate of a bank. However, a bank may not participate in a transaction in which an affiliate has nominally imposed a condition on a customer that the bank is prohibited from directly imposing under section 106 if the affiliate was acting on behalf of, as agent for, or in conjunction with the bank. For example, a bank should not have a pre-arrangement or understanding with an affiliate to fund a syndicated loan for which the affiliate acts as syndicate manager if the affiliate has conditioned the availability (or price) of its syndication services on a requirement that the customer obtain securities underwriting services from the affiliate. Similarly, if an affiliate of a bank has conditioned the availability (or price) of a bridge loan on a requirement that the customer hire the bank's securities affiliate as an underwriter for the company's follow-on bond offering, the bank should not have an arrangement or understanding with the affiliate at the time the bridge loan is made to purchase the loan (or a participation in the loan) from the affiliate.

*VII. What Internal Controls Should Banks Have to Ensure Compliance With the Anti-Tying Prohibitions of Section 106?*

The board of directors and senior management of a bank are responsible for ensuring that the bank establishes and maintains an effective system of internal controls that, among other things, provides reasonable assurances that the bank complies with applicable laws and regulations, including the anti-tying prohibitions of section 106. An effective system of internal controls and a management environment that emphasizes compliance not only helps an organization operate in an efficient and safe and sound manner, but also helps mitigate the legal and reputational risks that may arise from actual or perceived violations of the anti-tying prohibitions of section 106.

---

[63] *See* 12 U.S.C. 1971 and 1841(c)(1).

[64] 12 U.S.C. 1843(f)(9) and (h)(1). These institutions include limited-purpose trust companies, credit card banks, Edge Act and Agreement corporations, and industrial loan companies and similar institutions.

[65] *See* 12 U.S.C. 1813.

[66] *See* 12 U.S.C. 3106.

[67] *See* 12 U.S.C. 1843(f)(9)(B) and (h)(2).

[68] *See* 12 U.S.C. 1971; 12 CFR 208.73(e). Tying arrangements imposed by a financial subsidiary of a bank, like tying arrangements imposed by any other affiliate of a bank, remain subject to the general antitrust laws.

[69] *See* 12 U.S.C. 1464(q).

[70] *See* 12 U.S.C. 1972(1)(B) and (D). The exclusive dealing prohibition in section 106(1)(E) similarly prohibits a bank from requiring that a customer not obtain an additional product from a competitor of the ''bank holding company of such bank, or any subsidiary of such bank holding company.'' *Id.* at 1972(1)(E).

[71] *See* 12 U.S.C. 1843(f)(9) and (h)(1). A company that controls a bank (as defined under section 2(c) of the BHC Act) and that is not considered a bank holding company by reason of section 2(a)(5) of the BHC Act, however, is not considered a bank holding company for purposes of section 106 and, thus, is not considered an affiliate of the bank for purposes of this statement.

[72] *See* 12 U.S.C. 1971.

A. Anti-Tying Policies, Procedures and Systems

Banks should have policies, procedures and systems in place that are reasonably designed to ensure that the bank complies with the anti-tying prohibitions of section 106. The types of anti-tying policies, procedures and systems appropriate for a particular bank depends on the size of the bank, and the nature, scope and complexity of the bank's activities (including activities conducted in conjunction with affiliates). Banks should review and update their anti-tying policies, procedures and systems periodically to ensure that these policies, procedures and systems reflect any changes in the nature, scope or complexity of the bank's activities or applicable law, regulations or supervisory guidance.

The anti-tying policies and procedures of banks should describe the scope of section 106 and the types of tying arrangements prohibited by the statute. Banks should ensure that the anti-tying prohibitions of section 106 are appropriately reflected or incorporated in the institution's corporate policies and procedures, including the institution's policies and procedures concerning credit approval, new product approval and pricing, and marketing.

Banks also should ensure that appropriate bank personnel receive education and training concerning the anti-tying prohibitions of section 106. The scope and frequency of the education and training provided an individual or department should be tailored to the nature and scope of the person's or department's functions at the bank, with greater focus and resources devoted to those positions or departments that present the greatest legal or reputational risk to the bank. Corporate relationship managers, syndicated lending personnel, persons with authority to approve credit extensions or establish pricing policies for the bank and other personnel that have direct contact with customers for purposes of marketing or selling the bank's products, for example, should receive comprehensive and regular anti-tying training.[73]

In addition, the policies and procedures of a bank should—

• Permit personnel with questions concerning section 106 or its application to a particular transaction to discuss the issue with an appropriate representative of the institution's compliance or legal department;

• Include procedures for the receipt, handling and resolution of customer complaints alleging a violation of section 106 by the bank; and

• Prohibit the bank or any employee of the bank from taking adverse action against a customer because the customer submitted a complaint to the bank or a Federal banking agency alleging a violation of section 106 by the bank.

A bank's compliance function should take a lead role in monitoring the bank's compliance with section 106. Appropriate compliance activities may include reviewing periodically the bank's policies and procedures to ensure they are updated as necessary to reflect changes in the bank's business or applicable laws, regulations or supervisory guidance and conducting training sessions for appropriate bank personnel. The compliance function also should review the bank's marketing materials and individual transactions to test the bank's compliance with the anti-tying restrictions of section 106. In performing such tests, compliance personnel typically should review the documentation associated with the transaction and discuss the transaction with the relevant bank personnel involved in the transaction.

Internal audit also plays an important role in ensuring a bank's compliance with the anti-tying restrictions. A bank's internal audit function should periodically review and test the institution's anti-tying policies, procedures and systems in order to confirm that they are working effectively and in the manner intended. The appropriate scope and frequency of these reviews and tests will depend on the size, nature and complexity of the bank's business operations and the effectiveness of the bank's compliance function. Thus, for example, if the bank's compliance function properly conducts transaction testing on a regular basis, the bank's internal audit reviews may focus on reviewing the adequacy of the bank's policies and procedures and validating the compliance function's work. Banks should ensure that the compliance and internal audit personnel responsible for monitoring and assessing the institution's compliance with section 106 are well trained with respect to the anti-tying rules.

B. Internal Control and Recordkeeping Requirements for Banks Offering Mixed-Product Arrangements Outside a Regulatory Safe Harbor

As discussed above, a bank may offer a mixed-product arrangement under which the bank provides the customer the option of satisfying a condition imposed by the bank through the purchase of traditional bank products or non-traditional products where the customer has a meaningful option to satisfy the condition solely through the purchase of traditional bank products.[74] Because mixed-product arrangements present special compliance issues under section 106, the anti-tying policies, procedures and systems of a bank offering a mixed-product arrangement play a particularly important role in demonstrating and ensuring that the bank's actions with respect to these arrangements are consistent with section 106. Accordingly, in conducting anti-tying compliance reviews at banking organizations, the Board expects to carefully review the anti-tying policies, procedures and systems used by banks that offer mixed-product arrangements.

A bank's policies, procedures and documentation should reflect how the bank will and does establish a good faith belief that a customer offered a mixed-product arrangement would be able to satisfy the condition associated with the arrangement solely through the purchase of traditional bank products. For example, the bank's policies, procedures and documentation generally should address—

• The factors and types of information that the bank will review in forming a good faith belief that any customer offered a mixed-product arrangement has a meaningful option to satisfy the bank s condition *solely* through the purchase of one or more of the traditional bank products included in the arrangement. Information relevant to this determination may include:

• The range and types of traditional bank products that are offered by the bank and its affiliates and included in the mixed-product arrangement;

• The manner in which traditional bank products and non-traditional products are treated for purposes of determining whether a customer has or would meet the condition associated with the arrangement;[75]

• The types and amounts of traditional bank products typically required or obtained by companies that are comparable in size, credit quality, and nature, scope and complexity of business operations to the customer; and

---

[73] Banks also should review their employee compensation programs in order to ensure that such programs do not provide employees inappropriate incentives to tie products in a manner prohibited by section 106.

[74] *See* Part IV.A.2.

[75] In mixed-product arrangements, banks may not weight, discourage the use of, or otherwise treat traditional bank products in a manner that is designed to deprive customers of a meaningful choice.

- Information provided by the customer concerning the types and amounts of traditional bank products needed or desired by the customer and the customer s ability to obtain those products from the bank or its affiliates; and
- The bank personnel authorized to make the analysis described above for individual customers or classes of customers and the training and guidelines provided these personnel; and
- The internal processes and controls, including approval and documentation requirements, the bank uses to ensure that the analysis described above is (i) performed by the bank for a customer before the customer is offered a mixed-product arrangement and (ii) adequately reflected in the records of the bank.

The bank's policies and procedures also should ensure that any material information relied on by the bank in analyzing the types and amounts of traditional bank products likely required by a customer is current and reliable, and that the assessment of a customer's ability to satisfy the condition associated with a mixed-product arrangement solely through the purchase of traditional bank products is made prior to, and reasonably current with, the time the arrangement is offered to the customer.

The types and amount of information and level of analysis necessary for a bank to establish a good faith belief that a customer has a meaningful choice under a mixed-product arrangement may vary depending on the nature and characteristics of the arrangement and the types of customer(s) to which it is offered. For example, a less detailed and granular review likely would be required for a bank to establish a good faith belief that a large, complex company has a meaningful option of satisfying a condition solely through the purchase of traditional bank products than a smaller company with less complex business operations. In addition, a less detailed review likely would be necessary for a bank to develop a good faith estimate of the need for traditional bank products of an existing customer with a long history with the bank than of a potential customer or a customer with only a brief relationship with the bank.

C. Ability of Banks to Offer Mixed-Product Arrangements to Individuals

Bank products directed to individuals typically are standardized. Although such standardization may allow the product to be offered economically to large numbers of individual customers, it also means that the terms of the product typically are not modified to the same extent as with corporate customers to reflect the specific needs and resources of the customer.

Furthermore, because individuals typically have less bargaining power and may be less financially sophisticated, individuals may be more susceptible to subtle pressure by a bank that encourages the customer to purchase a non-traditional product from the bank or an affiliate. The potential for such subtle pressure to be applied in a manner that is both effective and difficult to uncover is particularly strong in mixed-product arrangements because these arrangements include both traditional bank products and non-traditional products and individuals often believe that they do not have (and, in fact, may not have) the ability to negotiate with a bank. These facts make it difficult for a bank to establish a good faith belief that a mixed-product arrangement provides an individual a meaningful option to satisfy the condition associated with the arrangement solely through the purchase of traditional bank products without a detailed and, in many cases, uneconomical analysis of the financial needs and capabilities of each individual offered the arrangement.

The Board recognizes that section 106 limits the ability of banking organizations to provide individual consumers with discounts on packages of bundled products and, thus, pass along the cost savings that may arise from bundled offerings in ways that are both pro-consumer and not anti-competitive. It was in part to allow banks some flexibility to provide individual consumers with the benefits of discounts on bundled offerings that the Board in 1995 exercised its exemptive authority to adopt a safe-harbor for combined-balance discount programs, which are a type of mixed-product arrangement that typically are marketed to individuals.[76] Moreover, the Board notes that section 106 does not impede the ability of a bank to provide individual consumers with discounts on packages of bundled *traditional* bank products and does not restrict the ability of a *nonbank* affiliate of a bank to offer mixed-product arrangements to individual consumers.

---

[76] This exception, which is discussed in Part IV.D, allows banks to offer certain combined-balance discount programs to individuals without making a specific determination that the particular customer has a meaningful option of qualifying for the discounts within the program solely through the use of the deposit products (a traditional bank product) included in the program. *See* 12 CFR 225.7(b)(2).

By order of the Board of Governors of the Federal Reserve System, August 25, 2003.

**Jennifer J. Johnson,**
*Secretary of the Board.*
[FR Doc. 03–22091 Filed 8–28–03; 8:45 am]
**BILLING CODE 6210–02–P**

---

# FEDERAL RESERVE SYSTEM

## Change in Bank Control Notices; Acquisition of Shares of Bank or Bank Holding Companies

The notificants listed below have applied under the Change in Bank Control Act (12 U.S.C. 1817(j)) and § 225.41 of the Board's Regulation Y (12 CFR 225.41) to acquire a bank or bank holding company. The factors that are considered in acting on the notices are set forth in paragraph 7 of the Act (12 U.S.C. 1817(j)(7)).

The notices are available for immediate inspection at the Federal Reserve Bank indicated. The notices also will be available for inspection at the office of the Board of Governors. Interested persons may express their views in writing to the Reserve Bank indicated for that notice or to the offices of the Board of Governors. Comments must be received not later than September 12, 2003.

**A. Federal Reserve Bank of Cleveland** (Stephen J. Ong, Vice President) 1455 East Sixth Street, Cleveland, Ohio 44101-2566:

*1. Laurie L. McClellan and Walter L. McClellan*, Minerva, Ohio; to acquire voting shares of Consumers Bancorp, Inc., and thereby indirectly acquire voting shares of Consumers National Bank, Minerva, Ohio.

Board of Governors of the Federal Reserve System, August 25, 2003.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 03–22092 Filed 8–28–03; 8:45 am]
**BILLING CODE 6210–01–S**

---

# GENERAL SERVICES ADMINISTRATION

## Maximum Per Diem Rates for the Continental United States (CONUS)

**AGENCY:** Office of Governmentwide Policy, General Services Administration (GSA).

**ACTION:** Notice of Per Diem Bulletin 04–1, Fiscal Year (FY) 2004 continental United States (CONUS) per diem rates.

---

**SUMMARY:** An analysis of lodging and meal cost survey data reveals that the FY 2004 maximum per diem rates for locations within the continental United