**Ex. 3**

The Banking Law Journal
Volume 100  Number 2
February 1983

# THE ANTI-TYING PROVISION:
# ITS POTENTIAL IS STILL THERE

Timothy D. Naegele*

*There is still bite in the anti-tying provision of the Bank Holding Company Act Amendments of 197.  The author discusses the legislative background, the major issues litigated, and their implications for future litigation.  He argues that the anti-tying provision, as supplemented by newly developing state law remedies, remains a valuable tool for litigants injured as a result of abusive or overreaching conduct on the part of banks, bank holding companies and their subsidiaries.*

In 1970, Congress passed the Bank Holding Company Act Amendments of 1970[1], which included Section 106,[2] the so-called anti-tying provision.[3]  Now, more than a decade later, it is useful to analyze the impact of Section 106 on banking and other commercial practices and to discuss the implications of recent developments and emerging trends for banks, other financial institutions, and those with whom they deal.

A tie-in or tying arrangement has been defined as "an agreement by one party to sell one produce (the 'tying product') but only on the condition that the buyer also purchase a different …product (the 'tied product'), or at least agree that he will not purchase that product from any other supplier."[4]  Section 106 proscribes tie-in arrangements imposed by banks,[5] bank holding companies[6] and their subsidiaries[7] on bank customers.  The crucial language of the 1970 tie-in amendments to the Bank Holding Company Act (BHCA or the Act) of 1956 is found in Section 106(b), which is now codified at 12 U.S.C. § 1972(1).[8]

The Broad language of Section 1972, and the sparse legislative history surrounding the provision, promptly raised questions of interpretation. Since the Act's passage, courts have sought to define the parameters of Section 1972; however, despite judicial efforts to add fiber and sinew to the abstract language of the statute, Section 1972 remain ill-defined and little understood.

Two recent decisions in the U.S. Courts of Appeals for the First and Third Circuits appear to evidence a trend toward a narrow construction of the range of conduct prohibited by Section 1972.[9]  Notwithstanding these and other federal court decisions, Section 1972 is an effective and yet frequently overlooked statutory remedy for predatory conduct on the part of banks.

## The Legislative Background

At the outset, it is important to note that while bank tie-in arrangements are numerous and take a variety of forms, their legitimacy is seldom questioned by even the most astute bankers. For example, prior to the legislative debate which led to passage of the Bank Holding Company Act Amendments of 1970, few if any borrowers or bank officers questioned the right of a bank to impose restrictions on the ability of borrowers to obtain loans from other institutions when loans were outstanding with the bank in question. While it is certainly logical and consistent with good banking practices to require customers to notify bank personnel before the borrower incurs other loan obligations which could jeopardize existing loans, banks often imposed other requirements which tested the limits of reasonable and legitimate business needs.[10]

In recognition of the enormous power and economic leverage held and exercised by financial institutions in general, and banks in particular, Congress enacted what is now Section 1972 of the BHCA.[11] The purpose of this provision, as stated in the accompanying Senate Report, is "to prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire.[12]

Section 1972 prohibits a bank from extending credit, leasing or selling property, or furnishing any service on the condition or requirement that the customer provide or obtain something else in the process, or refrain from obtaining something else from a competitor of a bank. In short, Section 1972 prohibits three types of conditional transactions: (1) traditional tie-in arrangements[13]; (2) reciprocal arrangements whereby the customer agrees to provide the bank with something of value in exchange for the bank's product or service[14]; and (3) exclusive dealing arrangements.[15]

Not all banks tie-in arrangements are per se illegal under this section. Congress provided a limited exemption in Section 1972 for transactions exclusively involving four so-called traditional banking services – specifically, loans, discounts, deposits, or trust services.[16] This exemption only applies, however, where all of the components of a particular transaction fall into one or more of the four enumerated categories.[17] If any of these so-called traditional banking services are tied to another service offered by the bank, the exemption does not apply.[18] Finally, even within the four exempted bank service categories, the bank is still subject to treble damage actions under the antitrust laws.[19]

The Supreme Court has long recognized that "tying agreements hardly serve any purpose beyond the suppression of competition."[20] Consequently, tying arrangements have been declared per se unlawful under the antitrust laws[21]; that is, tying arrangements are illegal in and of themselves and do not require any specific showing of unreasonable anticompetitive effect.[22] Nevertheless, certain tests must be met for a tying arrangement to be deemed per se unlawful under the general antitrust laws.

First, there must be two separate products, with the purchase of one (the "tying product") conditioned upon the purchase of the other (the "tied product").[23]  Second, the party imposing the tying arrangement must have had sufficient economic power with respect to the tying product so as to appreciably restrain free competition in the market for the tied product.[24]  The plaintiff need now show that the defendant has a monopoly or even a dominant position in the market.[25]  However, the plaintiff must show the existence of that type of leverage or economic power which would allow the defendant to raise prices or to require "purchasers" to accept burdensome terms "that could not be exacted in a completely competitive market."[26]

Third, a not insubstantial amount of interstate commerce must be affected by the tying arrangement.[27]  In *Fortner Enterprises v. United States Steel Corp.*,[28] the leading antitrust case pertaining to tie-in arrangements involving credit, the U.S. Supreme Court held that even when the total value of the tied product amounted to only $190,000, a not insubstantial volume of commerce was affected.[29]

In contrast to the general antitrust laws, Section 1972 imposes treble damage liability without a showing that the bank, bank holding company, or its subsidiary has sufficient economic power in the market for the tying product to impose a tying arrangement.[30]  Moreover, a litigant under Section 1972 need not prove that a more than de minimis amount of volume of commerce was affected by the tying arrangement.[31]

In enacting the anti-tying provision of the BHCA, Congress recognized that tying arrangements in the banking industry generally involve such small dollar amounts that they do not justify expensive and time-consuming antitrust litigation.[32]  Congress also recognized the difficulties in establishing an antitrust violation, since it is doubtful whether a bank customer subjected to a bank tie-in could adduce sufficient evidence of the bank's market power and the effect on interstate commerce to recover under the Sherman Act.[33]  Thus, even if evidence of market power and the effect on interstate commerce are insufficient to state a cause of action under the Sherman Act, a litigant can still recovery under Section 1972 of the Bank Holding Company Act.[34]

The existence of an illegal tying arrangement under Section 1972 need not be shown by proof of an express agreement, but can be inferred from the totality of the circumstances.  As Senator Edward W. Brooke (who was one of the sponsors of the anti-tying provision) explained:

> It is important to note that *per se* illegality arises where either express or implied coercion is involved.  Thus, where the totality of the circumstances indicates that the customer has not voluntarily entered into the transaction but rather has been induced into doing so through coercion, either expressed or implied, the conduct under consideration is actionable under this provision.[35]

The attorney general is charged with the duty of preventing and restraining violations of the anti-tying provision.[36]  More importantly, private litigants may bring treble damage suits for damages cause by a violation of Section 1972, as well as obtain

injunctive relief.[37]  Interestingly enough, there have been no cases where the government has brought an enforcement action against a bank [38]; all of the litigation so far under the BHCA has involved private suits for treble damages.

## Judicial Decisions Interpreting Section 1972

Case law interpreting Section 1972 has been relatively sparse.  In fact, there have been less than a dozen reported decisions to date.  Decisions interpreting Section 1972 have in the main centered on three issues: (1) standing; (2) the existence of a tying or exclusive dealing arrangement; and (3) the applicability of the so-called traditional banking exemption.

The statutory basis for proving standing in treble damage suits under the BHCA is Section 1975.  This section provides in relevant part as follows:

> *Any person who is injured in his business or property* by reasons of anything forbidden in Section 1972 of this title may sue therefore…and shall be entitled to recover three times the amount of damages sustained by him and the cost of suite, including a reasonable attorney's fee.[39]

Plaintiffs bringing an action under Section 1972 pass the thresh-old for standing by alleging the statutorily required injury in their business or property.  The question remains, however, whether the language of the statute can be read to establish a standing requirement akin to that existing under the general antitrust laws.[40]

In antitrust litigation, the courts have uniformly interpreted language nearly identical to that of Section 1975 as imposing an additional requirement for standing beyond the showing of causation in fact.[41]  Specifically, only those plaintiffs whose injuries are considered to be a direct result of the prohibited anti-competitive activity are deemed to have standing to sue.[42]  Where a plaintiff's injuries are indirect, incidental, or derivative, the plaintiff is denied standing to sue, even though he may have suffered a pocketbook injury.[43]

Given the decisional morass that presently exists in the antitrust laws over the standing issue,[44] reading the antitrust standing doctrine into the BHCA would serve no salutary purpose.  Indeed, this doctrine is antithetical to Congress' intent that Section 1972 is to have broad applicability to bank tying arrangements, since the general antitrust standing requirement restricts the scope of a defendant's liability and a plaintiff's right to recovery.

The issue of standing under Section 1972 of the BHCA has arisen most often where a shareholder of a defunct corporation has brought suit against a bank for injuries caused by a purported illegal tying arrangement.  In these cases, the courts have centered their inquiry on whether the plaintiff, as distinct from the corporation of which the plaintiff is a stockholder, has been damaged as a result of a purported illegal tying arrangement.

In *Swerdloff v. Miami National Bank*,[45] for example, the Fifth Circuit (now the Eleventh Circuit) found that two shareholders who owned 100 percent of a corporation, and who were guarantors of a loan made by a bank to the corporation, had standing to bring a suit under Section 1972 against the bank.[46]  Under an accounts receivable financing agreement, the defendant bank lent money to Standard Container and Paper Company (Standard Container) upon the assignment of the company's receivables as collateral.  Standard Container was wholly owned by the Swerdloffs and operated as a family business.  As part of the financing plan, the bank required the Swerdloffs to personally guarantee the loans.

In the middle of an expansion program, and after Standard Container had become heavily dependent upon the financial arrangement, Miami National advised the Swerdloffs that it would no longer honor the financing arrangement unless 51 percent of the capital stock of Standard Container was transferred to another company which was one of the bank's other customers. The bank also allegedly threatened to put Standard Container out of business if the Swerdloffs did not accede to the transfer.  The Swerdloffs refused to transfer their stock; and, subsequently, Miami National retaliated by terminating the financing arrangement, which, the Swerdloffs contended, forced Standard Container out of business and resulted in its being placed into involuntary bankruptcy.

The Fifth Circuit rejected the defendant bank's contention that (1) no violation of Section 1972 (1)(C) had been stated because the alleged demands were made upon the Swerdloffs and not Standard Container and (2) the Swerdloffs were not "customers" within the meaning of the subsection.[47]  The Court held that under these facts, the stockholder guarantors who were required to perform the additional service (i.e., transferring their stock) if the loan to their corporation was to be continued had standing to bring a suit against the bank.[48]  IN reaching this result, the court of appeals looked to the purposes of Section 1972, as well as to the economic realties of ownership and control of a closely held corporation.

The court recognized that a great deal of important business is done through closely held corporations and that substantial credit to such corporations is generally extended because of the credit rating of the stockholder guarantors, regardless of the creditworthiness of the corporations itself.[49]  The court of appeals found that to decide in favor of the bank under these circumstances would permit banks throughout the country to impose with impunity all manner of anticompetitive arrangements on stockholders of such corporations.[50]

Since the Swerdloffs were customers of the bank, and the prohibited additional services had been demanded of them by the bank, the court held that the plaintiffs had standing to sue for the Section 1972(1)(C) violations.[51]  This case left unresolved, however, the issue of whether a shareholder of a corporation would have standing to bring suit under Section 1972, where the corporation is the only customer in the transaction.

In *Costner v. Blount National Bank of Maryville, Tennessee,*[52] decided the same year as *Swerdloff*, the Sixth Circuit upheld a jury verdict in favor of a shareholder under both Section 1972 of the BHCA and Section 1 of the Sherman Antitrust Act.[53] There, the tying arrangement was created when the plaintiff, owner of 50 percent of the stock in an automobile dealership, obtained a $420,000 personal loan from the defendant bank to buy the remaining stock in the company.

Costner pledged all of his stock to secure payment of the loan and the defendant bank, as a condition to making a loan to the plaintiff, required the car dealership to sell a substantial share of its commercial installment paper to the bank and to employ a person designated by the bank to ensure compliance with the tying arrangement. The automobile dealership subsequently experienced financial difficulties caused, at least in part, by the tying arrangement. Approximately eighteen months after the loan agreement and tying arrangement were entered into, the bank demanded payment of the personal loan.

Threatened with foreclosure of the pledged stock, the plaintiff agreed to let the bank find a purchaser of the stock at a price to be determined by the bank in negotiations with the prospective purchaser. The bank officer who handled the transaction then sold the stock to a group headed by his brother for a value equivalent to the outstanding indebtedness. After trial, a jury found the defendant bank guilty of violating the anti-tying provisions of the BHCA and the Sherman Act.[54]

On appeal, the defendant bank conceded that the agreement violated the BHCA but contended that the illegal tying arrangement did not damage the plaintiff,' thus, the plaintiff had no standing to bring suit under Section 1972.[55] The Sixth Circuit rejected this argument stating that there was sufficient evidence in the record to justify a finding that the plaintiff, as distinct from the automobile dealership, suffered direct damage as a result of the illegal tying arrangement.[56]

The court recognized that the plaintiff would not be entitled to damages solely upon a finding by the jury that the tying resulted in damages to the car dealership; rather, the plaintiff had to prove that, as a result of the tying arrangement, his stock in the corporation was sold for less than its fair market value at the time.[57] That is, the injury to the stockholder must be direct and not merely consequential or derived form injury to the corporation. Plaintiff's theory of causation was that the tying arrangement increased the cost of doing business and led to the decline of the business which, in turn, put the bank in a position to call the loan and force plaintiff to sell his stock in the business for a price considerably below its fair market value.[58]

More recently, in *Shulman v. Continental Bank*,[59] the district court granted summary judgment to defendant bank on plaintiff's claim under Section 1972.[60] The court held that the plaintiffs, who were controlling shareholders, officers and directors of the corporation, did not state cause of action on their own behalf for violation of the BHCA, and lacked standing to bring the action on behalf of the corporation.[61] The plaintiffs alleged that the defendant bank violated Section 1972(1)(C) of the BHCA by

requiring them personally to provide $1.3 million in the form of a junior participation in the bank's loan to the corporation, as a condition for extending further credit to the company.

In holding that the plaintiffs lacked standing to bring the action under Section 1972(1)(C), the court distinguished *Swerdloff*.[62]  The court stated that the case before it was factually distinguishable from *Swerdloff*[63] in that there the plaintiffs' company was a closely held family corporation in which the Swerdloffs were the sole stockholders, whereas in *Shulman*, no such close legal identity existed between the plaintiffs and the corporation.  Specifically, in *Shulman* the corporation was a public corporation, which traded its stock on the American Stock Exchange.[64]

In so holding, the district court ignored the economic realities of the situation and analyzed the case strictly in terms of the arrangement between the plaintiffs and the bank.  That is, the court viewed the transaction between the plaintiff and the bank in isolation, rather than as an integral part of the loan to the plaintiffs' corporation.

Under the Court's analysis, a bank could require the officers, directors, or even shareholders of a *public corporation* to provide additional property or credit as a condition to making loans to the shareholders' corporation, without fear that the transaction would be viewed as an illegal tying arrangement.  The court seemed to imply that only if the bank requires shareholders of a *closely held corporation* to provide the additional credit, property or service would the plaintiffs have standing under Section 1972.[65]  While the court vainly attempted to distinguish *Swerdloff*, it is apparent that there is no reasoned basis for the court's decision denying the *Shulman* plaintiffs' standing under Section 1972.

*Shulman* is also difficult to reconcile with decisions which have permitted individuals to maintain actions under Section 1972, for example, where a plaintiff receives a loan on the condition that the plaintiff's corporation provide a service to the bank.  For example, as mentioned above, in *Costner v. Blount National Bank*,[66] the bank required the dealership owned by the plaintiff to sell substantially all of its commercial installment paper to the bank, as a condition to making a personal loan to the plaintiff, so that he could purchase the remaining stock in the corporation.[67]  The Sixth Circuit in *Costner* correctly focused on whether the plaintiff, as distinct from the plaintiff's corporation suffered damages as a result of the illegal tie-in arrangement.[68]  Unlike the district court in *Shulman*, the court of appeals had no problem in finding an illegal tying arrangement where the two customers of the bank involved in the tying arrangement had a unity of interest.[69]

Thus, there are still unanswered questions relating to whether a particular plaintiff has standing to bring a lawsuit under Section 1972.  Rather than clarify the situation, the court in *Shulman* further muddled the standing issue.  Given the stated purpose behind Section 1972, it is submitted that *any* person who is injured in his business or property by reason of an illegal tying arrangement should have standing to sue.

A secondary category of cases under Section 1972 consists of those cases that have focuses on the issue of whether a tying arrangement actually exists. To establish an illegal tying arrangement, a plaintiff must prove that the bank required the bank customer to accept or provide some additional credit, property, or service, or to refrain from dealing with other parties, in order to obtain the desired credit, property or service.[70] Thus, there are three distinct elements to a prohibited tie-in: (1) a *bank* (2) must require a *customer* of the bank (3) to accept from or provide to the bank, the holding company of such bank, or a subsidiary of the bank's holding company, *additional credit, property or service*.

A strict reading of the statutory language limits the applicability of the anti-0tying provision to conditions or requirements imposed by banks.[71] Therefore, a tying arrangement instigated by and imposed by a nonbanking affiliate of a bank which requires a person to accept from or provide additional credit, property or services to an affiliated bank, in exchange for the nonbanking affiliate's product or service, could arguably be exempt even though the bank obviously would profit from the tying arrangement.[72]

Nevertheless, a court could treat the nonbanking affiliate as an agent of the bank, especially where the bank has control over the terms of the transaction between the customer and the nonbaning affiliate. In addition, a court examining a tying arrangement imposed by a nonbanking affiliate of a bank should be mindful of the economic realities of such a situation. On the surface, what might appear to be a tying arrangement imposed by the nonbanking affiliate, based solely on the desirability of its own product or service, may in actuality be the result of the customer's desire for the bank's credit, property, or service. In such a situation, the tying arrangement is imposed by the bank and not by the nonbanking affiliate of the bank. To permit such a bank to escape liability would exalt form over substance, a result clearly not intended by Congress.

A second element in establishing the existence of a tying arrangement under Section 1972 is that a conditional transaction be imposed on a "bank customer." Although the anti-tying provisions of the BHCA have a definitional section,[73] no definition of the term "customer" is provided. The legislative history is likewise silent on who should be considered a customer. At least one court has given the term a broad interpretation. In *Swerdloff*,[74] the Fifth Circuit looked to the ordinary meaning of the term and held that, in common usage, "a customer is one who has business dealings with another or who purchases a commodity or service."[75]

While the plaintiffs did not maintain an account at the defendant bank, they did enter into a contract of guarantee pertaining to the extension of credit by the bank to the plaintiffs corporation. The Fifth Circuit found this to be a business dealing with the bank; thus, the plaintiffs were "customers" for purposes of the BHCA.[76] The appeals court went on to suggest that a party might still be considered a customer of a bank even though there is no direct dealing with the bank or privity of contract, as long as the bank maintains control over the price and terms of the transaction.[77]

A more recent district court decision, *Shulman*, embodied a restrictive definition of the term "customer"[78]; however, the holding in that case can be better explained by the implicit sentiment on the part of the court that the plaintiffs, who were the principal officers and directors as well as shareholders of a public corporation, voluntarily contributed their own capital in exchange for the extension of credit.[79]

A third element of a tie-in under Section 1972 involves whether "additional credit, property or service" must be obtained by the bank customer or provided by the bank customer to the bank, the bank holding company of such bank or a subsidiary of such bank holding company in exchange for the bank credit or property.[80] While the terms "credit" and "property" are seemingly self-explanatory, the concept of what constitutes and "additional service" is none too clear. Two decisions which have addressed this issue are illustrative of the problem: *Sterling Coal Co. v. United American Bank,*[81] and *B.C. Recreational Industries v. First National Bank of Boston.*[82]

In *Sterling Coal Co.*, the court ruled that conditioning the grant and extension of credit on the requirement that the bank supervise and control plaintiff's checking account and other corporate affairs – including veto power over purchases and payment of dividends – was not prohibited by the BHCA.[83] The plaintiff argued that permitting the bank to obtain control over the corporation's disbursements constituted the acceptance of an additional service provided by the bank. The district court rejected this argument and found contrariwise that the bank's control over disbursements was not a service provided to the plaintiff corporation, but rather a measure taken by the bank to protect its investment.[84] The record before the court showed that at the time the plaintiff corporation obtained the financing from the defendant bank, it was a new, closely held corporation with few, if any, assets.[85] Thus, the requirements imposed arguably appeared to be reasonable to protect the bank's loan.

Similarly, in *B. C. Recreational Industries*, the First Circuit held that a bank's demand that its customer-debtor employ a full-time business adviser designated by the bank did not constitute the provision of "additional credit, property, or service," as those terms are used in Section 1972(1)(C).[86] IN so holding, the court of appeals said that the forced hiring of the business advisor chosen by the bank provided additional security to the bank in the form of management control.[87] However, there was no financial connection between the business adviser and the bank or the bank's affiliate.[88]

In addition, the court of appeals was persuaded that the bank's conduct was motivated not by any venal or anticompetitive purpose or design, but rather because it felt that the customer-debtor was "in a precarious financial condition."[89] Indeed, the court of appeals specifically affirmed the district court's dismissal of plaintiffs' tie-in claim under Section 1 of the Sherman Act for failure to state a cause of action on this precise ground.[90]

A recent decision of the U.S. Court of Appeals for the Eleventh Circuit emphatically underscored the importance of demonstrating that the bank imposed a tying arrangement. In *Parsons Steel v. First Alabama Bank of Montgomery,*[91] the plaintiffs

alleged that First Alabama Bank of Montgomery, N.A. (First Alabama) conditioned additional credit to a wholly owned subsidiary of the plaintiffs on their agreement to hire a local businessman, Michael Orange, with whom the bank had done business, as manager of the subsidiary with an option to acquire a majority interest in the subsidiary in lieu of compensation.  The plaintiffs further maintained that these requirements were "unusual" and thus violated Section 1972.  First Alabama claimed it never agreed to extend any credit to the subsidiary nor did it require that Orange be appointed as manager or be granted the stock option.  The jury accepted the plaintiffs' version of the facts, and gave judgment to the plaintiffs.  However, the district court granted First Alabama 's motion for judgment notwithstanding the verdict.  On appeal, the Eleventh Circuit found that "plaintiffs were able to establish only that the requirement allegedly imposed upon them was an unusual banking practice."[92]  But in order to establish a violation of Section 1972, the court stated, the unusual banking practice must be shown to be a tying arrangement.  The court held that the plaintiffs failed to establish the requisite facts from which a tying arrangement could be inferred.  As the court stated:

> The bank did not tie the loan to any other bank product, service or benefit, and thus there is no "tied" product or service.  The subsidiary was in financial difficulty and the bank was simply reluctant to grant additional credit.  [Plaintiffs were]…in the market for a purchaser of the subsidiary…[they] controlled.  The fact that Mr. Orange had been a customer of the bank and that his name was suggested by the bank does not establish a "tie-in."  There is no evidence that the bank would benefit in any way other than by getting additional protection for its investment.  That is not a tying arrangement.  The allegation that the bank wanted to induce Mr. Orange to do additional business by offering him a favorable deal has no factual support.  The District Court's grant of a judgment notwithstanding verdict was thus justified.[93]

The Eleventh Circuit also reconciled its decision with that of the former Fifth Circuit's interpretation of Section 1972 in *Swerdloff v. Miami National Bank*.[94]  In *Parsons Steel*, the Eleventh Circuit interpreted *Swerdloff* to hold that a benefit to the bank will be inferred at the pleading stage where a bank requires that a business be sold to a third party as a condition of granting further credit.[95]  From this, the Eleventh Circuit reasoned that in *Parsons* Steel the district court acted properly and in accord with *Swerdloff* by denying First Alabama's motion for summary judgment and directed verdict, and by allowing the plaintiff's an opportunity at trial, to establish the existence of an illegal tying arrangement.[96]  Accordingly, the result in *Parsons Steel* can be harmonized with *Swerdloff*.  In *Parsons Steel*, the decision turned on plaintiffs' failure to prove that the bank received a benefit, other than getting additional security, from the conditions imposed on them.  Without some benefit, direct or indirect, flowing to the bank, no tying arrangement existed; consequently, there was no violation of Section 1972.

Thus, a litigant suing under Section 1972 must allege sufficient facts for the court to find the existence of a tying or exclusive dealing arrangement.  However, as discussed

below, even where a tying arrangement can be proven, a litigant may be denied recovery
under the BHCA if the so-called traditional banking practice exemption applies.
Is the Tying Arrangement Exempt Under the So-Called
*Traditional Banking Practice Exemption?*

      The third and most important category of cases under Section 1972 has focused
on whether the tying arrangement falls within the "traditional banking practice"
exception to liability. Section 1972(1), as originally proposed in the Senate, would have
given the Federal Reserve full discretion to grant exceptions to the per se illegality
requirements[97], however, Section 1972(1) was amended on the Senate floor to add certain
statutorily delineated exemptions.[98]

      Accordingly, bank tie-in arrangements exclusively involving so-called traditional
banking services – i.e., "a loan, discount, deposit, or trust service" – are not considered to
be per se illegal under Section 1972, where only a bank is involved.[99]  In addition, a
credit transaction involving on y a bank does not give rise to a cause of action under the
BHCA where the only credit, property, or service required of the customer is related to
the loan and is of a character commonly provided in connection with a loan.[100]  Finally,
restrictions on outside borrowing by a customer-debtor are permissible so long as the
condition or requirement imposed is reasonable and for the purpose of assuring the
soundness of the credit extended by the bank.[101]

      Two recent decisions of the U.S. Courts of Appeals for the First and Third
Circuits have addressed and interpreted the traditional banking practice exemption.  In *B.
C. Recreational Industries* mentioned above,[102] the First Circuit held that a bank's
demand that the debtor hire a full-time business adviser designated by the bank, because
it felt that the debtor was "in a precarious financial condition."[103] was within the range of
appropriate traditional banking practices permissible under the Bank Holding Company
Act.[104]  The decision of the First Circuit in that case precursed the decision of the Third
Circuit in *Tose v. First Pennsylvania Bank*.[105]

      In the latter case, Leonard Tose, the owner of the Philadelphia Eagles Football
Club, alleged that First Pennsylvania Bank (FPB) demanded that Tose relinquish his
financial control over the Eagles, give up the power to sign the Eagles' checks, and step
down as chief executive officer of the Eagles in favor of a person acceptable to the bank,
as a condition of refinancing certain loans to the Eagles.  Tose contended, inter alia, that
FPB, and its officers, had violated Section 1972(1)(C) of the BHCA by requiring him to
provide an illegal service to the bank as a condition of refinancing certain loans.[106]

      Although FPB conceded that it had insisted that Tose relinquish financial control
to a specified comptroller, as a condition for continuing its loans,[107] the Third Circuit held
that this was not a demand for a "service…other than those related to and usually
provided in connection with a loan."[108]  The court found that the imposition of financial
controls over the Eagles was directly related to maintaining the security of FPB's
substantial investment; and the bank's demand could not be considered unusual in the
face of substantial evidence that I had good reason to be concerned about the loan.[109]

Moreover, the court determined that the purpose behind Section 1972(1)—prohibiting anticompetitive practices that require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service[110]--would not be served in any way by holding the bank's conduct illegal.[111] The court of appeals concluded that no violation of Section 1972(1)(C) of the BHCA occurred as a matter of law; accordingly, it affirmed the district court's grant of a directed verdict in favor of FPB[112] and its officers.[113]

Both the *B. C. Recreational Industries* and *Tose* cases are premised on the finding that the challenged conduct was not intended to, nor did it result in either the lessening of competition or the encouragement of unfair competitive practices.[114] Rather, the courts concluded that the banks' actions were motivated out of concern about the extension of credit and were aimed at protecting their investment. As discussed later, such conduct may, however, subject a bank to actions under state law.[115]

Other decisions have elaborated on the kinds of conditions or requirements that are considered to be related to, and of a type usually provided in connection with, an extension of credit and, therefore, exempt from treble damage liability under the BHCA. For instance, requiring a customer-debtor to make improvements on certain real property as a condition of a mortgage loan has been held to be permissible.[116] The court which addressed this issue concluded that the practice is a traditional banking practice founded on genuine business need and, therefore, exempt from the prohibitions of Section 1972 by virtue of the traditional banking practice exemption clause.[117] Similarly, requiring a customer to provide collateral as a condition of making a loan,[118] and permitting the bank to make withdrawals from a customer's account at the bank in order to repay the loan,[119] have been held to be conditions that are related to and usually provided in connection with a loan for purposes of Section 1972.

Certain conditions, if imposed by a bank as a condition of extending credit, leasing, or selling any property or service, have been conclusively found to be outside the range of the traditional banking practice exemption. Thus, it has been held that requiring a customer to employ the property management services of the bank's subsidiary as a condition of a loan,[120] and requiring that the customer utilize the bank's lawyer as a condition of a loan,[121] would not qualify under the traditional banking practice exemption.

As the discussion above makes clear, there are no hard-and-fast rules for determining whether a particular practice is exempt. To date, the courts have interpreted the traditional banking practice exemption on a case-by-case basis. There will undoubtedly be more litigation in this area before the precise limits of the exemption are defined. During this process, the courts should be mindful of the fact that Congress included this narrow exception to liability not to foster anticompetitive conduct, but rather to allow certain banking practices to continue that arguably have little or no anticompetitive consequences.[122] To achieve this narrow purpose, the traditional banking practice exemption must be narrowly construed in the future.

**Section 1972 Is Alive and Well**

The decisional law reviewed herein demonstrates that a litigant seeking relief from coercive conduct on the part of a bank has numerous barriers to overcome. A complaint alleging a violation of Section 1972 must be carefully drawn, and must contain the minimal factual allegations necessary for a court to conclude that the plaintiff has been injured as a result of an illegal tying arrangement and that the bank's conduct cannot be explained as an attempt to protect this soundness of the credit. Conclusory statements such as "illegal or outrageous conduct" will not suffice.[123]

While some may view the *B.C. Recreational Industries*[124] and *Tose*[125] cases as representative of a trend toward the general blunting of Section 1972, this is not the case. The legislative history of the Act makes it clear that Section 1972(1)'s purpose is to prohibit practices which require bank customers to accept or provide some other service or product, or refrain from dealing with other parties, in order to obtain the bank product they desire.[126] Neither of these cases involved such a practice.[127] Nor can any of the other recent decisions interpreting Section 1972 be interpreted as permitting or sanctioning illegal tie-in arrangements.

Moreover, these recent decisions can be of little solace to a bank engaging in implicit or explicit tying arrangements, involving its holding company or a subsidiary of the holding company. The exemption provided for intrabank tying does not apply.[128] Thus, even if requiring a customer to maintain an account with the bank as a condition of making a loan does not violate Section 1972 (and this has not been established clearly in the case law[129]), requiring the "deposit" to be made with the bank holding company or a sister subsidiary would be a violation.[130]

Furthermore, while a litigant may not be able to recover under Section 1972 for the conduct alleged in the *B. C. Recreational Industries* and *Tores* cases, other remedies do exist under state law. The recent verdict in *Farah Manufacturing Company v. State National Bank of El Paso*[131] emphatically underscores this point.

In *Farah*, the plaintiff, Farah Manufacturing Company (Farah), brought an action in Texas state court to recover damages for injuries purportedly caused when three banks and an insurance company assumed control of Farah's internal affairs. Under the terms of a loan agreement, the defendants were empowered to declare their $22 million loan to Farah in default if any two of the defendants disagreed with any proposed change in Farah's management. Farah alleged that the defendants used this power to assume control wrongfully of the corporation by packing the Farah board of directors with common or friendly directors.

Farah also alleged that, having gained control, the defendants proceeded to auction off millions of dollars of corporate assets to make unnecessary prepayments on the outstanding bank loan. Farah based its claim for relief on the state law theories of fraud, duress[132] and tortuous interference with its business.[133] After a trial, the jury awarded Farah approximately $19 million in damages to compensate it for injuries

caused during the period when the defendants controlled the corporation. The damages were for actual losses, lost profits, and the difference between the market value and actual sale price of assets and equipment sold by the defendants at auction sales.

The facts in *Farah* are nearly identical to those alleged in *B.C. Recreational Industries*.[134] Thus, if the plaintiff in the latter case had framed its action in terms of fraud or tortuous interference with is business under state law, rather than under Section 1972 of the BHCA, the plaintiff may have been able to recover as did the plaintiff in *Farah*. Indeed, the First Circuit suggested as much in its opinion.[135]

Thus, litigants injured as a result of overreaching conduct on the part of a bank or, now, a federally chartered thrift institution[136] must look to both state and federal law in searching for a remedy. Obviously not ever loan transaction that results in injury to a bank customer involves an actionable illegal tying arrangement. However, in future cases where such an arrangement can be shown to exist, courts may not and should not hesitate to use the weapon of Section 1972.

As courts further define the scope of Section 1972, they must be mindful of the public policies involved. The treble damages remedy was enacted to achieve at least two public purposes: compensation for private harm and enforcement of the national policy of free competition.[137] Insofar as Section 1972 was intended to provide protection against the lessening in economic welfare resulting from bank tie-ins, anyone injured by such practices is an intended beneficiary of the compensation policy. Not only the bank customer who is required to provide or accept the unwanted product or service falls within the ambit of this policy but also competitors of the bank.

The second major policy behind the treble damages remedy is deterrence. In enacting Section 1972, Congress recognized that the government has limited resources to prevent or restrain illegal tie-in arrangements.[138] The availability of a private treble damages suit was viewed as a valuable supplement to government suits.[139]

Taken together, the important public policies of compensation and deterrence weigh conclusively in favor of an expansive interpretation of Section 1972's scope. Bank customers injured as a result of anticompetitive tying arrangements should be provided with liberal access to recovery pursuant to the federal statutory remedy embodied in Section 1972. Narrow or hypertechnical construction of Section 1972 should and must be rejected.

## Conclusion

The true impact of Section 1972 has not yet been felt. With the enactment of the Depository Institution Act of 1982, anti-tying prohibitions comparable to those contained in Section 1972 have been extended to federally chartered savings and loans and federally chartered savings banks.

Moreover, legislation was introduced in the U.S. Senate[140] during the Ninety-seventh Congress to strengthen Section 1972, and to clarify the fact that the prohibitions against tying arrangements contained in 12 U.S.C. § 1972 apply to nonbanking subsidiaries of a bank holding company.[141]  This amendment to section 1972 was part of proposed legislation that would permit subsidiaries of bank holding companies to engage in a whole series of activities heretofore prohibited under federal law (e.g., owning securities firms).

With the expansion of new powers, the temptation for a bank, its bank holding company or subsidiaries of the bank holding company to engage in illegal tying arrangements will be even greater in the future.  Section 1972 remains an effective weapon to remedy such abuses, and it must be given expanded scope in the future.

## APPENDIX

Section 106(b) of the Bank Holding Company Act Amendments of 1970, 12 U.S.C. § 1972(1) (1977 & Supp. IV 1981).

§1972.  Certain tying arrangements prohibited; correspondent accounts.

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement –

    (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

    (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;

    (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;

    (D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company or

    (E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

The Board may by regulation or order permit such exceptions to the foregoing prohibition as it considers will not be contrary to the purposes of this chapter.

---

[1] Bank Holding Company Act Amendments of 1970, Pub. L. 91-607, 84 Stat. 1760 (1970) (codified in, scattered sections of 12, 15, and 26 U.S.C.) (hereinafter cited as BHCA).

[2] BHCA § 106, note 1 *supra*, 84 Stat. At 1766 (codified at 12 U.S.C. §§ 1971-1978 (1977 & Supp. IV 1981)).

[3] See Naegele, "Are All Bank Tie-Ins Illegal?" 154 Bankers Magazine 46 (1971).

[4] Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958).

[5] A "bank" is defined as a state or federally chartered institution that accepts demand deposits and is engaged in making commercial loans. 12 U.S.C. § 1841(c). It should be noted that individual officers of a bank are not covered by this provision. See note 113 *infra*.

As for other financial institutions, the definition does not encompass credit unions or savings and loans, and thus, these entities are not subject to the proscriptions contained in Section 1972. With the recent enactment of The Garn-St. Germain Depository Institutions Act of 1982, however, the victim of a tying arrangement effected by a federally chartered savings and loan association or a federally chartered savings bank will now have a federal remedy. See Garn-St Germain Depository Institutions Act of 1982, Pub. L. 97-320, § 331, H.R. 6267, 97th Cong. 2d Sess. (1982), *reprinted* in 128 Cong. Rec. H8096 (daily ed., Sept. 30, 1982) (hereinafter referred to and cited as the Depository Institutions Act or the Act). Section 331 of the Depository Institutions Act subjects federal thrift institution to anti-tying restrictions generally comparable to those applicable to banks, bank holding companies and their subsidiaries, and provides for treble damages and injunctive relief. *Id*. at H8106; see S. Rep. No. 536, 97th Cong. 2d, Sess 17 (1982). Specifically, Section 331 of the Act, which will be codified at 12 U.S.C. § 1464(q), prohibits federally chartered thrift association from conditioning the availability or the terms of credit, property, or services on a potential customer's agreement to accept from or provide to such association, or any service corporation or affiliate of such association, other credit, property or services or to refrain from dealing with other parties in order to obtain the credit, property or service that the customer wants from the association. *Id*. It should be noted that Section 331 also contains an exemption for so-called appropriate traditional lending practices. *Id.:* see S. Rep. No. 536, *supra* at 17. This exemption is nearly identical to the traditional banking practice exemption found in Section 1972 of the BHCA. See text accompanying notes 97-122 *infra*, wherein the traditional banking practice exemption of the BHCA is discussed in detail. Given the similarity in language between Sections 331 and 1972, and the sparse legislative history concerning section 331, the courts will undoubtedly look to judicial decisions under Section 1972 for guidance in interpreting and applying Section 331.

As discussed above, savings and loan associations are not encompassed within the prohibitions of Section 1972, and new Section 331 of the Act does not apply to state-chartered savings and loans or credit unions. However, in one reported decision, McCoy v. Franklin Sav. Ass'n, 636 F.2d 172 (7th Cir. 1980), an action was brought against a savings association alleging an illegal tying arrangement under Section 1972. Apparently, the issue of the applicability of Section 1972 was not raised in the district court, and the Seventh Circuit did not reach the issue in its opinion. However, the victim of a tying arrangement by either a federally insured savings and loan or a federally insured credit union may have an implied remedy under existing regulations. See note 136 *infra*.

[6] A bank holding company is defined as any company that controls a bank. 12 U.S.C. § 1841(a)(1) (1977 & Supp. IV 1981). The term "company" means "any person, estate, trust, partnership, corporation, association, or similar organization, but does not include any corporation the majority of the shares of which are owned by the United States or by any state." 12 U.S.C. § 1971 (1977 & Supp. IV 1981).

Control is conclusively presumed when the company in question owns, controls or has the power to vote at least 25 percent of any class of voting securities of a bank.

[7] A subsidiary of a bank holding company is defined as any company (1) at least 25 percent of whose voting shares are directly or indirectly owned or controlled by the bank holding company, or held by the bank holding company with power to vote; (2) the election of a majority of whose directors is controlled by the bank holding company; or (3) whose management or policies are directly or indirectly subject to a controlling influence of the bank holding company, as determined by the Board of Governors after notice and an opportunity for hearing. 12 U.S.C. § 1841(d) (1977 & Supp. IV 1981).

[8] BHCA § 106(b), 12 U.S.C. § 1971(1) (1977 & Supp. IV 1981), is set forth in the Appendix.  To avoid confusion, all references hereinafter to Section 106 will be to the section of 12 U.S.C. in which it presently appears.

[9] *See* Tose v. First Pa. Bank, N.A., 648 F.2d 879 (3d Cir. 1981), *cert denied* 454 U.S. 893 (1981); B.C. Recreational Inds. V. First Nat'l Bank of Boston, 639 F.2d 828 (1st Cir. 1981); see also notes 97-115 *infra* and accompanying text wherein these decisions are discussed.

[10] For instance, in Joseph Mullan v. Equitable Trust Co., Civ. Act. No. JH79-160 (D. Md., filed Jan. 22, 1979), plaintiffs, The Joseph Mullan Company, Joseph Mullan and Getty Mullan (collectively referred to as the Mullans); received several loans from Equitable Trust Company (Equitable) for the purpose of constructing apartment units on a tract of land owned by them.  The Mullans allege that Equitable blocked numerous offers of permanent financing proposed by other financial institutions and entities to replace Equitable's temporary financing.  The Mullans also allege that none of these other credit transactions would have jeopardized Equitable's outstanding loans.  Indeed, they maintain that all or substantially all of Equitable's outstanding loans to them would have been paid off.  If the Mullans' allegations are proven at trial, Equitable's conduct arguably is not excusable as an attempt on the part of the bank to protect the outstanding loans.

[11] 12 U.S.C. § 1972 (1977 & Supp. IV 1981).

[12] S. Rep. No. 1084, 91st Cong., 2d Sess., *reprinted* in 1970 U.S. Code Cong. & Ad. News 5519, 5535.

[13] 12 U.S.C. §§ 1972(1)(A), 1972(1)(B), (1977 & Supp. IV 1981).

[14] 12 U.S.C. § 1972(1)(C), 1972(1)(D), (1977 & Supp. IV 1981).

[15] 12 U.S.C. § 1972(1)(E) (1977 & Supp. IV 1981).

[16] Conf. Rep. No. 1747, 91st Cong., 2d Sess., *reprinted* in 1970 U.S. Code Cong. & Ad. News 5561, 5579.

[17] *Id*. at 5580.

[18] *Id.*

[19] 12 U.S.C. § 1978 (1977 & Supp. IV 1981).

[20] Standard Oil Co. of Cal. V. United States, 337 U.S. 293, 305-306 (1949).  As the Supreme Court explained in Northern Pac. Ry. Co. v. United States, note 4 *supra*, at 5-6:

> They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market.  At the same time buyers are forced to forego their free choice between competing products.

[21] International Salt Co. v. United States, 332 U.S. 392 (1947).  The Supreme Court initially applied the per se rule to tying arrangements in *International Salt*, and has repeatedly affirmed that holding.  See, *e.g.*, United States Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 612 n.1 (1977) (hereinafter cited as Fortner II).

[22] Northern Pac. Ry. Co. v. United States, note 4 *supra*.  Proof that a tying arrangement possesses certain critical elements will render it illegal per se under Section 1 of the Sherman Act (15 U.S.C. § 1), Section 3 of the Clayton Act (15 U.S.C. § 14), or both.  See notes 23-29 *infra* and accompanying text wherein these tests are set forth.

[23] Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 499 (1969) (hereinafter cited as Fortner I); Moore v. Jas. H. Matthews Co., 550 F.2d 1207, 1212 (9th Cir. 1977).

[24] Fortner I, note 23 *supra* at 499, quoting Northern Pac. Ry. Co. v. United States, note 4 *supra*, at 6.

[25] Fortner I, note 23 *supra* at 502.

[26] Fortner II, note 21 *supra* at 618.

[27] Fortner I, note 23 *supra* at 499.  To make out a per se violation of Section 1 of the Sherman Act, plaintiffs are required to establish all three elements.  By contrast, it was traditionally understood that a tying arrangement would run afoul of Section 3 of the Clayton Act if it satisfied the first and either the second or the third elements required under the Sherman Act.  Times-Picayune Publishing Co. v. United States, 354 U.S. 594, 608-609 (1953).  Recently, however, the distinction between tying arrangements which violate Section 1 of the Sherman Act and those that violate Section 3 of the Clayton Act has faded beyond recognition.  Recent decisions have indicated that the requisite elements are now virtually identical.  See Spartan Grain & mill Co. v. Ayers, 581 F. 2d 419, 429 (5th Cir. 1978); Moore v. Jas. H. Matthews & Co., note 23 *supra*, at 1214 (9th Cir. 1977); see also von Kalinowski, 9 *Antitrust Laws and Trade Regulation*. § 64.05(1), at pp. 64-01 (1979).

[28] Note 23 *supra*.

[29] *Id*. at 502.  In *Fortner I*, Fortner Enterprises claimed that, in order to obtain loans from United States Steel Homes Credit Corporation, a wholly owned subsidiary of U.S. Steel Corporation, for the purchase and development of certain land, it had been required to agree – as a condition of the loan – to purchase prefabricated homes manufactured by another U.S. Steel subsidiary.  *Id*. at 495.  The Supreme Court held that an illegal tying arrangement could be found to exist if Fortner was required to take the prefabricated homes as a condition of being allowed to obtain credit.  *Id*. at 498.  While the court remanded the case for further consideration on the issue of whether an illegal tying arrangement existed under the facts, the rule that credit could be used to impose an illegal tying arrangement was firmly established.  *Id*. at 508-509.

[30] See 12 U.S.C. § 1972 (1977 & Supp. IV 1981); S. Rep. No. 1084, 91st Cong., 2d Sess., *reprinted* in 1970 U.S. Code Cong. & Ad. News 5519, 5558.

[31] S. Rep. No. 1084, note 30 *supra*, at 5558.

[32] *Id*. at 4449.

[33] *Id*. at 5561.

[34] This was the precise holding in Costner v. Blount Nat'l Bank of Maryville, Tenn., 578 F.2d 1192, 1196 (6th Cir. 1978), which is discussed in detail in the text accompanying notes 52-58 *infra*.  Conversely, an action could be stated under Section 1 of the Sherman Act and not under Section 1972 of the BHCA where the tying arrangement involves the tying of so-called traditional banking services.

[35] 112 Cong. Rec. 42432 (1970).

[36] 12 U.S.C. § 1973 (1977 & Supp. IV 1981).

[37] 12 U.S.C. § 1975 provides for treble damages, while the provision for injunctive relief is contained in 12 U.S.C. § 1976 (1977 & Supp. IV 1981).  There is no implied right to recover punitive damages apart from treble damages.  Hometowne Builders Inc. v. Atlantic Nat'l Bank, 477 F. Supp. 717, 719-720 (E.D. Va. 1979).

[38] A review of all relevant case law has revealed no recorded decisions where the government has brought an enforcement action against a bank.

[39] 39 U.S.C. § 1974 (1977 & Supp. Iv 1981) (emphasis added).

[40] IN Swerdloff v. Miami Nat'l Bank, 408 F. Supp 940 (S.D. Fla 1975), *rev'd* 584 F.2d 54 (5th Cir. 1978), the district court looked to the antitrust statutes and decisions defining the standing issue in order to determine whether the plaintiffs had standing under Section 1972.  *Id*. at 942.  The court determined that since the plaintiffs would not have standing under the pertinent antitrust case law, they had no standing under Section 1972.  *Id*. at 942-943.  Accordingly, the court granted defendant bank's motion for judgment on the pleadings.  The Fifth Circuit reversed the district court on the ground that the plaintiffs were "customers" of the bank and hence had standing under Section 1972.  548 F.2d at 48.  Although the court of appeals did not specifically address the district court's holding, it appears that the appellate court did reject the lower court's restrictive approach to standing under Section 1972.  See notes 45-51, *infra* and accompanying text.

[41] 15 U.S.C. § 15, which is the antirust counterpart to Section 1975 of the BHCA, confers the right to sue for treble damages on "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws…"On its face, this language seems to g rant a private right of action to anyone who can prove that an injury to his "business or property" was caused by an antitrust violation.  The courts have taken a more const5rained view and have consistently required that a plaintiff allege an injury *directly* resulting from a violation, in order to make out a claim under the antitrust laws.  See Bookout v. Schine Chain Theatres, Inc., 253 F.2d 292, 294 (2d Cir. 1958).

[42] *Id*. at 294; see Perkins v. Standard Oil Co., 395 U.S. 642, (1969), Hawaii v. Standard Oil Co., 405 U.S. 251, 262 n.14 (1969); Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1131 (5th Cir. 1975).  The lower courts have experimented with several different rules for determining whether an injury is sufficiently direct to be remediable by a treble damages action.  For an excellent discussion of the conflict that exists among the circuits over the appropriate test to apply for ascertaining directness of injury, see *In re* Multidistrict Vehicle Air Pollution, 481 F.2d 122, 125-129 and n.7 (9th Cir.), *cert. denied* 414 U.S. 1045 (1973).

[43] Loeb v. Eastman Kodak Co., 183 F. 704, 709 (3d Cir. 1910); Hoopes v. Union Oil Co., 374 F.2d 480, 485 (9th Cir. 1967); Productive Inventions Inc., v. Trico Prods. Corp., 224 F.2d 678, 679 (2d Cir. 1955).

[44] For a summary of the problems of standing under the antitrust law, see Berger & Bernstein, "An Analytical Framework for Antitrust Standing," 86 Yale L.J. 809, 813-845 (1977).

[45] 584 F.2d 54 (5th Cir. 1978) (hereinafter cited as Swerdloff).

[46] *Id*. at 59-60.

[47] *Id*. at 58-59.

[48] *Id*. at 59-60.

[49] *Id*. at 58.

[50] *Id.*

[51] *Id*. at 59.

[52] 578 F.2d 1192 (hereinafter cited as Costner).

[53] Sherman Antitrust Act, 15 U.S.C. §§ 1 et deq. (1977 & Supp. IV 1981).

[54] Costner, note 52 *supra* at 1194.

[55] *Id*. at 1195.

[56] *Id.*

[57] *Id.*

[58] *Id*. at 1194-1195.

[59] 513 F. Supp. 979 (E.D. Pa. 1981) (hereinafter cited as Shulman).

[60] *Id*. at 984-985.

[61] *Id*. at 984.

[62] *Id.* at 984-985 n.6.

[63] *Id*.

[64] *Id.*

[65] *Id*. at 984.

[66] Note 52 *supra*.

[67] *Id*. at 1194.

[68] *Id*. at 1195.

[69] *Id*.

[70] 12 U.S.C. § 1972(1) (1977 & Supp. IV 1981).

[71] *Id*.

[72] *Id*.

[73] 12 U.S.C. § 1971 (1977 & Supp. IV 1981).

[74] Note 45 *supra*.

[75] *Id*. at 58.

[76] *Id.*

[77] *Id*. at 59.

[78] Shulman, note 59 *supra*.

[79] *Id.*

[80] 12 U.S.C. §§ 1972(1)(A)-1972(1)(D) (1977 & Supp. IV 1981).

[81] Sterling Coal Co., Inc. v. United American Bank in Knoxville, 470 F. Supp. 964 (E.D. Tenn. 1979) (hereinafter cited as Sterling Coal Co.).

[82] 639 F.2d 828 (1st Cir. 1981) (hereinafter cited as B.C. Recreational Indus.).

[83] Sterling Coal Co., note 81 *supra*, at 965.

[84] *Id.*

[85] *Id.*

[86] B. C. Recreational Indus., note 82 *supra*, at 832.

[87] *Id.*

[88] *Id.*

[89] *Id*. at 829.

[90] *Id*. at 832.

[91] 679 F.2d 242, 244 (11th Cir. 1982).

[92] *Id*. at 246.

[93] *Id*.

[94] Note 45 *supra*.

[95] Parsons Steel v. First Ala. Bank of Montgomery, note 91 *supra*, at 245.

[96] *Id*. at 245-246.

[97] S. Rep. No. 1084, 91st Cong., 2d Sess., *reprinted* in 1970 U.S. Code cong. & Ad. News 5519, 5535.

[98] Conf. Rep. No. 1747, 91st Cong., 2d Sess., *reprinted* in 1970 U.S. Code Cong. & Ad. News 5561, 5580.

[99] 12 U.S.C. §§ 1972(1)(A), 1972 (1)(C) (1977 & Supp. IV 1981).

[100] 12 U.S.C. § 1972(1)(C) (1977 & Supp. IV 1981).

[101] 12 U.S.C. § 1972(1)(E) (1977 & Supp. IV 1981).

[102] Note 82 *supra*.

[103] *Id*. at 829.

[104] *Id*. at 832.

[105] Tose v. First Pa. Bank, N.A., 648 F.2d 879 (3d Cir.), *cert denied* 454 U.S. 893 (1981) (hereinafter cited as Tose).

[106] *Id*. at 897.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.* The Third Circuit affirmation of summary judgment on the Bank Holding Company Act count reflected a misunderstanding of the procedural posture of the case. The district court denied defendant's motion for summary judgment on this count, but entered a directed verdict for defendants at trial. See Tose v. First Pa. Bank, N.A., 492 F. Supp. 346, 255 (E.D. Pa. 1980), *aff'd* 648 F.2d 879 (3d Cir.) *cert denied* 454 U.S. 893 (1981).

[113] Tose, note 105 *supra*, at 897. The Third Circuit affirmed the directed verdict in favor of the officers of First Pennsylvania Bank on a separate ground. The court held that individuals are not encompassed by the term "bank" and, thus, are not subject to the proscriptions of Section 1972. *Id*. at 898 n.23. See Nesglo, Inc. v. Chas Manhattan Bank, N.A., 506 F. Supp. 254, 265 (D.P.R. 1980) (natural persons are not subject to the anti-tying provisions of the Bank Holding Company Act).

[114] Tose, note 105 *supra*, at 898; B.C. Recreational Indus., note 82 *supra*, at 832.

[115] See note 131 *infra* and accompanying text.

[116] McCoy v. Franklin Sav. Ass'n, 636 F.2d 172 (7th Cir. 1980).

[117] *Id*. at 175.

[118] Freidco of Wilmington, Del., Ltd. v. Farmers Bank, 499 F. Supp. 995, 1003 (D.Del. 1980).

[119] *Id*. at 1002.

[120] *Id*. at 1001.

[121] Sterling Coal co., note 81 *supra*, at 964.

[122] S. Rep. No. 1084, 91st Cong., 2d Sess., *reprinted* in 1970 U.S. Code Cong. & Ad. News 5519, 5547-5548.

[123] See Nesglo, Inc. v. Chase Manhattan Bank, N.A., note 113 *supra*, at 265 (conclusory averments insufficient to state a cause of action under Section 1972 of BHCA).

[124] Note 82 *supra*. See notes 86 and 102 *supra* and accompanying text.

[125] Note 105 *supra*. See note 105 *supra* and accompanying text.

[126] See S. Rep. No. 1084, note 122 *supra*, at 5535, 5558; Conf. Rep. No. 1747, 91st Cong., 2d Sess., *reprinted* in 1970 U.S. Code Cong. & Ad. News 5561, 5579-5580.

[127] B. C. Recreational Indus., note 82 *supra*, at 828; Tose, note 105 *supra*, at 897.

[128] See 12 U.S.C. §§ 1972(1)(B), 1972(1)(D) (1977 & Supp. IV 1981); Naegele, "Are All Bank Tie-Ins Illegal?" 154 Bankers Magazine 46, 48-49 (1971).

[129] In Clark v. United Bank of Denver Nat'l Ass'n, 480 F.2d 235 (10th Cir), *cert denied* 414 U.S. 1004 (1973), the Tenth Circuit had an opportunity to address the question of whether requiring an interest free deposit with the bank as a condition of granting a loan violates Section 1972. However, the court sidestepped the issue by affirming the lower court's dismissal of plaintiff's Section 1972 claim on the ground that since no loan agreement was ever actually consummated, there could be no violation of this section. *Id*. at 238.

[130] Conf. Rep. No. 1747, note 126 *supra*, at 5580; see Naegele, note 128 *supra*, at 48-49.

[131] No. 78-4465 (D. El Paso County, Tex., Jan. 13, 1982) (verdict for plaintiff).

[132] Economic duress is recognized in some states as an affirmative tort, in addition to its invocation as an excuse of failure to perform contract obligations. This cause of action is directed at the recovery of damages resulting from the use of economic coercion. See Pecos Constr. Co., Inc. v. Mortgage Inv. Co. of El Paso, 80 N.M> 680, 459 P.2d 842 (1969); Housing Auth. Of City of Dallas v. Hubbel, 325 S.W.2d 880 (Tex. Civ. App. 1959); Fizzel v. Meeker, 339 F. Supp. 624 (D. Mo. 1970); 30 East End, Inc. v. World Steel

Prods. Corp., 110 N.Y.S.2d 754 (S. Ct. 1952); see also Note, "Economic Duress After the Demise of Free Will Theory:  A Proposed Tort Analysis,"  53 Iowa L. Rev. 892 (1968).

[133] Interference with business operations is widely recognized as an affirmative tort in a lender and borrower context.  See Douglas-Hamilton, "Creditor Liabilities Resulting From Improper Interference With the Management of a Financially Troubled Debtor," 31 Bus. Law. 343 (1975); see also *Restatement (Second) of Torts* §§ 755-774A, regarding interference with current or prospective contractual relations.

[134] Note 82 *supra*.

[135] *Id*. at 832.

[136] As mentioned earlier, note 5 *supra*, federally chartered savings and loan associations and federally chartered savings banks, while not covered by the Bank Holding Company Act, are now subject to anti-tying restrictions nearly identical to those of Section 1972.  See Depository Institutions Act § 331, note 5 *supra*, Cong. Rec. at H8106; see also S. Rep. No. 536, 97th Cong., 2d Sess. 17 (1982).

     State-chartered savings and loan and all credit unions are not subject to the anti-tying prohibitions contained in the new Act or in Section 1972.  However, all federally insured savings associations and credit unions are prohibited by regulation from tying the grant of loans to the use of certain other services.  Specifically, 12 C.F.R. § 563.35 (1976) prohibits insured savings and loan associations or their affiliates from conditioning any loan on the borrower's agreement to contract with specific sources for insurance services, building materials or construction services, legal services, real estate agent or broker services, or real estate or property management services.  Nearly identical prohibitions on tying arrangements exist for loans made by federally insured credit unions.  See 12 C.F.R. § 701.21-6(c) (1981).  No explicit private cause of action is provided in these regulations.  However, courts may imply a private cause of action if consistent with the purpose of the legislation.  See Cort. V. Ash. 422 U.S. 66 (1975); Cannon v. University of Chicago, 441 U.S. 677 (1979) (private cause of action implied under sex discrimination provision of Title IX of the Education Amendments of 1972); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 50 U.S.L.W. 4457 (U.S., May 3, 1982) (private cause of action implied for violations of Commodities Exchange Act); DeJesus Chavez v. LTV Aerospace Corp., 412 F. Supp. 4 (N.D. Tex. 1976) (student borrower under Higher Education Act of 1965 has private remedy against lender for violations of Act).  Since the purpose of anti-tying regulations is to protect individuals and firms from economic coercion, an implied private right o4r cause of action for violation of the regulations is clearly consistent with this purpose.

[137] S. Rep No. 1084, note 122, *supra*, at 5519, 5536.

[138] *Id*. at 5559.

[139] *Id*. at 5561.

[140] S. 2490, 97th Cong., 2d Sess., 128 Cong. Rec. S4562-4565 (daily ed. May 5, 1982).

[141] The author believes that Section 1972, at least in certain contexts, applies to tying arrangement imposed by nonbanking subsidiaries of a bank holding company.  See discussion accompanying notes 71 and 72 *supra*.  However, lest there be any question, the Treasury Department sought in S. 2490 to extend Section 1972's prohibitions to tying arrangements imposed by nonbanking subsidiaries of bank holding companies.  As the analysis of this proposed amendment to Section 1972 explained:

     Section 17 would amend 12 U.S.C. § 1972 to extend the prohibitions on the tying arrangements in that section to nonbanking subsidiaries of the bank holding company.  Under current law, only a bank is prohibited from providing services or extending credit subject to the condition that the customer obtain additional services from the bank, it's bank holding company, or any of the holding company's subsidiaries. The bill would extend this prohibition to any subsidiary of a bank holding company.  The bill would thus prohibit any subsidiary of a bank holding company, including all those engaged in new activities authorized under this bill, from engaging in such tying arrangements.

S. 2490, note 140 *supra*, at S4568.  The language of the amendment is less than perfect inasmuch as it ostensibly does not reach ties created by bank holding companies themselves, as opposed to banking or nonbanking subsidiaries of such bank holding companies.